IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MATTHEW BYRNES, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| ST. CATHERINE HOSPITAL, | ) | |
| CENTURA HEALTH CORPORATION, | ) | |
| AND CENTURA HEALTH PHYSICIAN | ) | |
| GROUP, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## **COMPLAINT**

### INTRODUCTION

1. This is a case about cold-blooded unlawful retaliation.

2. Dr. Matthew Byrnes is an exceptional and well-respected surgeon who used to be employed by Defendants.

3. Several nurses employed by Defendants reported to Dr. Byrnes, based on their first-hand knowledge, that another surgeon had (i) engaged in acts of sexual harassment directed toward nurses and (ii) engaged in acts of substandard clinical care that had a reasonable probability of causing injury to patients.

4. The nurses brought these concerns to Dr. Byrnes because they feared they would be retaliated against if they complained directly to Defendants' administrators.

5. Dr. Byrnes believed the nurses' concerns were credible, and, acting in good faith, he filed a formal written complaint with the President of the Hospital Medical Staff reporting the allegations of sexual harassment and substandard clinical care.

6. Defendants were dismissive of Dr. Byrnes' complaint. They failed to properly investigate or take appropriate responsive action. And they essentially accused Dr. Byrnes of being crazy for making the complaint and thus demanded that he undergo a psychological assessment (a demand they later withdrew).

7. A few months later, Defendants fired Dr. Byrnes in retaliation for filing the complaint.

8. At the time, Defendants did not even try to hide their retaliation. They provided no reason whatsoever for firing him, and even admitted they did not have good cause to do so.

9. Dr. Byrnes thus lost his job, and the Garden City community lost a highly skilled surgeon.

10. Dr. Byrnes has suffered and will continue to suffer significant economic and other damages.

11. Defendants' retaliation against Dr. Byrnes is a clear and obvious violation of Title VII of the Civil Rights Act of 1964, which provides that it is unlawful to retaliate against an employee for engaging in protected activity, such as reporting sexual harassment to a supervisor, participating in an EEO process, intervening to protect others from sexual harassment, or taking other action opposing sexual harassment.

12. Defendants' retaliation against Dr. Byrnes is also a clear and obvious violation of K.S.A. § 65-4928, which provides that no employer shall discharge or otherwise discriminate against an employee for making any report to the chief of medical staff that a health care provider has committed a reportable incident.

13. Defendants also violated the Americans with Disabilities Act by wrongfully believing Dr. Byrnes needed a psychological assessment because he filed a complaint about sexual harassment and substandard clinical care.

**JURISDICTION AND VENUE**

14. This Court has original jurisdiction over federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 1343, 42 U.S.C. § 2000e-5(f)(3), and 42 U.S.C. § 12117(a), and supplemental jurisdiction over Kansas state claims pursuant to 28 U.S.C. § 1367(a).

15. Venue and personal jurisdiction are proper because Plaintiff was employed by Defendants in Kansas, and the unlawful employment practices alleged herein were committed in Kansas. *See* 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

**PARTIES**

16. Plaintiff Matthew Byrnes, M.D. ("Dr. Byrnes") is a resident of Kansas.

17. Dr. Byrnes is a medical doctor licensed to practice medicine in Kansas.

18. Defendant St. Catherine Hospital ("the Hospital") is a Kansas not-for-profit corporation with its principal place of business in Garden City, Kansas.

19. The Hospital's registered agent in Kansas is Registered Agent Solutions, Inc., 2101 SW 21st St., Topeka, KS 66604.

20. Defendant Centura Health Corporation ("Centura") is a Colorado not-for-profit corporation with its corporate office in Centennial, Colorado.

21. Centura's registered agent in Kansas is Registered Agent Solutions, Inc., 2101 SW 21st St., Topeka, Kansas 66604.

22. Centura promotes itself as "the region's largest health care network."

23. The Hospital is a member of the Centura health care network.

24. Centura refers to the Hospital as one of "our locations."

25. Centura controls and manages the Hospital's day-to-day operations, including personnel matters.

26. Defendant Centura Health Physician Group ("CHPG") is a subsidiary or affiliate of Centura.

27. CHPG is a network of over 900 medical providers in more than 250 locations across Colorado and Western Kansas.

28. At all relevant times, Defendants have continuously been doing business in Kansas.

29. Defendants have continuously had at least 15 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

30. At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce within the meaning of 42 U.S.C. §§ 2000e(b), (g) and (h).

31. Defendants are covered entities under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.

32. Defendants are joint employers, an integrated enterprise, and/or otherwise jointly and severally liable to Dr. Byrnes for their unlawful conduct.

33. Defendants collectively made decisions and took actions with respect to Dr. Byrnes' employment, including his unlawful retaliatory discharge.

## FACTS

### Dr. Byrnes and his employment with Defendants

34. Defendants employed Dr. Byrnes as a physician at the Hospital from 2012 to February 12, 2020.

35. Dr. Byrnes graduated from the University of Kansas School of Medicine in 2001 and is board-certified in critical and general surgery.

