IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MATTHEW BYRNES,

     Plaintiff,

v.

                                   Case No. 21-2086-DDC-ADM

ST. CATHERINE HOSPITAL, *et al.*,

     Defendants.

_____

### MEMORANDUM AND ORDER

Plaintiff Matthew Byrnes ("Byrnes") was formerly a surgeon and Chief Medical Officer ("CMO") at defendant St. Catherine Hospital in Garden City, Kansas ("the Hospital"). The Hospital is operated by defendants Centura Health Corporation and Centura Health Physician Group (collectively, "Defendants"). In 2019, Byrnes reported to the Hospital that another surgeon was sexually harassing nurses and providing substandard patient care. Less than six months later, Defendants fired him. Defendants say they fired him for providing substandard patient care and shutting down normal peer-review processes that would have identified deficiencies in his medical care. But Byrnes says these reasons are false and a pretext to cover up Defendants' unlawful actions. He claims Defendants never properly investigated his complaint, but instead violated Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans With Disabilities Act ("ADA"), and other Kansas state laws by discriminating and retaliating against him for making the complaint.

This matter now comes before the court on Byrnes's Motion to Compel. (ECF 54.) This motion is directed to more than a thousand documents Defendants have withheld based on peer-review, risk-management, and attorney-client privilege objections. Byrnes asks the court to overrule these objections and order Defendants to produce the documents, as well as to respond to

Byrnes's interrogatories to the extent Defendants have withheld information based on their privilege objections.  For the reasons explained below, the court finds Defendants have improperly withheld documents based on the Kansas statutory peer-review and risk-management privileges.  As for Defendants' attorney-client-privilege objections, the court finds Defendants have properly withheld some material, but have applied the privilege too broadly and must produce much of the material they withheld on that basis.  Accordingly, Byrnes's motion is granted in part and denied in part as more specifically set forth below.

## I.   <u>BACKGROUND</u>

As explained above, Byrnes was formerly a surgeon and CMO at the Hospital.  In the fall of 2018, as Defendants began the process of renewing his employment contract, they became concerned about potential compliance issues associated with his compensation.  Negotiations over a new employment contract at a lower salary ensued.  Ultimately, the Hospital removed Byrnes from his role as CMO effective June 30, 2019, and the parties came to terms on a new employment agreement that would take effect on September 1, 2019.  Meanwhile, issues remained unresolved about whether the Hospital was going to claw back a portion of Byrnes's historically high compensation.

### A.   <u>Byrnes's Complaint and the Hospital's Response</u>

On August 31, 2019, the day before Byrnes's new employment contract was scheduled to take effect, he submitted a written complaint to Dr. William Freund.  At the time, Freund was President of the Hospital's Medical Staff, which consists of all providers at the Hospital, regardless of whether those providers are Hospital employees.  The complaint was about another surgeon, Kurt Kessler, who had privileges to provide services at the Hospital but was not employed there.  Byrnes's complaint alleged that Kessler had provided substandard clinical care and sexually

harassed nurses by making sexually explicit comments to them and by inappropriately touching one of them "just inches from her breasts without her consent."  (ECF 55, at 3; ECF 74, at 3.)  According to Byrnes, the sexual-harassment complaint was based on a series of complaints the nurses brought to him "because they feared Defendants would retaliate against them if they reported directly."  (ECF 55, at 3-4.)

The parties dispute how the Hospital handled Byrnes's complaint.  Defendants contend that Freund, other members of the Hospital's Medical Executive Committee ("MEC"),[1] and Hospital personnel "promptly investigated Plaintiff's complaints and found them to be without merit."  (ECF 74, at 3.)  Byrnes, on the other hand, contends that Defendants failed to properly investigate the complaint, breached confidentiality protocols, and failed to follow their own policies in handling the complaint.  (ECF 55, at 3.)  Byrnes further points out that the nurses logged their complaints about Kessler in a binder or folder, Freund took possession of these documents in September of 2019, and Defendants now say they cannot locate them.  (*Id.*)

On October 16, 2019, Freund, Dr. Toni Green-Cheatwood, and Dr. Bryan Stucky[2] met with Byrnes to explain the outcome of the investigation into his complaints.  They told Byrnes that his complaint had no merit and was being dismissed in its entirety.  They also told him they would not do anything about the sexual harassment allegations because the nurses had not filed formal complaints via the corporate hotline.  (ECF 55, at 3; ECF 74, at 4.)

---

[1] Defendants point out that the MEC is an independent body that makes determinations about Medical Staff privileges at the Hospital, but that it has no authority to make employment decisions concerning providers employed by the Hospital.

[2] At the time, Green-Cheatwood was the Physician Executive and Group Vice President, Greater Colorado and Kansas, for Centura Health Physician's Group.  Stucky was Vice President of the Hospital's Medical Staff.  Stucky would later replace Freund as President of the Hospital's Medical Staff effective January 1, 2020.

Behind the scenes, Defendants asserted concerns that Byrnes's allegations were "so incredibly unmeritorious" that he was displaying "irrational thought process[es]." (ECF 74, at 3-4.) Freund sought guidance from Green-Cheatwood about the MEC's authority to ask Byrnes to submit to a mental evaluation. In addition, the MEC consulted with the Hospital's General Counsel, Peter Sabey, about Byrnes's competency to continue treating patients at the Hospital. On January 2, 2020, Freund delivered a letter to Byrnes dated December 29, 2019, saying the MEC was so concerned about Byrnes's allegations that it was "unanimously agreed" to ask Byrnes to submit to an evaluation, including a psychological assessment. (ECF 55, at 3-4; ECF 74, at 4.)

Meanwhile, Defendants began looking into the state of peer review at the Hospital. On January 2, 2020, Morgan Thomas, Centura's Group Director of Quality for Greater Colorado and Kansas, emailed Steve Brown, Manager of Medical Staff Services, to request an SBAR (Situation-Background-Assessment-Recommendation) about the state of peer review at the Hospital— "**asap**." (ECF 74-5 (emphasis in original).) Brown responded that there had been no peer-review committee at the Hospital for at least one and a half years. (ECF 74, at 4-5; ECF 74-5.)

On January 19, Byrnes provided a written response to the MEC's request that he undergo a psychological assessment. He explained that he believed he had an ethical obligation to report Kessler. (ECF 55, at 4.) He also complained about the request to Stucky, who by that time had replaced Freund as President of the Medical Staff. On January 21, Defendants retracted their request that Byrnes submit to a psychological evaluation. (ECF 74, at 4; ECF 65-1, at 27.) That same day, the MEC reappointed Byrnes to the Medical Staff and granted him continued clinical privileges at the Hospital. (ECF 55, at 6.)

The next day, on January 22, Byrnes learned that someone had filed an anonymous complaint against him with the Kansas Board of Healing Arts ("KBHA"). (ECF 55, at 4.) The

KBHA complaint alleged that Byrnes (1) pressured the Hospital's CEO to disband the peer-review committee; (2) engaged in substandard patient care; and (3) made false accusations against a fellow physician.   (The suspicion/implication has been that Kessler is the one that lodged this "anonymous" complaint against Byrnes, likely in retaliation for Byrnes making a complaint to the Hospital's Medical Staff about Kessler.)  On January 27, the Hospital received a subpoena from the KBHA seeking various information about Byrnes going back to 2015.  (ECF 74, at 5; ECF 74-6.)   Shortly thereafter, Byrnes's counsel notified Sabey that the KBHA had initiated an investigation against Byrnes based on an anonymous complaint.  (ECF 74, at 5; ECF 74-7.)

Defendants assert the anonymous complaint "raised numerous concerns" that Byrnes "had numerous adverse patient outcomes that were not properly reported because [Byrnes] pressured [then-Hospital CEO Scott] Taylor to disband peer review at the [H]ospital."   (ECF 74, at 5.) According to Defendants, in response to the KBHA subpoena and the anonymous complaint, they "launched an internal investigation led by Mr. Sabey, Dr. Green-Cheatwood, and Ms. Thomas"; and Green-Cheatwood and Thomas began preparing a plan to address the historic absence of peer review at the Hospital.  (ECF 74, at 5; ECF 74-8; ECF 74-9.)  On February 10, they reported the findings of their investigation to Centura executives.  (ECF 74, at 5.)

Two days later, on February 12, Defendants fired Byrnes.  They had not interviewed Byrnes as part of their investigation, talked to him about workplace concerns, or warned him that his employment was in jeopardy.  (ECF 55, at 4.)  And, at the time, Defendants did not provide a reason why they fired him.  They simply gave him a letter signed by a Centura executive (who had never met with or spoken to Byrnes) terminating Byrnes under the "without cause" provision of his contract, effective immediately.  (ECF 74, at 5; ECF 74-8; ECF 74-9.)  Byrnes alleges that Defendants "did not conduct a reasonable investigation (or likely any investigation at all) regarding

Dr. Byrnes before firing him."  (ECF 33 ¶ 88.)  Defendants contend that Sabey and Green-Cheatwood spoke with several individuals about Byrnes on February 7.  But Byrnes points out that Defendants have not produced the "supposed investigation file" that contains Sabey and Green-Cheatwood's notes.  (ECF 55, at 4-5.)  According to Defendants, they gave this file to their outside counsel, Melvin Sabey (Peter Sabey's father), who cannot find it.  (ECF 55-7 (Ex. 6), at 21.)  On February 14, Byrnes voluntarily resigned his medical privileges at the Hospital.  (ECF 74, at 6.)

From approximately February 2020 through January 2021, Defendants conducted a comprehensive review of thousands of medical files for every provider at the Hospital going back two years, and going back five years for Byrnes because of the KBHA's five-year subpoena.  Every case that met certain review triggers was sent to review teams at other Centura hospitals.  The process resulted in the Hospital filing Reports of Adverse Findings ("RAFs") with the KBHA.  These RAFs related to three of Byrnes's cases, which Defendants produced in this case.  But the RAFs also related to other providers' cases, and Defendants have withheld those based on the peer-review and risk-management privileges set forth at KAN. STAT. ANN. §§ 65-4915 and 65-4925, respectively.  (ECF 74, at 6.)