36. Dr. Byrnes is a fellow of the American College of Surgeons and the American College of Critical Care Medicine.

37. Dr. Byrnes was the youngest chair of the Surgical Section of the Society of Critical Care Medicine.

38. While employed by Defendants, Dr. Byrnes specialized in general surgery and critical care.

39. Dr. Byrnes served as the Hospital's Chief Medical Officer from 2013 to June 2019.

40. During Dr. Byrnes' tenure as CMO, the Hospital's ratings improved significantly; he led the Hospital through three different stroke certifications and its first national accreditation as a breast cancer center; and the Hospital became an award-winning and nationally accredited stroke center.

***Dr. Byrnes files a complaint about sexual harassment and substandard patient care.***

41. In 2019, several members of the nursing staff at the Hospital told Dr. Byrnes that another physician at the Hospital, Kurt Kessler, MD, had sexually harassed nurses (including an incident of inappropriate touching) and provided substandard care to patients.

42. The nurses brought their concerns to Dr. Byrnes because they feared Defendants would retaliate against them if they reported their concerns directly.

43. On August 31, 2019, Dr. Byrnes filed a formal written complaint against Dr. Kessler with William Freund, MD, President of the Hospital Medical Staff.

44. The Complaint, which was based on information provided to Dr. Byrnes by staff with firsthand knowledge, reported that Dr. Kessler had: (i) engaged in acts of sexual harassment directed to nurses at the Hospital, and (ii) engaged in acts that departed from the applicable standard of clinical care that had a reasonable probability of causing injury to patients.

5

45. With regard to clinical care, the Complaint reported, among other things, that: Dr. Kessler's "conversion rate" when performing laparoscopic gallbladder removal surgery (conversion from a laparoscopic procedure to an open surgical procedure) seemed massively high; the nursing staff had created a binder of events documenting Dr. Kessler's poor clinical care; and Dr. Kessler rarely wore gloves when conducting sensitive exams, including touching abscesses and doing buttock and perianal exams with his bare hands.

46. With regard to sexual harassment, the Complaint reported that Dr. Kessler "has made sexually explicit comments to numerous nurses. This has made many of them highly uncomfortable…. Nurses in both units [OR and ICU] have registered complaints to me about this. … Dr. Kessler has inappropriately touched nurses. Just two weeks ago, he touched [a nurse] just inches form her breasts without her consent. She felt extremely uncomfortable with this harassment. Just yesterday, Dr. Kessler voiced out loud in the operating room area that he rarely spends time at home because he is either at the hospital or the strip club. This was heard by multiple PACU nurses."

***Defendants fail to timely and appropriately respond to Dr. Byrnes's complaint.***

47. On October 16, 2019, Dr. Byrnes was called into a meeting with Dr. Freund; Bryan Stucky, MD, Vice-President of Medical Staff; and Toni Green-Cheetwood, Physician Administrator of CHPG. They told Dr. Byrnes his complaint was being dismissed in its entirety.

48. After October 16, 2019, several nurses asked to talk to Green-Cheetwood about Dr. Kessler's sexual harassment. Green-Cheetwood told Dr. Byrnes that Defendants were not going to investigate or interview the nurses who complained about Dr. Kessler's sexual harassment because they had not reported the harassment via the Integrity Hotline.

49. Upon information and belief, Defendants did not conduct a timely or thorough investigation into the sexual harassment allegations against Dr. Kessler that Dr. Byrnes reported on August 31, 2019.

50. Upon information and belief, Defendants did not conduct a timely or thorough investigation into the substandard clinical care allegations against Dr. Kessler that Dr. Byrnes reported on August 31, 2019.

51. On January 2, 2020, Dr. Byrnes received, via hand-delivery, a letter from Dr. Freund on CHPG letterhead, dated December 29, 2019, responding to the complaint Dr. Byrnes had filed in August. Dr. Fruend's letter states: "The Medical-Executive Committee of St. Catherine Hospital met on Tuesday November 19, 2019 and reviewed your August 31, 2019, letter. … The members of the Med-Exec committee expressed concern about your allegations and your insistence that you believe these allegations to be true. Thorough investigation provided many of your statements to be false. It was felt that this and other issues could affect medical judgment and hence patient care…. It was unanimously agreed that it was in the best interest of the hospital and the medical staff to ask you to seek an evaluation including a psychological assessment."

52. On January 19, 2020, Dr. Byrnes provided a written response to Dr. Freund's letter. Dr. Byrnes's stated that he filed the whistleblower complaint about Dr. Kessler because he believed it was his ethical obligation to report behavioral and clinical behaviors that do not meet the standards expected from physicians. Dr. Byrnes also further explained the bases for the original complaints he had made; pointed out that staff members were afraid to report or go on record about Dr. Kessler's sexual harassment because they feared retaliation; and stated his belief that he was being retaliated against because of his whistleblower complaint.

53. On January 21, 2020, Dr. Bryan Stucky, the new President of the Hospital Medical Staff, writing on Centura letterhead, sent a letter to Dr. Byrnes stating that the Medical-Executive Committee was "retracting" Dr. Freund's letter dated December 29, 2019, and that they were no longer requiring Dr. Byrnes to obtain a psychological assessment.