B.    **EEOC Proceedings & This Litigation**

After Defendants fired Byrnes, Byrnes filed charges with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendants retaliated against him for engaging in protected activity (reporting Kessler's sexual harassment of nurses), discriminated against him by taking adverse actions against him based on their erroneous perception that he had an ADA disability, and engaged in ongoing retaliation against him.  (ECF 65-1, 65-2, 65-3.)  On September 29, 2020, Defendants filed a position statement with the EEOC stating they fired Byrnes for the following reasons:

>Dr. Byrnes had numerous cases in which he provided care well below the standard of care . . . . Dr. Byrnes is currently under investigation by the State of Kansas for providing substandard care and harming patients. In his role as CMO, he inappropriately shut down the normal and required processes of professional peer review within the Hospital that would have identified the deficiencies in his medical care and should have resulted in his loss of clinical privileges at the Hospital. In doing so, he immunized himself from the oversight that should have existed and should have stopped his dangerous treatment of patients.
>
>When the facts regarding his patient care and his halting of the peer review processes fully came to light, his employment was terminated. . . .
>
>As a result of the foregoing, this case is all about professional peer review. It turns on the inappropriateness of Dr. Byrnes' patient care and his self-protecting shut down of the peer review processes that would have uncovered that care and responded to protect patients. . . .

(ECF 55-24.)

Byrnes contends that the Hospital's stated reasons for firing him as set forth in the EEOC position statement are false and pretextual. He points out that, at the time Defendants fired him, they expressly told him they did not have any cause for termination, he was still a member in good standing of the Hospital's Medical Staff, and there were no restrictions on his privileges or pending Medical Staff investigations against him. (ECF 31 ¶¶ 83-84.) He also says he had no role in and never did anything to "halt" or "shut down" the Hospital's peer-review process, and Defendants never expressed any such concerns to him or asked him about this at any time. Byrnes also points out that Defendants' own policies give the MEC primary oversight authority for performance improvement regarding professional services provided by Medical Staff members with clinical privileges. Furthermore, the MEC has the authority to create and dissolve committees, and Byrnes believes some of the documents being withheld will show the MEC dissolved the Hospital's peer-review committee at a time when Byrnes was not even a voting member of the MEC or otherwise involved in dissolution of the peer-review committee. (ECF 55, at 6-7.)

On or about October 8, 2020, the Hospital filed a report against Byrnes with the KBHA based on a procedure he performed more than five years earlier.  The Hospital later filed a report with the KBHA based on medical care he provided more than three years earlier.  Byrnes claims all of the Hospital's reports to the KBHA contain false and misleading information, and he alleges the Hospital made these reports in bad faith and in retaliation for Byrnes filing charges with the EEOC.  (ECF 31 ¶¶ 68-73, 77-81.)  Byrnes points out that the KBHA later issued its determination regarding the complaints filed against him—both the initial "anonymous" complaint as well as the Hospital's subsequent KBHA complaint.  Those KBHA letters, dated September 22, 2021 (after this lawsuit was filed) and May 25, 2022 (after Byrnes filed the current motion), state the KBHA Disciplinary Panel completed its investigations and closed the cases without taking any action. (ECF 55-19, 77-2.)

On February 12, 2021, Byrnes filed this lawsuit.  (ECF 1.)  His complaint alleges Defendants violated Title VII, the ADA, and Kansas whistleblower laws in numerous respects, including: (1) terminating his employment in retaliation for reporting another doctor's sexual harassment of nurses; (2) taking adverse employment actions against him based on their erroneous perception that he had an ADA disability; and (3) retaliating against him for reporting another doctor's substandard patient care.  (ECF 1; *see also* ECF 16 & 31 (amending complaint to allege ongoing retaliation and to assert various state-law claims).)  Defendants' answer denies the material allegations and asserts an affirmative defense alleging Defendants terminated Byrnes for legitimate, non-discriminatory, non-retaliatory reasons and that he cannot establish pretext.  (ECF 33 ¶ 12, at 25.)  Defendants also assert an after-acquired evidence defense (*id.* ¶ 15, at 25), presumably based on what Defendants learned during their comprehensive review process after they fired Byrnes.

C.      **Procedural History Leading Up to the Current Motion**

Soon after Byrnes filed this case, the parties wanted to try to mediate.  They initially

planned to mediate by June 30, 2021.  (ECF 15.)  But they soon realized that any mediation efforts

would be stymied by Defendants' anticipated withholding of documents based on various privilege

claims, which Byrnes was going to largely dispute.  By June of 2021, Byrnes served his initial

discovery requests, and the court set a plan in place to tee up the anticipated privilege disputes

within a few months.  (ECF 21, 25.)  But this process proved to be lengthy and voluminous, with

the court extending briefing deadlines for several months while Defendants produced documents

and prepared privilege logs, and the parties met and conferred to see if they could narrow and

refine their privilege disputes.  (ECF 27, 35-37, 39-41, 47-49.)

On April 8, 2022, Byrnes filed the current motion to compel.  (ECF 54.)  At the time,

Defendants had produced 2,104 documents, of which 596 contained redactions, and five privilege

logs containing more than 2,000 privilege entries, most of which were disputed.  Defendants

initially responded to Byrnes's motion to compel by arguing primarily that the court should deny

the motion for failing to adequately meet and confer.  (ECF 66.)  But the court struck Defendants'

response brief because the court had already given the parties many months to work through

document-production issues and to meet and confer.  (ECF 67.)  The court directed Defendants to

finalize any further meet-and-confer efforts and file a revised brief responding to the substantive

arguments raised in Byrnes's motion and clarifying the extent to which the parties may have further

narrowed their areas of disagreement.  (ECF 67-71.)

After the court struck Defendants' original response brief, they produced or re-produced

more than 1,000 documents they had previously withheld either in their entirety or with redactions;

withdrew all Patient Safety Quality Improvement Act ("PSQIA") and work-product objections;

withdrew certain (but not all) privilege objections for other documents; and partially removed some redactions in documents that previously were more heavily redacted.  (ECF 73, 74, 77.)  In addition, Defendants provided more detailed descriptions in a revised privilege log, in response to which Byrnes withdrew challenges to 167 of the privilege-log entries.  (ECF 77, at 2 n.1.)  By the time briefing was complete, Byrnes's remaining challenges were to 1,260 log entries asserting Kansas statutory privileges (peer-review and risk-management privileges) and/or attorney-client privilege.  (ECF 74, at 1-2.)  Against this backdrop, the court now turns to the parties' arguments.

## II.  KANSAS PEER-REVIEW AND RISK-MANAGEMENT PRIVILEGES

Byrnes moves to compel Defendants to produce documents they continue to withhold based on the Kansas peer-review privilege, KAN. STAT. ANN. § 65-4915, and the risk-management privilege, KAN. STAT. ANN. § 65-4925 (the "statutory privileges").  Byrnes originally sought to compel Defendants to produce 1,059 documents they had withheld and/or redacted based on these statutory privileges, primarily on the grounds that these privileges do not apply to Byrnes's federal employment-discrimination claims.  By the time Defendants filed their revised brief in response to Byrnes's motion, they backpedaled on their position that these statutory privileges protect documents related to Byrnes's federal employment-discrimination claims.  Defendants withdrew many of their objections and are now down to 806 documents that they continue to withhold or redact based on the statutory privileges.  According to Defendants, they produced everything that Defendants agree is relevant to Byrnes's federal employment-discrimination claims.  Defendants contend the remaining 806 documents are "privileged but not relevant" because they do not "relate to Plaintiff or Plaintiff's federal claims in any way."  (ECF 74, at 7.)  Byrnes disputes this.

### A.    The Statutory Privileges Do Not Apply to Byrnes's Federal Claims

Byrnes's opening brief argues Defendants cannot assert the statutory privileges because federal courts do not recognize state peer-review and risk-management privileges as grounds to

withhold documents relevant to federal employment-law claims, such as Byrnes's claims under Title VII and the ADA.  Byrnes contends that "[t]he only way these privileges could apply here is if Defendants can establish by a 'clear showing' that the evidence sought 'relat[es] only to Plaintiff's pendant state law cause of action' and that Defendants 'adequately asserted' the objection."  (ECF 55, at 9 (citation omitted).)  By the time Defendants filed their revised brief in response to the motion, they conceded that "state law privileges cannot apply to otherwise privileged documents or information relevant to Plaintiff's federal law claims."  (ECF 74, at 7.)  Based on this, it appears the parties now largely agree on the applicable legal standard.  However, because semantic differences arguably exist, the court will clarify the legal standard it is applying.

In federal court, the determination of what is privileged begins with Federal Rule of Evidence 501.  Under that rule, federal law generally governs privilege on claims brought pursuant to federal law and "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  FED. R. EVID. 501 & Advisory Committee Notes; *see also Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1369 (10th Cir. 1997).  But that rule "is unhelpful in many instances where the privilege asserted goes to evidence that is relevant to both a federal and a state law claim." *Tolbert v. Gallup Indian Med. Ctr.*, 555 F. Supp. 3d 1207, 1236 (D.N.M. 2021).  Particularly at the discovery phase, "any attempt to bifurcate privileges along the border between federal and state claims is hollow if the allegedly privileged evidence impacts both set of claims." *Id.* at 1237.  Accordingly, the court will follow the majority approach and apply federal law on privilege as to evidence that is relevant to federal claims, even if that same evidence may also be relevant to pendent state claims, for essentially the reasons persuasively explained in *Tolbert*, 555 F. Supp. 3d at 1235-38. *See also D.M. ex rel. Morgan v. Wesley Med. Ctr., LLC*, No. 18-2158-KHV-KGG, 2019 WL 329569, at *3

(D. Kan. Jan. 25, 2019) ("Simply stated, the state law privilege does not apply to evidence relevant to the federal claims, even if it is also relevant to the pendant claims arising under state law.").