*Defendants fire Dr. Byrnes in retaliation for his protected complaint.*

54. On January 22, 2020, Dr. Byrnes was informed that an anonymous complaint had been filed against him with the Kansas Board of Healing Arts ("Board.")

55. The allegations in the anonymous complaint filed with the Board were false.

56. Dr. Byrnes had an exemplary medical care record that was superior to other physicians with privileges at the Hospital.

57. On February 12, 2020, fired Dr. Byrnes in retaliation for the protected whistleblower complaint he filed regarding the alleged sexual harassment of nurses and substandard clinical care.

58. On that day, Defendants sent a letter to Dr. Byrnes on CHPG letterhead, signed by its President, stating they were terminating his employment effective that day.

59. Defendants did not give any legitimate, non-retaliatory reason for firing Dr. Byrnes. To the contrary, they expressly admitted they did not have cause to fire him.

60. Prior to firing him, Defendants did not express any concerns to Dr. Byrnes about his job performance.

61. At the time they fired him, the Hospital and its Medical Staff leaders expressly acknowledged and agreed that Dr. Byrnes was a member in good standing of the Medical Staff, there were no restrictions on his privileges, and there were no pending Medical Staff investigations against him.

62. Defendants failed to follow their policies and procedures with respect to their discharge of Dr. Byrnes.

*Dr. Byrnes files EEOC Charges, and the Hospital files a report against him with the Board.*

63. On May 1, 2020, Dr. Byrnes filed EEOC Charges against Defendants, alleging that Defendants had retaliated against him for engaging in protected activity, in violation of Title VII, and discriminated against him based on a perceived disability, in violation of the ADA.

64. On or about October 8, 2020, the Hospital filed a report against Dr. Byrnes with the Kansas Board of Healing Arts.

65. The report was based on a procedure Dr. Byrnes performed over five years earlier.

66. The patient care Dr. Byrnes provided during this procedure was exemplary, and the Hospital had never before suggested anything to the contrary.

67. The report was made in bad faith and contains false and misleading information.

68. The Hospital did not follow its policies and procedures with respect to this matter.

69. On January 13, 2021, Dr. Byrnes received a Notice of Right to Sue from the EEOC and exhausted his administrative remedies with respect to his Title VII and ADA claims.

## CLAIMS

70. Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

71. Defendants' misconduct gives rise to numerous legal claims, which are asserted both cumulatively and in the alternative.

72. Dr. Byrnes opposed unlawful employment practices and engaged in activity protected by Title VII by filing a complaint about sexual harassment.

73. Defendants subjected Dr. Byrnes to adverse employment actions because he engaged activity protected by Title VII and treated him differently than similarly situated employees who had not engaged in activity protected by Title VII.

74. Defendants wrongly perceived Dr. Byrnes to have a physical or mental disability.

75. Though Dr. Byrnes does not have a disability, he is protected by the ADA against discrimination on the basis of a perceived disability.

76. Defendants subjected Dr. Byrnes to adverse employment actions because of his perceived disability and treated him differently than similarly situated employees who were not perceived to have a disability, in violation of the ADA.

77. Dr. Byrnes filed a protected whistleblower report alleging substandard patient care at the Hospital.

78. Defendants subjected Dr. Byrnes to adverse employment actions for filing his protected whistleblowing report and treated him differently than similarly situated employees who had not filed such reports, in violation of K.S.A. 65-4928.

79. Defendants are employers, and Dr. Byrnes is an employee, within the meaning of Title VII, the ADA, and K.S.A. 65-4928.

80. Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages under the cited federal and state laws.

## DAMAGES AND RELIEF

81. Dr. Byrnes has suffered and continues to suffer damages as a result of Defendants' misconduct.

82. Dr. Byrnes is entitled to the following damages and relief, which are asserted both cumulatively and in the alternative:

- back pay, front pay, and all other economic loss resulting from Defendants' unlawful actions;
- compensatory damages;
- punitive damages;
- civil penalties;
- interest;
- costs, expenses, and attorneys' fees; and
- any and all other damages and relief allowed by law or deemed to be just and proper.

83. Dr. Byrnes reserves the right to amend his complaint, including the addition of new claims and theories as more facts become known through investigation and discovery.

## JURY TRIAL DEMAND

84. Dr. Byrnes requests a jury trial on all claims.

## DESIGNATION OF PLACE OF TRIAL

85. Dr. Byrnes designates Kansas City, Kansas, as the place of trial.

Respectfully submitted,

By:   */s/ Boyd A. Byers*
     Boyd A. Byers, #16253
     Foulston Siefkin LLP
     1551 N. Waterfront Pkwy. Ste. 100
     Wichita, Kansas 67206-4466
     316.267.9716
     bbyers@foulston.com

     Sarah E. Stula, #27156
     Foulston Siefkin LLP
     32 Corporate Woods, Suite 600
     9225 Indian Creek Parkway
     Overland Park, KS 66210-2000
     913-253-2149
     sstula@foulston.com

     *Attorneys for Plaintiff*