Federal law does not recognize an evidentiary privilege unless it "promotes sufficiently important interests to outweigh the need for probative evidence." *Univ. of Penn. v. E.E.O.C.*, 493 U.S. 182, 189 (1990).  Applying this standard, the Supreme Court has declined to recognize a federal privilege over academic peer-review materials in an employment discrimination case.  *Id.* Likewise, federal courts have declined to recognize a federal common law medical peer-review or risk-management privilege in civil rights or discrimination actions.  *See, e.g.*, *Adkins v. Christie*, 488 F.3d 1324 (11th Cir. 2007) (finding no medical peer-review privilege in a federal discrimination case); *Agster v. Maricopa Cnty.*, 422 F.3d 836 (9th Cir. 2005) (rejecting a medical peer-review privilege and ordering production of a morbidity review conducted by a prison facility); *Virmani v. Novant Health Inc.*, 259 F.3d 284, 293 (4th Cir. 2001) (declining to recognize hospital's claimed peer-review privilege in race-discrimination case).  Indeed, "[n]either the Supreme Court nor the Tenth Circuit has recognized a medical peer review or medical risk management privilege under federal common law."  *Sonnino v. Univ. of Kan. Hosp. Auth.*, 220 F.R.D. 633, 644 (D. Kan. 2004).

In view of this, the court does not fully agree with Byrnes's characterization that the statutory privileges would apply in this case only if "Defendants can establish by a 'clear showing' that the evidence sought 'relat[es] only to Plaintiff's pendant state law cause of action' and that Defendants 'adequately asserted' the objection."  (ECF 55, at 9.)  In support of this assertion, Byrnes cites *Sellers v. Wesley Med. Ctr., LLC*, No. 11-1340-JAR-KGG, 2012 WL 5362977 (D. Kan. Oct. 31, 2012).  In that case, the court said it would attempt to determine whether particular evidence related only to the plaintiff's federal claim (which would not be subject to the Kansas

peer-review privilege); or related only to the plaintiff's pendent state-law claim (which would be subject to the peer-review privilege "to the extent it was adequately asserted by Defendant"); or, to the extent the evidence relates to both the federal and state-law causes of action, "the privilege will not apply to the extent it was adequately opposed by Plaintiff." *Id.* at *3.

Here, the court need not try to distinguish between whether particular evidence might apply to federal versus state-law claims or examine whether the parties have "adequately asserted" or "adequately opposed" whether the statutory privileges apply. "Obviously, the court and litigants are not always able to parse out what discovery or evidence supports a federal claim as opposed to a state claim." *Hermann v. Rain Link, Inc.*, No. 11-1123-RDR, 2012 WL 1207232, at *8 (D. Kan. Apr. 11, 2012). In this case, no party has taken the position that any document at issue is relevant *only* to Byrnes's state-law claims. Although Defendants argue the material they have withheld based on the statutory privileges is not relevant to Byrnes's federal claims, they never contend that is because the documents are relevant *only* to his state-law claims. Rather, Defendants contend the material is not relevant at all—*i.e.*, to any claim—and the parties only discuss this material in terms of its relevance to Byrnes's federal discrimination claims. *Cf. D.M. ex rel. Morgan*, 2019 WL 329569, at *3 (overruling objections based on peer-review and risk-management privileges where defendants did not attempt to distinguish between evidence that related only to state-law claim or only to federal claim).

Thus, because no party asserts that any document (or group of documents) is uniquely relevant only to Byrnes's state-law claims, the court resolves the parties' dispute concerning Defendants' statutory privilege claims based on a straightforward relevancy determination under the Federal Rules of Civil Procedure.

**B.**     **Byrnes Has Met His Initial Burden to Show the Statutory Privilege Material Is Relevant**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to a party's claim or defense and proportional to the needs of the case."  FED. R. CIV. P. 26(b)(1). Relevance is "construed broadly to encompass any matter that bears on, or that could reasonably lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also In re Syngenta AG MIR 162 Corn Litig.*, MDL No. 2591, No. 15-9900-JWL, 2019 WL 5622318, at *2 & n.7 (D. Kan. Oct. 31, 2019) (recognizing the *Oppenheimer* relevance standard still exists after the 2015 amendments to Rule 26(b)(1)).  "[D]iscovery should be considered relevant if there is any possibility the information sought may be relevant to the subject matter of the action."  *Waters v. Union Pacific R.R. Co.*, No. 15-1287, 2016 WL 3405173, at *1 (D. Kan. June 21, 2016) (internal quotations and citation omitted).  The party seeking discovery has the initial burden to establish the documents sought are relevant under Rule 26(b)(1).  *See Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 243598, at *3 (D. Kan. Jan. 16, 2020).

Byrnes has met his initial burden to show the material Defendants are withholding based on the statutory privileges is relevant.  The only "legitimate, non-discriminatory, non-retaliatory reasons" Defendants have provided for firing Byrnes is in their EEOC position statement: (1) his substandard patient care, and (2) his shutdown of the "normal and required processes of professional peer review within the Hospital."  (ECF 33 ¶¶ 7-8, 13, at 2-4; ECF 55-24.)  Byrnes is entitled to discover information that may bear on whether these reasons are a pretext for discrimination—namely, information that suggests "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in these stated reasons, *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006), or that Defendants' stated reasons are "false, or that

14

the plaintiff was treated differently from similarly-situated employees," *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011).  Defendants are withholding materials that appear to be central to these issues.  As Byrnes explains, documents related to peer review, quality, patient safety, credentialing, ongoing and focused professional performance evaluations ("OPPE" and "FPPE"), and quality-action plans, including related evaluations, policies, practices, and standards may all show that Byrnes's patient care was not substandard and that he did not interfere with peer-review processes.  Furthermore, documents related to other doctors' patient care and how Defendants treated those doctors are relevant to show how Byrnes's patient care compared to theirs and whether Defendants treated them differently.  Documents relating to Defendants' investigation into the shutdown of the peer-review procedure and year-long comprehensive quality review are relevant for similar reasons, as they may reveal how Byrnes was treated compared to other surgeons during the comprehensive review and whether it was fair for the Hospital to blame Byrnes for the Hospital not having a peer-review process in place for the prior year and a half.

Information concerning the comprehensive quality review may also bear on Defendants' after-acquired evidence defense, which limits an employee's remedies "if an employer learns of employee wrongdoing after it has fired that employee, and it can prove that the 'wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge.'" *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 554 (10th Cir. 1999) (quoting *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995)).  Information that came out of the comprehensive quality review may undermine the veracity of Defendants' contention that they would have terminated Byrnes as a result of that investigation, particularly depending on how Byrnes fared during that investigation compared to other surgeons.

In short, "a physician alleging that a health care facility discriminated and retaliated against [him] is entitled to discovery of the peer review proceedings needed to prove [his] claim." *Sonnino*, 220 F.R.D. at 646.  Accordingly, Byrnes has met his initial burden to show the documents Defendants are withholding based on the statutory privileges are relevant to his federal discrimination and retaliation claims and Defendants' after-acquired evidence defense.  *See, e.g.*, *Univ. of Penn.*, 493 U.S. at 193 ("Often, . . . peer review material itself must be investigated to determine whether the evaluations are based in discrimination.  Indeed, if there is a 'smoking gun' to be found that demonstrates discrimination in tenure decisions, it is likely to be tucked away in peer review files."); *Jiricko v. Coffeyville Mem'l Hosp. Med. Ctr.*, 700 F. Supp. 1559, 1564 (D. Kan. 1988) (allowing discovery of peer-review activities because "denying [such discovery] would effectively prevent Dr. Jiricko from bringing his lawsuit"); *Schafer v. Parkview Mem'l Hosp., Inc*., 593 F. Supp. 61, 65 (N.D. Ind. 1984) (declining to recognize statutory privilege in ADEA case where plaintiff needed peer-review materials to show pretext); *Robinson v. Magovern*, 83 F.R.D. 79, 89 (W.D. Pa. 1979) (allowing discovery of hospital peer-review records that go "to the heart of the issues in this case, i.e., why Robinson was denied staff privileges").

## C.   Defendants Have Not Shown the Requested Discovery Is Not Relevant

When the discovery sought appears relevant on its face, or the discovering party has established relevance, the party resisting discovery bears the burden to support its objections.  *See Ehrlich v. Union Pac. R.R. Co.*, 302 F.R.D. 620, 624 (D. Kan. 2014) (holding the party resisting discovery bears the burden to show why a discovery request is improper); *Martin K. Eby Const. Co. v. OneBeacon Ins. Co.*, No. 08-1250-MLB-KGG, 2012 WL 1080801, at *3 (D. Kan. Mar. 29, 2012) ("Once this low burden of relevance is established, the legal burden regarding the defense of a motion to compel resides with the party opposing the discovery request.").  The party resisting this discovery does not carry this burden by asserting "conclusory or boilerplate objections that

discovery requests are irrelevant, immaterial, unduly burdensome, or overbroad." *Sonnino*, 221 F.R.D. at 670. "Rather, an objecting party must specifically show in its response to the motion to compel, despite the broad and liberal construction afforded by the federal discovery rules, how each request for production or interrogatory is objectionable." *Id.* at 670-71.

In this case, Defendants say they have produced all documents that "involve in any way Plaintiff, Plaintiff's claims, KBHA proceedings involving Plaintiff, and so on." (ECF 74, at 7.) They explain they produced documents related to "cases in which Plaintiff provided care well below the expected standard of care" and documents related to Byrnes's "inappropriate shut down of the normal and required processes for professional peer review within the Hospital." (*Id.* at 8 (brackets omitted).) Defendants claim the remaining documents are "privileged but not relevant," and they advance several arguments to try to support the line they have drawn.

First, Defendants contend that, by virtue of their "privileged but not relevant" designation in Column AK of the privilege log, the court should rely on their representation that "none of the documents withheld relate to Plaintiff or Plaintiff's federal claims in any way." (*Id.* at 7.) In other words, Defendants have produced documents that support their theory of the case, while they are withholding documents that might support Byrnes's theory of the case. Defendants' "privileged but not relevant" explanations are insufficient to overcome Byrnes's initial showing that the peer-review and risk-management materials appear relevant to his federal claims. Indeed, these are precisely the type of "conclusory or boilerplate objections" that are insufficient for Defendants, as the parties resisting discovery, to carry their burden to "specifically show" that this discovery is categorically irrelevant.

Next, Defendants point out that Column AL of their privilege log explains "why the information redacted and/or withheld qualifies as privileged under the" Kansas statutes. But this

argument is immaterial.  As explained above, documents that are relevant to Byrnes's federal employment discrimination claims must be produced.  Kansas statutory privileges do not apply.

Defendants also argue that Byrnes wrongly interprets their argument to the EEOC that "this case is all about professional peer review."  Defendants contend that Byrnes "conflates the phrase 'peer review' as used in Defendants' correspondence with the EEOC . . . to mean anything and everything that qualifies under the broad privileges created by KAN. STAT. ANN. 65-4915(a)(3)(A)-(L) and/or KAN. STAT. ANN. 65-4925(a)(1)-(4)" when Defendants were merely referring to "Plaintiff's interference with the process by which a physician's quality of care is reviewed by other professionals."  (ECF 74, at 8.)  But Byrnes is not required to accept Defendants' characterization of what they meant by the statement that "this case is all about professional peer review." (ECF 55-24.)  Defendants themselves elaborated in their EEOC position statement about what they meant, as follows:

> Dr. Byrnes had numerous cases in which he provided care well below the standard of care . . . .  Dr. Byrnes is currently under investigation by the State of Kansas for providing substandard care and harming patients.  In his role as CMO, he inappropriately shut down the normal and required processes of professional peer review within the Hospital that would have identified the deficiencies in his medical care and should have resulted in his loss of clinical privileges at the Hospital.  In doing so, he immunized himself from the oversight that should have existed and should have stopped his dangerous treatment of patients.
>       . . . . .
> As a result of the foregoing, this case is all about professional peer review.  It turns on the inappropriateness of Dr. Byrnes' patient care and his self-protecting shut down of the peer review processes that would have uncovered . . . .

(*Id.*)

Documents that bear on Defendants' stated reasons for terminating Byrnes's employment, including Defendants' after-acquired-evidence defense, are relevant.  Byrnes seeks documents that compare the way Defendants treated him with how they treated similarly-situated physicians who

had not filed a complaint.  He also seeks documents that may help him establish that Defendants discriminated against him in violation of the ADA when they wrongfully perceived he had a disability by requiring that he undergo a psychological assessment.  The withheld documents may show that physicians who were similarly situated to Byrnes, and who did not file complaints of sexual harassment and/or substandard clinical care against other surgeons, were not terminated and were not asked to submit to a psychological assessment.  Materials revealed in the "comprehensive peer review process" that continued after Byrnes was fired may also bear on these issues.

Defendants further contend the withheld documents are "wholly irrelevant" because they used search criteria that resulted in an overinclusive document collection, as explained in their response to Plaintiff's Request for Production ("RFP") No. 1.  (*See* ECF 74, at 8-9; ECF 55-7, at 3-4, 40-44 (Exhibits 1-2).)  But Defendants' response to RFP 1 does not help them.  It explains that responsive documents (i.e., "any document that mentions, discusses, or refers or is related in any way to the allegations, claims, defenses, or issues potentially relevant in this litigation") were identified using search parameters, custodians, and search terms selected by Defendants themselves as set forth on Exhibits 1 and 2.  (*See* ECF 74, at 8-9; ECF 55-7, at 40-44 (Exs. 1 and 2).)  Defendants do not explain why those search parameters were overinclusive.  The court has reviewed the search parameters and cannot glean any apparent reason why they are *not* reasonably targeted to capture relevant information.  But even more to the point, Defendants' response to RFP 1 goes on to explain that, once those documents were collected, the collection was de-duped, the resulting documents were reviewed for responsiveness and privilege, and only responsive documents were produced or withheld based on privilege.  So even by Defendants' own admission, they only produced and/or included on the privilege log documents that were responsive to

Byrnes's RFPs.  This argument does not meet Defendants' burden to "specifically show" why the logged materials are categorically irrelevant, particularly when Defendants did not lodge a "not relevant" objection to any of the subject RFPs.

> **D.**     **Discovery Regarding Comparators Dr. 1 (a/k/a Dr. Kessler) and Dr. 2 Is Relevant**

Defendants also focus on two categories of documents that they say deserve specific mention.  Specifically, Defendants say they withheld documents concerning a doctor they refer to as "Dr. 1," who Byrnes suspects filed the anonymous complaint against him with the KBHA.  (ECF 74, at 9.)  In other words, Dr. 1 is Kessler.  (ECF 77, at 5 n.4.)  Defendants explain that, after they fired Byrnes, they received numerous complaints about Kessler on their internal hotline; a complaint was filed against Kessler with the KBHA in the spring of 2020, which resulted in subpoenas being issued to the Hospital; the comprehensive quality review resulted in one of Kessler's cases being the subject of a Report of Adverse Findings ("RAF") that the Hospital reported to the KBHA; and Kessler resigned his privileges with the Medical Staff.  Defendants explain that they produced internal complaints to the extent they did not relate to Kessler's "quality of care, patient safety, or other categories protected against disclosure by KAN. STAT. ANN. 65-4915(b)."  (ECF 74, at 10.)  But Defendants withheld "all documents constituting 'reports' or 'other records submitted to or generated by' a peer review committee or officer," including the RAF involving Kessler that the Hospital submitted to the KBHA in January 2021.  (*Id.*)  Defendants contend this discovery is irrelevant to Byrnes's claims.

In support of this argument, Defendants argue "Dr. 1 is not similarly situated to Plaintiff in all material respects for comparison purposes under Title VII or the ADA because unlike Plaintiff, Dr. 1 was not employed by Defendants and Defendants, therefore, had no authority to take any employment action concerning Dr. 1."  (ECF 74, at 10.)  But the cases Defendants cite only serve

to support the proposition that Kessler would not be classified as an "employee" for purposes of bringing federal employment claims against the Hospital. That principle is inapposite to the issue presented here, which is the scope of discovery regarding potential comparators. Furthermore, documents concerning Kessler are relevant for another reason. Byrnes argues the documents Defendants have withheld will show not only that Byrnes's complaint about Kessler had merit, but that even Defendants later concluded it had merit. (ECF 55, at 3 n.1.) Documents revealing impressions about Kessler's patient care, including the RAF involving Kessler that the Hospital later submitted to the KBHA, may bear on this issue if they support Byrnes's theory that Defendants failed to adequately investigate Byrnes's complaint at the time he made it.

Defendants also withheld documents concerning another surgeon they refer to as "Dr. 2."[3] Defendants argue these documents are irrelevant because Dr. 2 is not a proper comparator. Defendants explain that Dr. 2 was hired in February 2020 after Byrnes was terminated; he practiced in a different specialty area, resigned his employment during the peer review process, was not in Hospital administration, and "never interfered with the proper functioning of the peer review process." (ECF 74, at 11.) In other words, once again, Defendants have produced documents that support their theory of the case, while withholding documents that might bear on the veracity of their position.

Defendants purport to limit proper comparators for discovery purposes to Hospital employees with authority over the peer-review process who also practiced in the same specialty as

---

[3] Defendants have redacted (or tried to redact) Dr. 2's identity throughout their document production, privilege log, and metadata. Dr. 2's identity is not particularly germane to the parties' current dispute, but Defendants may not withhold his identity in discovery because doing so deprives Byrnes of the context needed to understand discovery concerning potential comparators. These redactions are therefore improper and must be removed. The protective order is the proper mechanism for Defendants to address any confidentiality concerns surrounding Dr. 2's identity.

Byrnes during the same time period as Byrnes.  (ECF 74 at 9-11.)  But "discovery in discrimination cases should not be narrowly circumscribed."  *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir. 1995).  To prove a discrimination claim, a plaintiff may offer "evidence that he was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness."  *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (internal quotation marks omitted).  "A similarly situated employee is one who deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline."  *Id.* (same).  "Work histories, company policies applicable to the plaintiff and the comparator, and other relevant employment circumstances should be considered when determining whether employees are similarly situated."  *Id.*

Byrnes points out that merely because Kessler was not an employee of the Hospital or Dr. 2 never had administrative duties does not remove either of them from the realm of "similarly situated" for discovery purposes.  All three physicians were required to abide by the same professional standards for providing health care to patients and appear to have been subject to the same hospital policies concerning those standards.  All were or should have been subject to the Hospital's peer-review and risk-management processes, and accountable to the Medical Staff for maintaining Hospital privileges.  Indeed, Defendants investigated the care provided by Kessler, even though he was not an employee, and this investigation led to a RAF to the KBHA, just like with Byrnes.  And, when concerns about Dr. 2's care surfaced during the peer-review process, he ended up resigning his employment and his Medical Staff privileges.  Kessler and Dr. 2 therefore are proper comparators to Byrnes, at least for discovery purposes.  Indeed, discovery into Kessler seems particularly central to the issues in the case given the aftermath of Byrnes's August 2019 complaint about Kessler, in response to which Kessler may have retaliated by lodging the

"anonymous" complaint with the KBHA that prompted Defendants to fire Byrnes just weeks later, all of which spiraled into the competing narratives at issue in this lawsuit.

In sum, because these doctors with privileges at the Hospital are subject to the same patient-care, reporting, and credentialing standards—regardless of whether they are Hospital employees, perform administrative duties, etc.—they are sufficiently similarly situated for discovery purposes where, as here, they were all the subject of complaints about substandard patient care, investigation, and peer review.

### E.   Documents and Information Relating to Quality Review Are Relevant

Defendants also argue they properly withheld documents and materials constituting the "comprehensive quality review conducted in 2020-2021 under Ms. Thomas's direction," including "deliberations regarding cases submitted to teams outside of the Hospital for initial review, summary reports of finding, conclusions, and recommendations, strategy communications regarding development and implementation of a quality review plan, a comprehensive summary report from the quality review, a presentation (and drafts thereof) to the Hospital Board regarding the quality review, and a host of other information."  (ECF 74, at 12.)  Again, Defendants offer only a conclusory and unsupported statement that these documents are not relevant to Byrnes's federal claims because they "do not involve Plaintiff in any way."  (*Id*.)  This does not meet Defendants' burden to show these documents are not relevant.

For example, Defendants explain that they produced the full files relating to three cases involving Byrnes that were peer reviewed and resulted in the Hospital filing RAFs with the KBHA. (ECF 74, at 6.)  But Defendants say they withheld files relating to cases involving other physicians that were peer reviewed and resulted in the Hospital filing RAFs with the KBHA.  (*Id.*)  Defendants contend these other files are not relevant.  Byrnes argues these case files, including the KBHA's decisions on those RAFs, are relevant to identifying comparators who, like Byrnes, had RAFs filed

with the KBHA.  The case files also are relevant to determining whether those comparators and Byrnes are similarly situated for purposes of showing pretext.  The documents may show how Defendants treated other surgeons during the peer-review process, which Byrnes may be able to use to support his claim that Defendants treated him differently in retaliation for lodging a complaint about Kessler.  Defendants cannot blame Byrnes for allegedly "shutting down" the peer-review process to cover up his own deficient patient care, while simultaneously withholding discovery concerning the comprehensive quality review that shows what that process would have revealed if it had been up and running as Defendants claim it should have been.

F.      **Conclusion Concerning Documents Withheld Based on Statutory Privileges**

In sum, the court finds Byrnes met his initial burden to show the material Defendants have withheld based on the statutory privileges is relevant.  This shifted the burden to Defendants to establish this discovery is not relevant to Byrnes's federal discrimination claims.  For the reasons articulated above, Defendants have not met that burden.

In addition, the court notes that it required Defendants to submit the documents they withheld based on the statutory privileges for *in camera* review.  The court has reviewed hundreds of these documents (not all of them, but a substantial sampling) and finds the universe of documents is consistent with the court's analysis of the parties' arguments above.  These documents are overwhelmingly relevant to his federal discrimination claims.  Some of them appear to be highly relevant, whereas others seem less interesting, but that is not at all unusual in a case like this involving a sizeable document production.  Even the less-interesting documents still appear to fall within the broad definition of relevance under the Federal Rules, particularly when Defendants have not advanced any cogent argument by which the court could draw a clear and meaningful distinction between documents that are relevant and those that clearly are not.  In other

words, the court cannot find that any particular category of documents is not relevant for any of the reasons articulated by Defendants.

The court therefore finds the materials are relevant to Byrnes's federal claims, so they are discoverable at this stage of the litigation unless otherwise privileged. The withheld materials may aid Byrnes in establishing his prima facie case of retaliation and disability discrimination, or, more probably, aid in his rebuttal of Defendants' proffered reasons for terminating Byrnes's employment and Defendants' after-acquired-evidence defense. Byrnes's motion to compel Defendants to produce documents withheld based on the statutory privileges is therefore granted. The court overrules Defendants' statutory-privilege objections and orders them to produce the documents they have withheld on this basis except to the extent that Defendants are entitled to withhold those materials based on attorney-client privilege, as discussed below.[4]

## III.   PSQIA PRIVILEGE

Byrnes originally moved to compel 98 documents that Defendants withheld based on a privilege claim pursuant to the PSQIA at 42 U.S.C. § 299b-22(a) (codifying privilege for "patient safety work product"). (ECF 55, at 17-18.) By the time Defendants filed their revised opposition to the motion to compel, they withdrew their PSQIA privilege objection for all of those documents.

---

[4] Byrnes also argues the peer-review and risk-management privileges do not apply to the type of documents Defendants withheld on those grounds and that Defendants waived their statutory privilege objection for 53 documents by not identifying those documents on their original privilege logs (*see* Column AO of privilege log) and/or belatedly adding statutory privilege objections for those documents in their revised privilege log. (ECF 55, at 15-16 & 21-23; ECF 58, App. E-7 (filed under seal); ECF 74, at 16; ECF 77, at 9-10.) These arguments are moot in view of the court's order overruling the statutory-privilege objections. Byrnes also argues Defendants waived any Kansas peer-review privilege by taking the position that this case is "all about peer review." Although Byrnes framed this as an "at issue" waiver argument, the court sees it as more of a relevance argument that bears on Defendants' stated reasons for firing Byrnes. To that end, the argument is adequately addressed in the court's analysis above.

(ECF 77, at 2.)[5]  The court therefore denies Byrnes's motion to compel Defendants to produce documents they withheld based on PSQIA objections as moot.

## IV.    ATTORNEY-CLIENT PRIVILEGE

Under federal common law,[6] the attorney-client privilege protects "confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor." *In re Grand Jury Proc.*, 616 F.3d 1172, 1182 (10th Cir. 2010) (internal quotations omitted).  The privilege also protects advice given by the lawyer in the course of representing the client.  *See New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 425 (D. Kan. 2009) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).  "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed."  *United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir. 2016); *see also In re Grand Jury Proc.*, 616 F.3d at 1183 (party asserting attorney-client privilege bears the burden to establish it applies).  In other words, the proponent of the privilege must provide sufficient information to enable the requesting party and the court to determine whether each element of the privilege has been satisfied.  *See Sonnino v. Univ. of Kan. Hosp. Auth.*, 220 F.R.D. 633, 649 (D. Kan. 2004).  The burden of showing the

---

[5] The privilege log lists eight entries for which "Patient Safety Quality Improvement Act" continues to be listed as a "privilege tag" in column AG, but the court understands from column AP or yellow highlighting that Defendants have withdrawn those PSQIA objections.  (ECF 74, at 1 n.1.)  As a result, Defendants no longer assert any PSQIA objections.

[6] The court will apply federal law here for clarity and because no real conflict between federal and Kansas law regarding the attorney-client privilege exists.  *See Klaassen v. Univ. of Kan. Sch. of Med.*, No. 13-2561-DDC, 2016 WL 6138169, at *3 (D. Kan. Oct. 21, 2016) ("But when no real conflict between federal and Kansas law regarding the attorney-client privilege exists, whether the Court applies federal or Kansas law generally makes no difference in determining whether attorney-client privilege applies." (internal quotations, brackets, and citation omitted)); *In re Motor Fuel Temp. Sales Pracs. Litig.*, No. 07-MD-1840-KHV, 2010 WL 11431875, at *2 (D. Kan. July 7, 2010) (same).  In other words, the court would reach the same conclusion regarding Defendants' attorney-client privilege objections regardless of which body of law it applies.

privilege has not been waived also remains with the party claiming the privilege. *In re Qwest Commc'ns, Int'l, Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006).

Byrnes's opening brief asks the court to compel Defendants to produce most of the 1,201 documents they withheld based on the attorney-client privilege. (ECF 55, at 18.) Byrnes contends that Defendants have not met their burden because their privilege-log entries do not support an attorney-client privilege objection for three main reasons: (1) the information provided suggests the document relates to ordinary business activities rather than legal advice, (2) a large number of entries identify documents held by an "Unspecified Custodian," which fails to establish that the communication was made and has been maintained in confidence, and (3) Defendants waived some of their attorney-client designations by not asserting them on their original privilege log or because Defendants were late in logging four documents.

## A.     Communications for the Purpose of Requesting or Receiving Legal Advice

The court turns first to Byrnes's primary argument, which is that Defendants' privilege-log entries do not support their attorney-client privilege objections because they relate to ordinary business activities rather than legal advice.[7]  In support, Byrnes argues attorney-client-privileged communications must be made for the purpose of requesting or receiving legal advice; in-house counsel's communications are privileged only when legal advice predominates; mandatory and business-purpose investigations are not privileged; and communications among non-attorneys are privileged only in limited circumstances. (ECF 55, at 18-21.)  Byrnes then argues that hundreds

---

[7] Defendants' response says Byrnes challenges 481 privilege-log entries on this basis, but sorting the privilege log to isolate these documents returns 480 entries.  According to Defendants, they withheld 311 of the documents from production in their entirety and produced 170 of them with redactions.  Defendants subsequently withdrew some of their attorney-client privilege objections, produced some of the documents without redactions, and re-produced others they had previously withheld—this time with redactions.  (ECF 74, at 1 n.1 (explaining yellow and light blue highlighting); ECF 84 (explaining green shading).)

of entries "do not involve any attorneys and generally appear to relate to ordinary business or to convey facts (business negotiations, staff training, medical cases, corporate documents, work schedules, etc.)" or "appear to relate to ordinary business or underlying facts with no evidence they contain legal advice." (*Id.* at 22-23.)  In response, Defendants contend they have made "a clear showing within the Privilege Log that the privilege applies," and they point to the factual bases for their privilege objections as set forth in columns AI, AJ, and AQ.  (ECF 74, at 18.)  Byrnes's reply contends these log entries "either fail, on their face, to show that any legal advice was sought or received or give reason to question whether 'legal' advice is communicated."  (ECF 77, at 8-9 (pointing to column AR).)  Byrnes suggests that, in these circumstances, "courts may look past the conclusory assertions on the log and determine, based on an *in camera* review, whether the privilege applies."  (ECF 77, at 9.)

Most of the parties' disputes on this issue turn on whether the communication was made for the purpose of seeking or providing legal advice.  Not all communications involving attorneys are privileged.  *Motley*, 71 F.3d at 1550-51 ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege.").  The privilege only protects confidential communications "made in order to obtain legal assistance from the attorney in his capacity as a legal advisor."  *In re Grand Jury Proc.*, 616 F.3d at 1182.  This means the communication "must relate to legal advice or strategy sought by the client."  *Id.*  For the privilege to apply, legal advice must predominate.  *See Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 1643679, at *3 (D. Kan. Apr. 2, 2020).  Attorney-client privilege does not attach where legal advice is merely incidental to business advice.  *See id.*  Where a communication contains both legal advice and business advice, attorney-client privilege only applies if the legal advice predominates over the business advice.  *See In re*

*Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2017 WL 1106257, at *7 (D. Kan. Mar. 24, 2017).   Where the legal and business purposes of the communication are inextricably intertwined, the entire communication is privileged if the legal purpose outweighs the business purpose.  *See Neuder v. Battelle Pacific Northwest Nat. Lab.*, 194 F.R.D. 289, 292 (D.D.C. 2000); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co*., 951 F. Supp. 679, 685–86 (W.D. Mich. 1996) (finding legal and business considerations may be inextricably intertwined when legal advice is rendered in the corporate context, but the fact that business considerations are weighed in the rendering of legal advice will not vitiate the attorney-client privilege).

### *In Camera* Review Is Warranted

Given the record and the applicable legal standards, *in camera* review is warranted to determine the extent to which the subject communications involve legal advice versus business advice.  An explanation of the first four privilege log entries at issue in this dispute demonstrates why.  In the email threads Defendants produced at CENTURA_001018, -1022, -1072, and -1077, Defendants redacted the substance of the first email at the beginning of each thread.  (It is the same email, but it appears in these four email threads and others throughout the production.)  This email from the Hospital's then-CEO Scott Taylor is dated April 28, 2019, which was during the time period when Defendants and Byrnes were renegotiating his contract.  In Column AQ of the privilege log, Defendants claim the redacted email is privileged because it involves communications with legal counsel about eliminating Byrnes's role as CMO, proposing revisions to draft contract, and "seeking legal advice."  Byrnes challenges this privilege claim, as set forth in Column AR of the privilege log, by arguing the redacted email does not appear to be a communication with counsel for legal advice but rather an email exchange amongst employees discussing new coverage issues, gaps, and costs; and that in-house counsel is merely copied on the

email.  The court has examined the redacted email and finds that both parties are partly correct. The email largely involves business matters concerning the logistics of Defendants removing Byrnes from his role as CMO and staff coverage issues that will likely follow.  Taylor's email is to mostly non-legal Centura personnel who will presumably be tasked with handling the fallout of this decision from a business perspective, including Senior Vice President Tom Gessel, Green-Cheatwood, Senior Vice President and Chief Clinical Officer Shauna Gulley, and Senior Vice President and Chief Corporate Responsibility Officer Nima (Williams) Davis.  However, the last recipient listed on the email is Kris Ordelheide, Centura Senior Vice President and General Counsel, and the second paragraph of the email appears to implicate legal advice concerning Defendants' contract negotiations with Byrnes.  So those documents (and other duplicates of this email throughout the production) must be re-produced with only the second paragraph redacted. This is but one example.  Many of the privilege log entries pose similar challenges.

Accordingly, the court has reviewed *in camera* all of the documents and redactions Byrnes challenges as not involving legal advice.  In doing so, the court has evaluated the full record—including the parties' arguments in their briefs and in Columns AI, AJ, AQ, and AR of the privilege log, other pertinent information in the privilege log, and the documents themselves—to determine whether Defendants have met their burden to establish the withheld communications were made in order to seek or render legal advice from an attorney acting in the attorney's capacity as legal advisor and, if so, to determine whether legal advice predominates the communication.  This is a context-specific determination, and the court provides the following non-exhaustive list of examples as to how it has applied the privilege to various documents.

**KBHA Subpoena Materials**

Defendants have withheld many documents related to responding to the KBHA subpoenas as privileged—as if the mere fact that KBHA subpoenas are involved makes them privileged.  But the individuals involved on many of those email threads and the substance of the communications do not establish that any attorney is involved in the communication in the attorney's capacity as a legal advisor for the purposes of seeking or rendering legal advice.  Merely gathering and providing information requested by the KBHA does not fall under the general privilege umbrella because it does not entail legal advice.  *See Matter of Grand Jury Proceedings*, 68 F.3d 193, 195-97 (7th Cir. 1995) (holding attorney was required to answer questions about how documents were searched in response to grand jury subpoena because that does not entail legal advice).   For example, CENTURA_005805, -5808, -5838, -5896, -5900, and -5903 are a series of email threads that begin with an incoming request from the KBHA for materials about the Hospital's termination of Byrnes's employment.  Human Resources ("HR") then forwards that request to a paralegal in Legal, who then forwards the request to Sabey, who then requests the documents from HR—all so that Sabey can respond to the KBHA.  None of this is privileged.  Sabey simply responded to the KBHA, including getting the requested documents from HR.  No legal advice was sought or rendered.  *See Matter of Feldberg*, 862 F.2d 622, 627-28 (7th Cir. 1988) (noting no privilege attaches to the mechanics of a document search).

For similar reasons, Defendants must produce communication between HR and in-house counsel searching for "Integrity Line complaints" for Byrnes or Kessler.  Defendants' explanation in Column AQ to the effect that this correspondence was at the direction of outside counsel for the purpose of defending claims made in the present lawsuit or that these communications "reveal[] outside counsel's state of mind and legal strategy" is not sufficient to establish privilege.  That

explanation calls into question the applicability of work-product, but Defendants have withdrawn their work-product claims. The mere act of searching for documents simply is not privileged. *See Marksberry v. FCA US LLC*, No. 19-2724-EFM, 2021 WL 2142655, at *8 (D. Kan. May 26, 2021) ("Testimony about the investigations and document searches performed by FCA's counsel: not privileged.").[8]

However, some communications that occurred within those general activities are privileged, such as initial guidance from counsel about responding to the subpoena and/or questions that came up during the process about specific legal requirements in responding to the KBHA's inquiries. *See, e.g.*, *Feldberg*, 862 F.2d at 627-28 (conversations where document clerk has to ask a lawyer whether a particular document falls within the scope of a subpoena are privileged). For example, CENTURA_005714, -5720, -5726, -5733, -5740, -5747, -5755, -5764, -5773, and -5783 are a series of email threads that begin with an incoming request from the KBHA for certain staff contact information. The initial emails in that thread are not privileged. But the later emails reflect legal advice being sought from in-house counsel about how to handle certain aspects of responding to the KBHA. To that extent, the record supports Defendants' privilege claims and hence the later emails in the thread are properly redacted.

---

[8] Although discovery into a party's search for documents responsive to discovery is not routine, that is not because such discovery is privileged. Discovery on discovery is generally disfavored and irrelevant. However, such discovery can be allowed if it is relevant and warranted. *See, e.g.*, *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164-MLB-DWB, 2007 WL 1054279, at *1, *6-*7 (D. Kan. Apr. 9, 2007) (compelling plaintiff to provide Rule 30(b)(6) deponent on Topic 17 relating to the plaintiff's search for and production of documents in response to discovery requests); *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns LLC*, Nos. 11-2684-JWL, 11-2685-JWL, 11-2686-JWL, 2015 WL 2742929, at *9 (D. Kan. June 15, 2015) (allowing Rule 30(b)(6) deposition on Topics 3-5 regarding document retention, collection, production, and destruction).

Defendants also have withheld and/or redacted many documents based on explanations in Column AJ of the privilege log like "hospital risk-quality management or peer review functions" and "KBHA subpoenas, reports, or investigations related thereto."   One example of this is CENTURA_003199, a document Defendants clawed back.  Byrnes contends this document is not privileged because it is a summary of a non-privileged meeting, and peer-review findings are not privileged.   It is an email from a non-lawyer, Bonnie Gutierrez, Centura's System Director, Medical Staff Services, thanking the email recipients (also mostly non-lawyers) for "participating in the call this morning to discuss the peer review concerns noted regarding [Dr. 2]" and summarizing next steps in handling and communicating with Dr. 2, shift coverage, and addressing quality-of-care concerns.  This document is not privileged because it involves predominantly business matters.  Sabey is on the email, but that does not make it privileged.  Nothing in the substance of this email reflects legal advice being sought or rendered.  Consequently, many of these documents are not privileged because the record does not establish that any attorney is involved in the communication in the attorney's capacity as a legal advisor for the purposes of seeking or rendering legal advice.  *See, e.g., Lyondell–Citgo Refining, LP, v. Petroleos de Venezuela, S.A.*, No. 02-0795, 2004 WL 3019767, at *1 (S.D.N.Y. Dec. 29, 2004) (finding the moving party did not meet "its burden of proving that the document contained legal, as opposed to business, advice" and "the inclusion of people outside the legal department in the recipient list further supported the conclusion that the email contained business advice").

## Investigations

One of Byrnes's other categorical arguments is that many documents are not privileged because they involve "mandatory investigations."  But the court is not persuaded that any such categorical rule applies, much less resolves the issue.  The pivotal consideration is whether a

particular investigation/communication was undertaken for the predominant purpose of rendering legal advice to the client (even if business advice is incidental), or whether the investigatory document reflects ordinary business activities that would be undertaken regardless.

The main group of documents at issue with respect to this argument relates to documents Defendants have withheld based on both statutory privilege and attorney-client privilege.  For example, shortly after the Hospital learned about the "anonymous" KBHA complaint regarding Byrnes, Sabey sent an email to Taylor, Green-Cheatwood, and Gessel on January 30, 2022, saying Sabey was "initiat[ing] an internal investigation under attorney-client privilege." (ECF 74-8.)  But Sabey's mere say-so does not make all subsequent communications regarding that "internal investigation" privileged.  And even though Sabey was included on many of the subsequent communications, that also does not make them privileged.  *See Motley*, 71 F.3d at 1550-51 ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege.").  The privilege only protects confidential communications "made in order to obtain legal assistance from the attorney in his capacity as a legal advisor."  *In re Grand Jury Proc.*, 616 F.3d at 1182.  To that end, many of the communications involving Sabey in the days immediately following his January 30 email reflect legal advice being sought or rendered.  However, other communications reflect ordinary business logistics, such as coverage issues and HR/benefit matters associated with Byrnes's termination. Those types of communications are not privileged.

After the Hospital terminated Byrnes on February 12, these documents largely involve Defendants' efforts to respond to the KBHA subpoena and to implement a peer-review process. During the initial stages and sporadically thereafter, Sabey was sometimes included on these communications to provide legal advice.  But most of the documents Defendants have withheld

on both statutory-privilege and attorney-client privilege grounds relate to KBHA subpoenas (an issue the court addressed above), the comprehensive peer-review process, and RAFs to the KBHA. This entire process was largely run and carried out by non-legal personnel such as quality improvement, patient safety, medical staff services, risk management, human resources, peer review, and medical (non-legal) professionals. Furthermore, the bulk of these communications reflect ordinary business activities, as evidenced in part by the fact that the Hospital's own Medical Staff Bylaws and Credentials Policy discuss performance improvement, peer review, professional practice evaluations, investigations, and related implications relating to provider privileges being suspended and revoked, etc. (ECF 64, 64-1.) Indeed, Defendants claim they fired Byrnes partly because of the lack of a peer-review process that they claim would have identified deficiencies in patient care. And the comprehensive quality review identified those deficiencies, both for Byrnes and for other providers. So most of these documents do not qualify as privileged because they involve predominantly or exclusively ordinary business activities.

One more group of documents is worth mentioning as it relates to the broader umbrella of "investigations." An anonymous letter sent to Centura CEO Peter Banko in December of 2017 alleged that Byrnes was sexually harassing nurses and making medical complications "disappear by shipping them to outside hospitals." In response, Jennifer England, Associate General Counsel of Centura, reached out to Nancy Killion, Executive Director of the Hospital, about the aspect of the complaint concerning quality of patient care. Defendants produced those communications but redacted some of the emails in the threads at CENTURA_029060 and -29068. Byrnes challenges these redactions on the grounds that "mandatory investigation of quality complaint" is not privileged. But the court has reviewed these documents and finds that Defendants' redactions are proper because the redacted material reflects legal advice being sought and rendered.

As to the sexual harassment allegations, Defendants hired an outside investigator to conduct the investigation, interview employees, and prepare a report with the investigator's findings and conclusions.  Defendants withheld some of their communications surrounding this investigation as privileged, including the investigator's report and amended report.  In particular, Defendants produced CENTURA_040010 and -40012, which are emails between England and Taylor about setting up witness interviews.  Defendants redacted portions of those emails, and Byrnes challenges those redactions on the grounds that "instructions for arranging interviews is not legal advice."  But this objection misses the point.  Defendants produced the portions of the emails about arranging witness interviews and redacted only the portions that reflect England giving Taylor legal advice.  This is proper.  Defendants also withheld the external investigator's final report (and amended report) at CENTURA_31132, -31148, and -40014.  In Column AQ of the privilege log, Defendants claim this report is privileged because it is an investigative report with legal analysis from outside counsel engaged to investigate the complaint.  In response, Byrnes contends this sexual harassment investigative report is not privileged because the author is not even identified as counsel, the fact that separate communications with counsel might have informed this report does not make it privileged, and, to the extent that attorney communications are included in the report, that does not make the entire report privileged.  The court certainly understands Byrnes's argument to the effect that communications generated during an investigation are not automatically privileged because the investigation was conducted by a lawyer or at the behest of a lawyer.  However, resolution of this issue once again turns on whether the record establishes the external report was made in order to render legal advice to Defendants and, in particular, to the Hospital.  Having reviewed *in camera* the entire record on this issue for context—including the above-described privilege-log entries and documents (including the

redacted material), as well as other communications relating to this investigation—the court concludes that it was.  As such, the court is satisfied that Defendants have properly withheld this external investigation as attorney-client privileged.

## Litigation Hold Notices

Defendants also have withheld as privileged litigation hold notices related to Byrnes's claims and communications relating to that notice.[9]  Byrnes challenges this because the metadata shows the hold letter was not authored by an attorney, the related documents likely do not contain legal advice, and Defendants are no longer asserting work-product privilege.  (ECF 77, at 8 & n.8.)  However, the court is unpersuaded that it needs to resolve this issue because Byrnes has not shown the litigation hold notice and related communications are relevant, at least at this procedural juncture.  *See, e.g., Ingersoll v. Farmland Foods, Inc*., No. 10-6046, 2011 WL 1131129, at * 17 (W.D. Mo. Mar. 28, 2011) (denying motion to compel as to litigation holds and related documents because "[a]t this early stage of litigation, it is entirely premature for plaintiffs to argue that there has been spoliation of the evidence").  In so holding, the court acknowledges Byrnes's point that Defendants "lost or destroyed two of the most-significant files in this case: (1) the file containing staff complaints about Dr. Kessler . . . , and (2) the investigation file that preceded Dr. Byrnes' termination (which was lost after being given to outside counsel, who happens to be the father of the in-house investigator)."  (ECF 77, at 1; *see also* ECF 55-7 (Ex. 6), at 34.)  But the litigation hold notice was issued to Defendants' employees, not Melvin Sabey.  And Defendants have explained that the binder with the staff complaints is missing because the person who retained it

---

[9] Despite withholding most email communications concerning the litigation hold notice, Defendants produced two such communications with redactions at CENTURA_001379-80 and CENTURA_001669.

retired in January of 2020, and Defendants produced Freund's summary of the contents of the nurses' files he reviewed as part of his investigation.  (ECF 55-7 (Ex. 6), at 34.)

So, based on the record as it currently stands, the court is unable to find the litigation hold notices and related communications are relevant.  Accordingly, the court denies Byrnes's motion to compel as it relates to Defendants' litigation hold notice.  However, the court denies this aspect of the motion without prejudice.  If the litigation hold notices somehow become relevant as this case progresses, Byrnes is welcome to re-raise issues concerning their production on a more-focused record that develops this issue.

## Conclusion

In sum, having conducted an *in camera* review and applied the above-mentioned legal principles, the court finds Defendants have met their burden to establish the communications identified in their privilege log were for the purpose of requesting or providing legal advice, and thus were properly withheld as privileged, other than as set forth in Exhibit A attached to this order.  Defendants' attorney-client privilege objections are overruled to the extent the court orders Defendants to produce specific documents (without redactions) or to produce documents with the redactions specified on Exhibit A.  As to those materials, Byrnes's motion to compel is granted.

### B.    Communications For Which Metadata Reflects an "Unspecified Custodian"

Byrnes next challenges Defendants' privilege claims on the grounds that a large number of entries on the privilege log identify documents held by an "unspecified custodian," which he says must mean those documents were not maintained confidentially.  (ECF 55, at 23; ECF 58, App. E-3; ECF 74, at 21; ECF 74-12, at 2 (Ex. 11).)[10]   Defendants counter that the "unspecified

---

[10] Byrnes originally contended 742 entries identified an unspecified custodian, but by the time of the reply, that number was 412.

custodian" documents were maintained in confidence because the privilege log identifies not only custodian metadata but the "file path" of each challenged document, which clarifies the collection source of the document, and thus establishes the documents were properly "held in confidence." (ECF 74, at 22.)

The court understands Byrnes's concern that the "unspecified custodian" metadata may signal that the document or communication was shared with someone outside of the attorney-client relationship. But the custodian, sender, and recipient metadata, when combined with the file path metadata (in Column AB of the privilege log), contain sufficient clarity as to the collection source of each file to establish that the document was maintained in confidence and was produced from a confidential location. (ECF 74, at 22.) For example, some of the file paths contain prefixes that show the type of file and identify the custodian, such as: (1) Microsoft Exchange .pst files from custodians (which have the "Exchange.pst" prefix and identify a custodian who is part of the attorney-client relationship); and (2) Mimecast .pst files from custodians (which have IM prefix and identify a custodian who is part of the attorney-client relationship). (*Id.*) As Defendants explain, the file path may also show the files were collected from a Mimecast litigation hold folder (e.g., "/IM606622-Byrnes_item4_5 - 01 - Part 3.pst") or that they were manually gathered by Defendants from secure locations and shared with outside counsel Kutak Rock using Citrix Sharefile. (*Id.*) As to the latter category, Defendants provide examples of files with the following path file prefixes: /Client Docs; /Complaint Against Byrnes; /Confidential Peer Docs; /Integrity Hotline Complaints; /KS Board of H Arts; /Minutes; /Personnel HR Files; or /RFP #. (*Id.*)

Byrnes argues Defendants have not explained how or why some entries that identify only Microsoft Exchange server file paths, for example, could generate an "unspecified custodian" in Column H. (ECF 77, at 7.) But the example given by Byrnes (CENTURA_001077) identifies

multiple file paths, including one that indicates it was collected from a Mimecast litigation hold folder, thus generating the "unspecified custodian" metadata. Byrnes further complains that Defendants have not truly disclosed the "source" of some documents insofar as Defendants have not established "where Defendants stored them and who had access to them." (*Id*.) The court disagrees. Defendants have disclosed the source and have established confidentiality for purposes of the attorney-client privilege for documents for which the collection sources are Microsoft Exchange and Mimecast .pst files that identify a custodian who is part of the attorney-client relationship; files collected from a Mimecast litigation hold folder; and files shared with their attorneys at Kutak Rock using Citrix Sharefile.

The court notes that some "unspecified custodian" log entries lack any of the example file paths that Defendants identified in their response. (*See* CENTURA_050322 and -50328.) However, based on the file name, email sender and recipient, date sent and received, file path, and the court's *in camera* review of these two documents (which were produced to Byrnes with redactions), the court finds these two files appear to have been obtained from a legal-department file and likely sent to outside counsel at Kutak Rock for legal advice using a file-sharing service, which triggered the "unspecified custodian" metadata. As such, the court finds these two communications meet the privilege element requiring the communication to be held in confidence.

### C.    Waiver By Failure to Timely Assert the Privilege

Finally, Byrnes argues that some attorney-client privilege designations were waived because Defendants did not assert the privilege objection on the original privilege log or because Defendants were late in logging four documents for which they now claim privilege. (ECF 77, at 9.) According to Byrnes, Defendants waived their privilege objections regarding these entries by belatedly raising "entirely new classes of privilege than they originally asserted and objections as

to entirely new documents" long after serving the initial privilege logs.  (ECF 77 at 9-10 (claiming

Defendants served supplemental privilege logs "over seven months after serving the initial

privilege logs, after Dr. Byrnes moved to compel, and after initially responding" to Byrnes's

motion).)  Defendants insist their failure to designate some documents on the log as attorney-client

privileged (in addition to the Kansas statutory-privilege designation) was inadvertent and the

addition of the attorney-client-privilege objection caused no prejudice.  (ECF 74, at 23.)  As for

the belated logging of four documents, Defendants contend "those four documents were not

designated as responsive until May 2022" and were then timely included on a supplemental

privilege log.  (*Id.*)

Under the circumstances here, the court is unpersuaded by Byrnes's waiver argument.

Federal Rule of Civil Procedure 26(b)(5)(A) sets out a party's duties in responding to discovery

requests when withholding information under a claim of privilege.  It provides that:

> When a party withholds information otherwise discoverable by
> claiming that the information is privileged or subject to protection
> as trial-preparation material, the party must:
> (i) expressly make the claim; and
> (ii) describe the nature of the documents, communications, or
> tangible things not produced or disclosed—and do so in a manner
> that, without revealing information itself privileged or protected,
> will enable other parties to assess the claim.

"Waiver does not automatically result from noncompliance with Rule 26(b)(5)."  *First Sav. Bank,*

*F.S.B. v. First Bank Sys., Inc.*, 902 F. Supp. 1356, 1361 (D. Kan. 1995), *on reconsideration*, 902

F. Supp. 1366 (D. Kan. 1995), *rev'd on other grounds*, 101 F.3d 645 (10th Cir. 1996).  Where a

party has identified the claimed privileged documents and actually established the privilege

applies, albeit in an untimely manner, this court is reluctant to find waiver, as "waiver of a privilege

is a serious sanction most suitable for cases of unjustified delay, inexcusable conduct, and bad

faith."  *Id.*; *see also Hopkins v. Bd. of Cnty. Comm'rs of Wilson Cnty., Kan.* No. 15-CV-2072-CM-

TJJ, 2018 WL 3536247, at *6 (D. Kan. July 23, 2018) ("[W]aiver of privilege is a harsh sanction and should be reserved as a penalty where the offending party committed unjustified delay in responding."); *White v. Graceland Coll. Ctr. for Pro. Dev. & Lifelong Learning, Inc*., 586 F. Supp. 2d 1250, 1266 (D. Kan. 2008) (describing cases finding no waiver due to late submission of privilege logs and noting that "the few cases where the court found waiver based upon the untimely submission of a privilege log, the privilege log had been prepared after the court was asked to rule on the issue and after entry of an order directing production of the documents").

Here, Defendants argue Byrnes's objection to four documents not identified on their original privilege logs is unfounded because those documents were not identified as responsive until May 2022.  (ECF 74, at 23.)  Accepting Defendants' representation as true, the court finds no waiver because the identification of these four documents on a later privilege log was not untimely.  As for the rest of the documents Byrnes argues are subject to waiver, the court finds that any failure by Defendants to include an attorney-client privilege designation in the "privilege tag" field of their prior logs was inadvertent and has caused Byrnes no prejudice.  The privilege logs in this case are voluminous and dense, with 2,095 entries at the time Byrnes filed his motion to compel and 1,260 entries after multiple meet-and-confers about the asserted privileges. Although Defendants could have and should have designated these documents as attorney-client privileged earlier, this is not a case of unjustified delay, inexcusable conduct, or bad faith.  Under these circumstances, the privilege is not waived.

## V.   **WORK-PRODUCT**

Byrnes originally moved to compel 133 documents that Defendants withheld based on work-product protection.  (ECF 55, at 23-24.)  But by the time Defendants filed their revised opposition to the motion to compel, they had withdrawn all work-product objections.  (ECF 74, at

2 n.2; ECF 77, at 2.)[11]  The court therefore denies the motion as to Defendants' work-product objections as moot.

## VI.    OTHER ISSUES

### A.    HIPAA or Other Privacy-Related Privilege Objections

Byrnes also asks the court to overrule Defendants' objections to RFPs 1, 27, 33, and 45 based on a general reference to privacy or confidential protected health information of non-parties. (ECF 55, at 24-25.)  Defendants do not respond to this argument, and the court agrees that Defendants cannot withhold documents on this basis.  Because the court has entered a qualifying protective order (ECF 19 ¶¶ 2, 6(a), 10(b)), Defendants may disclose protected health information in response to Byrnes's discovery requests, subject to the terms of the protective order.  *See Ehrlich v. Union Pac. R.R. Co.*, 302 F.R.D. 620, 628 (D. Kan. 2014) ("And even if Defendant, as an employer, was a covered entity under HIPAA, it would be permitted to disclose its employees' health information in response to discovery requests where a qualifying protective order is in place." (citing 45 C.F.R § 164.512(e)(1)(ii)(B), (e)(1)(v))).  Accordingly, the court overrules these objections.[12]

### B.    Interrogatory Answers

In addition to asking the court to overrule Defendants' privilege-related objections and to order them to produce documents as discussed above, Byrnes also asks the court to order Defendants to fully and completely answer his interrogatories to the extent Defendants have withheld information based on their privilege-related objections.  (ECF 54.)  Byrnes does not

---

[11] The current privilege log lists five entries for which "work product" continues to be listed as a "privilege tag" in column AG, but the court understands from columns AV and AW that such work product objections have been withdrawn.  As a result, Defendants no longer assert any work-product objections.

[12] Defendants' privacy-related objection in response to RFPs 88 and 89 is overruled for the same reasons.  (ECF 55-9, at 3-4.)

identify which specific interrogatories are at issue, and his opening brief mentions Defendants'
interrogatory answers only in passing. His most specific argument is a single sentence buried in a
footnote. (ECF 55, at 15 n.11.) Defendants and Byrnes likewise advance perfunctory arguments
in the final pages of their response and reply briefs, respectively. (ECF 74, at 23-24; ECF 77, at
10.) Thus, it is not entirely clear what relief Byrnes is seeking or the extent to which Defendants
oppose that requested relief.

As best as the court can tell, it appears this dispute relates to Interrogatories 2, 3, 4, 5, 6
and 8. (ECF 55-10, 55-11 (Exs. 9-10); ECF 74, at 23-24; ECF 77, at 10.) The court's ruling above
concerning the statutory and attorney-client-privilege objections should largely resolve the parties'
disputes. The court therefore orders Defendants to supplement their interrogatory answers to
provide the type of information the court has found is not privileged.

Byrnes further argues Defendants' interrogatory answers "give Dr. Byrnes the discovery
run-around by directing him to figure out the answers himself from the documents Defendants are
withholding." (ECF 55, at 15 n.11 (citing Interrogatory 8).) Byrnes explains as follows:

> Because Rule 33(d) allows a party to answer interrogatories by
> producing business records, Defendants suggest they do not have to
> answer interrogatories at all whenever they might have elected to
> answer by producing records which they say are privileged. But
> nothing in Rule 33 allows them to refuse to provide traditional,
> narrative answers merely because the business records alternative
> would involve privileged documents. Defendants still have to
> answer by providing the requested, non-privileged information.

(ECF 77, at 10.) For example, for Interrogatories 7 and 8, Defendants elected the option under
Rule 33(d) to specify records that must be reviewed to ascertain the answer, but then Defendants
state they withheld responsive records based on statutory privilege or attorney-client privilege.
(ECF 55-11, at 4 (answering by referring to certain documents produced on a certain date, but
noting "Defendants assert, preserve, and do not waive any and all privileges asserted with respect

44

to the above-identified documents as more fully set forth in Defendants' written responses to Requests for Production. All documents/communications withheld on the basis of privilege will be identified in Defendants' privilege log"), 6-7 (answering by specifying "all email communications with KBHA and/or KDHE representatives and, to the extent any of those communications were previously designated as privileged pursuant to K.S.A. 65-4915 and/or K.S.A. 65-4925, expressly assert, preserve, and do not waive those privileges already asserted with respect to the above-referenced communications").)  These responses do not fully answer the interrogatories because Defendants' withholding of privileged documents prevents Byrnes from ascertaining or deriving the full answer to his interrogatory.  Therefore, the court orders Defendants to supplement their responses to Interrogatories 7 and 8 to provide non-privileged information, whether that be through a more fulsome narrative response that incorporates the information from the documents the court has determined are not privileged or by specifying those documents under Rule 33(d).[13]

Whatever option Defendants choose, the court cautions them that some courts have held that a party waives the right to withhold privileged documents when the party elects to answer an interrogatory by producing business records under Rule 33(d).  *Compare Malone v. City of Memphis*, No. 18-2201-MSN-TMP, 2020 WL 465036, at *3 (W.D. Tenn. Jan. 28, 2020) (finding "a party cannot simultaneously refuse to produce business records and refuse to answer written interrogatories by invoking Rule 33(d)'s option to produce business records"); *Blake and Assoc.,*

---

[13] Defendants also answer parts of Interrogatory 4 pursuant to Rule 33(d).  But, instead of specifying the records that contain information responsive to the interrogatory, they state they will specify records either "in response to Plaintiff's First Requests for Production" or "following production of documents in response to Plaintiff's First Requests for Production."  (ECF 55-10, at 13, 14.)  To the extent Defendants have subsequently specified records that they designated as privileged, Defendants must supplement this interrogatory response as well, in accordance with the court's directions with respect to Interrogatories 7 and 8.

*Inc. v. Omni Spectra, Inc.*, 118 F.R.D. 283, 290 (D. Mass. 1988) ("If a party is going to invoke Rule 33[(d)], the party must be prepared to allow inspection of the documents which contain the answers to the interrogatories. If a party is going to claim a privilege with respect to documents, the party cannot use Rule 33[(d)]; rather, the party must answer the interrogatory in the traditional manner."), *with Ampex Corp. v. Mitsubishi Elec. Corp*., 937 F. Supp. 352, 355 (D. Del. 1996) (holding that, under Rule 33(d), documents that would otherwise be responsive may be withheld based on privilege, provided the exercise of the privilege does not prevent the interrogating party from ascertaining or deriving complete answers to the interrogatories and the withheld documents are listed on a privilege log); *O'Connor v. Boeing N. Am., Inc*., 185 F.R.D. 272, 279–80 (C.D. Cal. 1999) (following *Ampex* approach).  Thus, regardless of whether Defendants elect to supplement their answers to interrogatories by relying on Rule 33(d) and/or by providing a narrative response, it is clear that Defendants cannot do what they have done so far, which is to answer by relying on Rule 33(d) and then withhold responsive documents as privileged so that Byrnes cannot ascertain or derive the answer to the interrogatory.  Defendants must answer by providing responsive, non-privileged information and clearly state the extent to which Defendants are withholding responsive information based on any claim of privilege.

Accordingly, the court grants Byrnes's motion to compel as to Defendants' interrogatory answers.  Defendants are ordered to supplement these answers as set forth above.

\* \* \* \* \*

**IT IS THEREFORE ORDERED** that Byrnes's Motion to Compel (ECF 54) is granted in part and denied in part as set forth above.  Defendants are ordered, no later than **April 14, 2023**, to produce documents and supplement their interrogatory responses in accordance with the court's rulings above.

**IT IS FURTHER ORDERED** that the parties are ordered to meet and confer, and to submit a joint status report to the court no later than **April 21, 2023**, proposing case-management deadlines for an amended scheduling order to move this case forward.

**IT IS SO ORDERED.**

Dated March 31, 2023, at Kansas City, Kansas.

<u>s/ Angel D. Mitchell</u>
Angel D. Mitchell
U.S. Magistrate Judge