IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MATTHEW BYRNES,                          )
                                         )
                        *Plaintiff,*     )
                                         )
vs.                                      )          Case No. 21-CV-2086-DDC-ADM
                                         )
ST. CATHERINE HOSPITAL,                  )
CENTURA HEALTH CORPORATION,              )
AND CENTURA HEALTH PHYSICIAN             )
GROUP,                                   )
                                         )
                        *Defendants.*    )
_____ )

## THIRD AMENDED COMPLAINT

### INTRODUCTION

1.      This is a case about cold-blooded unlawful retaliation.

2.      Dr. Matthew Byrnes is an exceptional and well-respected surgeon who used to be employed by Defendants.

3.      Several nurses employed by Defendants reported to Dr. Byrnes, based on their first-hand knowledge, that another surgeon had (i) engaged in acts of sexual harassment directed toward nurses and (ii) engaged in acts of substandard clinical care that had a reasonable probability of causing injury to patients.

4.      The nurses brought these concerns to Dr. Byrnes because they feared they would be retaliated against if they complained directly to Defendants' administrators.

5.      Dr. Byrnes believed the nurses' concerns were credible, and, acting in good faith, he filed a formal written complaint with the President of the Hospital Medical Staff reporting the allegations of sexual harassment and substandard clinical care.

6.       Defendants were dismissive of Dr. Byrnes' complaint. They failed to properly investigate or take appropriate responsive action. And they essentially accused Dr. Byrnes of being crazy for making the complaint and thus demanded that he undergo a psychological assessment (a demand they later withdrew).

7.       A few months later, Defendants fired Dr. Byrnes in retaliation for filing the complaint.

8.       At the time, Defendants did not even try to hide their retaliation. They provided no reason whatsoever for firing him, and even admitted they did not have good cause to do so.

9.       Dr. Byrnes thus lost his job, and the Garden City community lost a highly skilled surgeon.

10.      Dr. Byrnes has suffered and will continue to suffer significant economic and other damages.

11.      Defendants' retaliation against Dr. Byrnes is a clear and obvious violation of Title VII of the Civil Rights Act of 1964, which provides that it is unlawful to retaliate against an employee for engaging in protected activity, such as reporting sexual harassment to a supervisor, participating in an EEO process, intervening to protect others from sexual harassment, or taking other action opposing sexual harassment.

12.      Defendants' retaliation against Dr. Byrnes is also a clear and obvious violation of K.S.A. § 65-4928, which provides that no employer shall discharge or otherwise discriminate against an employee for making any report to the chief of medical staff that a health care provider has committed a reportable incident.

13.       Defendants also violated the Americans with Disabilities Act by wrongfully believing Dr. Byrnes needed a psychological assessment because he filed a complaint about sexual harassment and substandard clinical care.

14.     Defendants also defamed Dr. Byrnes and engaged in numerous other tortious and unlawful actions as alleged below.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 1343, 42 U.S.C. § 2000e-5(f)(3), and 42 U.S.C. § 12117(a), and supplemental jurisdiction over Kansas state claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue and personal jurisdiction are proper because Plaintiff was employed by Defendants in Kansas, and the unlawful employment practices alleged herein were committed in Kansas. *See* 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

## PARTIES

17.     Plaintiff Matthew Byrnes, M.D. ("Dr. Byrnes") is a resident of Kansas.

18.     Dr. Byrnes is a medical doctor licensed to practice medicine in Kansas.

19.     Defendant St. Catherine Hospital ("the Hospital") is a Kansas not-for-profit corporation with its principal place of business in Garden City, Kansas.

20.     The Hospital's registered agent in Kansas is Registered Agent Solutions, Inc., 2101 SW 21st St., Topeka, KS 66604.

21.     Defendant Centura Health Corporation ("Centura") is a Colorado not-for-profit corporation with its corporate office in Centennial, Colorado.

22.     Centura's registered agent in Kansas is Registered Agent Solutions, Inc., 2101 SW 21st St., Topeka, Kansas 66604.

23.     Centura promotes itself as "the region's largest health care network."

24.     The Hospital is a member of the Centura health care network.

25.     Centura refers to the Hospital as one of "our locations."

26.     Centura controls and manages the Hospital's day-to-day operations, including personnel matters.

27.     Defendant Centura Health Physician Group ("CHPG") is a subsidiary or affiliate of Centura.

28.     CHPG is a network of over 900 medical providers in more than 250 locations across Colorado and Western Kansas.

29.     At all relevant times, Defendants have continuously been doing business in Kansas.

30.     Defendants have continuously had at least 15 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

31.     At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce within the meaning of 42 U.S.C. §§ 2000e(b), (g) and (h).

32.     Defendants are covered entities under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.

33.     Defendants are joint employers, an integrated enterprise, and/or otherwise jointly and severally liable to Dr. Byrnes for their unlawful conduct.

34.     Defendants collectively made decisions and took actions with respect to Dr. Byrnes, including his unlawful retaliatory discharge.

35.     The conduct of Defendants' employees and agents with respect to Dr. Byrnes was authorized or ratified by Defendants.

FACTS

*Dr. Byrnes and his employment with Defendants*

36.     Defendants employed Dr. Byrnes as a physician at the Hospital from 2012 to February 12, 2020.

37.     Dr. Byrnes graduated from the University of Kansas School of Medicine in 2001 and is board-certified in critical and general surgery.

38.     Dr. Byrnes is a fellow of the American College of Surgeons and the American College of Critical Care Medicine.

39.     Dr. Byrnes was the youngest chair of the Surgical Section of the Society of Critical Care Medicine.

40.     While employed by Defendants, Dr. Byrnes specialized in general surgery and critical care.

41.     Dr. Byrnes served as the Hospital's Chief Medical Officer ("CMO") from 2013 to June 2019.

42.     During Dr. Byrnes' tenure as CMO, the Hospital's ratings improved significantly; he led the Hospital through three different stroke certifications and its first national accreditation as a breast cancer center; and the Hospital became an award-winning and nationally accredited stroke center.

*Dr. Byrnes files a complaint about sexual harassment and substandard patient care.*

43.     In 2019, several members of the nursing staff at the Hospital told Dr. Byrnes that another physician at the Hospital, Kurt Kessler, MD, had sexually harassed nurses (including an incident of inappropriate touching) and provided substandard care to patients.

44.     The nurses brought their concerns to Dr. Byrnes because they feared Defendants would retaliate against them if they reported their concerns directly.

45.     On August 31, 2019, Dr. Byrnes filed a formal written complaint against Dr. Kessler with William Freund, MD, President of the Hospital Medical Staff (the "Complaint").

46.     The Complaint, which was based on Dr. Byrnes' knowledge and information provided to Dr. Byrnes by staff with knowledge, reported that Dr. Kessler had: (i) engaged in acts of sexual harassment directed to nurses at the Hospital, and (ii) engaged in acts that departed from the applicable standard of clinical care that had a reasonable probability of causing injury to patients. Dr. Byrnes' knowledge of the reportable incidents was based on familiarity because of direct involvement or observation of the incidents.

47.     With regard to clinical care, the Complaint reported, among other things, that: Dr. Kessler's "conversion rate" when performing laparoscopic gallbladder removal surgery (conversion from a laparoscopic procedure to an open surgical procedure) seemed massively high; the nursing staff had created a binder of events documenting Dr. Kessler's poor clinical care; and Dr. Kessler rarely wore gloves when conducting sensitive exams, including touching abscesses and doing buttock and perianal exams with his bare hands.

48.     With regard to sexual harassment, the Complaint reported that Dr. Kessler "has made sexually explicit comments to numerous nurses. This has made many of them highly uncomfortable…. Nurses in both units [OR and ICU] have registered complaints to me about this. … Dr. Kessler has inappropriately touched nurses. Just two weeks ago, he touched [a nurse] just inches form her breasts without her consent. She felt extremely uncomfortable with this harassment. Just yesterday, Dr. Kessler voiced out loud in the operating room area that he rarely

spends time at home because he is either at the hospital or the strip club. This was heard by multiple PACU nurses."

***Defendants fail to timely and appropriately respond to Dr. Byrnes's complaint.***

49.     On October 16, 2019, Dr. Byrnes was called into a meeting with Dr. Freund; Bryan Stucky, MD, Vice-President of Medical Staff; and Toni Green-Cheatwood, Physician Administrator of CHPG. They told Dr. Byrnes his complaint was being dismissed in its entirety.

50.     After October 16, 2019, several nurses asked to talk to Green-Cheatwood about Dr. Kessler's sexual harassment. Green-Cheatwood told Dr. Byrnes that Defendants were not going to investigate or interview the nurses who complained about Dr. Kessler's sexual harassment because they had not reported the harassment via the Integrity Hotline.

51.     Upon information and belief, Defendants did not conduct a timely or thorough investigation into the sexual harassment allegations against Dr. Kessler that Dr. Byrnes reported on August 31, 2019.

52.     Upon information and belief, Defendants did not conduct a timely or thorough investigation into the substandard clinical care allegations against Dr. Kessler that Dr. Byrnes reported on August 31, 2019.

53.     On January 2, 2020, Dr. Byrnes received, via hand-delivery, a letter from Dr. Freund on CHPG letterhead, dated December 29, 2019, responding to the complaint Dr. Byrnes had filed in August. Dr. Freund's letter states: "The Medical-Executive Committee of St. Catherine Hospital met on Tuesday November 19, 2019 and reviewed your August 31, 2019, letter. … The members of the Med-Exec committee expressed concern about your allegations and your insistence that you believe these allegations to be true. Thorough investigation provided many of your statements to be false. It was felt that this and other issues could affect medical judgment and

hence patient care…. It was unanimously agreed that it was in the best interest of the hospital and the medical staff to ask you to seek an evaluation including a psychological assessment."

54.     On January 19, 2020, Dr. Byrnes provided a written response to Dr. Freund's letter. Dr. Byrnes's stated that he filed the whistleblower complaint about Dr. Kessler because he believed it was his ethical obligation to report behavioral and clinical behaviors that do not meet the standards expected from physicians. Dr. Byrnes also further explained the bases for the original complaints he had made; pointed out that staff members were afraid to report or go on record about Dr. Kessler's sexual harassment because they feared retaliation; and stated his belief that he was being retaliated against because of his whistleblower complaint.

55.     On January 21, 2020, Dr. Bryan Stucky, the new President of the Hospital Medical Staff, writing on Centura letterhead, sent a letter to Dr. Byrnes stating that the Medical-Executive Committee was "retracting" Dr. Freund's letter dated December 29, 2019, and that they were no longer requiring Dr. Byrnes to obtain a psychological assessment.

**Defendants fire Dr. Byrnes in retaliation for his protected complaint.**

56.     On January 22, 2020, Dr. Byrnes was informed that an anonymous complaint had been filed against him with the Kansas Board of Healing Arts.

57.     The allegations in the anonymous complaint filed with the Board were false.

58.     The Kansas Board of Hearing Arts investigated the anonymous complaint, and subsequently, on September 22, 2021, determined that the complaint's allegations were not substantiated. The Board took no action against Dr. Byrnes and closed the case.

59.     Dr. Byrnes had an exemplary medical care record that was superior to other physicians with privileges at the Hospital.

60.     On February 12, 2020, Defendants fired Dr. Byrnes in retaliation for the protected whistleblower complaint he filed regarding the alleged sexual harassment of nurses and substandard clinical care.

61.     On that day, Defendants sent a letter to Dr. Byrnes on CHPG letterhead, signed by its President, stating they were terminating his employment effective that day.

62.     Defendants did not give any legitimate, non-retaliatory reason for firing Dr. Byrnes. To the contrary, they expressly admitted they did not have cause to fire him.

63.     Prior to firing him, Defendants did not express any concerns to Dr. Byrnes about his patient care, conduct, or job performance.

64.     At the time they fired him, the Hospital and its Medical Staff leaders expressly acknowledged and agreed that Dr. Byrnes was a member in good standing of the Medical Staff, there were no restrictions on his privileges, and there were no pending Medical Staff investigations against him.

65.     Further, Defendants did not state or indicate in any way that there had ever been any investigation of him, or that there was any pending or planned future investigation of him.

66.     Defendants failed to follow their policies and procedures with respect to their discharge of Dr. Byrnes.

***Dr. Byrnes files EEOC Charges, and the Hospital files a report against him with the Board.***

67.     On May 1, 2020, Dr. Byrnes filed his first EEOC Charges against Defendants, alleging that Defendants had retaliated against him for engaging in protected activity, in violation of Title VII, and discriminated against him based on a perceived disability, in violation of the ADA.

68.     Dr. Byrnes engaged in activity protected by Title VII and the ADA by filing his first EEOC Charges against the Defendants.

69.     On or about October 8, 2020, shortly after Dr. Byrnes declined to participate in the EEOC's early mediation process, the Hospital filed a report against Dr. Byrnes with the Kansas Board of Healing Arts.

70.     The report filed with the Kansas Board of Healing Arts was based on a procedure Dr. Byrnes performed over five years earlier.

71.     The patient care Dr. Byrnes provided during this procedure was exemplary, and the Hospital had never before suggested anything to the contrary.

72.     The Kansas Board of Healing Arts investigated this report, and subsequently, on May 25, 2022, determined that the report's allegations were not substantiated. The Board took no action against Dr. Byrnes and closed the case.

73.     The report was made in bad faith and contains false and misleading information.

74.     The report was made in retaliation against Dr. Byrnes for engaging in protected activity regarding his first EEOC Charges.

75.     The Hospital did not follow its policies and procedures or applicable law with respect to this matter.

76.     On January 13, 2021, Dr. Byrnes received a Notice of Right to Sue from the EEOC and exhausted his administrative remedies with respect to the Title VII and ADA claims in his first EEOC Charges.

77.     On March 17, 2021, Dr. Byrnes filed his second EEOC Charges against Defendants, alleging that Defendants had further retaliated against him for engaging in protected activity, in violation of Title VII and the ADA.

78.     On April 8, 2021, Dr. Byrnes received a Notice of Right to Sue from the EEOC and exhausted his administrative remedies with respect to the Title VII and ADA claims in his second EEOC Charges.

**The Hospital files additional bad-faith reports with the Board.**

79.     On or about May 2021, Dr. Byrnes learned that the Hospital filed additional reports with the Kansas Board of Healing Arts.

80.     These reports were based on medical care provided over three years before the filing of the reports with the Board.

81.     The Kansas Board of Healing Arts investigated these reports, and subsequently, on August 3, 2022, determined that the reports' allegations were not substantiated. The Board took no action against Dr. Byrnes and closed the cases. The Board also concluded that the treatment Dr. Byrnes provided in the reported procedures met the applicable standard of care.

82.     These reports were made in bad faith and contain false and misleading information.

83.     These reports were made in retaliation against Dr. Byrnes for engaging in protected activity.

84.     The Hospital did not follow its policies and procedures or applicable law with respect to this matter.

85.     On July 9, 2021, Dr. Byrnes filed his third set of EEOC Charges against Defendants, alleging that Defendants had further retaliated against him for engaging in protected activity, in violation of Title VII and the ADA.

86.     On February 16, 2023, Dr. Byrnes received a Notice of Right to Sue from the EEOC, and he has exhausted his administrative remedies with respect to the Title VII and ADA claims in his third set of EEOC Charges.

*Defendants' alleged investigation of Dr. Byrnes is a sham.*

87.     At the time they fired Dr. Byrnes, Defendants expressly told him that they did not have any cause for termination.

88.     After firing Dr. Byrnes, Defendants represented to him that he was still a member in good standing of the Medical Staff, there were no restrictions on his privileges, and there were no pending Medical Staff investigations against him.

89.     In reliance upon these representations, Dr. Byrnes voluntarily resigned his privileges at the Hospital. Dr. Byrnes would not have resigned his privileges at the Hospital if he had known or had any reason to believe that there was any past or pending investigation against him.

90.     Had Defendants notified Dr. Byrnes about any investigation against him, Dr. Byrnes would have retained his privileges in order to receive due process and properly defend himself in the peer review process, according to the Hospital's established policies and procedures.

91.      Long after the Hospital had terminated Dr. Byrnes' employment, and in response to the legal claims asserted by Dr. Byrnes, Defendants asserted for the first time, as a defense, that Dr. Byrnes had engaged in misconduct and provided substandard care. These allegations are unequivocally false, malicious, and a pretext to try to cover up Defendants' unlawful retaliation against Dr. Byrnes.

92.     Defendants did not conduct a reasonable investigation (or likely any investigation at all) regarding Dr. Byrnes before firing him.

93.     Defendants' alleged reasons for firing Dr. Byrnes, as asserted in this litigation, are contrary to their actions and representations to him at the time they unlawfully fired him.

94.     Defendants' termination of Dr. Byrnes's employment was contrary to their policies and procedures.

95.     Any alleged investigation regarding Dr. Byrnes (if it occurred at all) was conducted in a manner contrary to Defendants' policies and procedures and applicable legal requirements.

96.     Defendants failed to provide any notice whatsoever to Dr. Byrnes of any alleged investigation or procedures relating to any personnel action or professional review action concerning him.

97.     If any such alleged investigation or professional review action concerning Dr. Byrnes really happened, it was done behind Dr. Byrnes' back, without giving him any notice or opportunity to provide input, in a manner contrary to Defendants' policies and procedures, applicable law, and Defendants' prior representations to Dr. Byrnes.

98.     Any such alleged investigation or professional review action concerning Dr. Byrnes was a sham and a pretext to try to cover up Defendants' retaliatory and unlawful actions.

99.     Even if Defendants' ultimate decisionmakers did not have a retaliatory animus, they were manipulated by or relied upon others who harbored such an unlawful animus.

## CLAIMS

100.     Defendants' misconduct gives rise to numerous legal claims, which are asserted both cumulatively and in the alternative. Some of these claims are being asserted in the alternative because Defendants continue to play "hide the ball" with respect to their documents and defenses in this case. Dr. Byrnes will modify and streamline his claims as may be appropriate as discovery continues.

101.    As to each count below, Dr. Byrnes first alleges that Defendants are joint employers, an integrated enterprise, and/or otherwise jointly and severally liable to Dr. Byrnes for their unlawful conduct.

102.    In the alternative, and in response to Defendants' assertion that Dr. Byrnes was employed exclusively by the Hospital, Dr. Byrnes alleges that Centura and CHPG are liable under the theory of aiding and abetting by substantially assisting the Hospital in its tortious and unlawful actions against Dr. Byrnes.

103.    In the alternative, and in response to Defendants' assertion that Dr. Byrnes was employed exclusively by the Hospital, Dr. Byrnes also alleges that Centura and CHPG are liable under the theory of conspiracy by agreeing with the Hospital to commit tortious and unlawful actions against Dr. Byrnes and by taking unlawful overt acts in furtherance of such conspiracy.

### Count 1: Title VII

104.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

105.    Defendants are employers, and Dr. Byrnes is an employee, within the meaning of Title VII.

106.    Dr. Byrnes opposed unlawful employment practices and engaged in activity protected by Title VII by filing a complaint about sexual harassment.

107.    Defendants subjected Dr. Byrnes to adverse employment actions because he engaged activity protected by Title VII and treated him differently than similarly situated employees who had not engaged in activity protected by Title VII.

108.    Dr. Byrnes engaged in activity protected by Title VII by filing EEOC Charges against the Defendants and by filing this lawsuit.

109.    Defendants repeatedly retaliated against Dr. Byrnes because he engaged activity protected by Title VII, in violation of Title VII.

110.    Dr. Byrnes suffered damages as a result of Defendants' unlawful retaliation.

111.    Dr. Byrnes has exhausted his administrative remedies under Title VII.

112.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

**Count 2: K.S.A. 65-4928**

113.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

114.    Defendants are employers, and Dr. Byrnes is an employee, within the meaning of K.S.A. 65-4928.

115.    Dr. Byrnes filed a protected whistleblower report alleging substandard patient care at the Hospital.

116.    Defendants subjected Dr. Byrnes to adverse employment actions for filing his protected whistleblowing report and treated him differently than similarly situated employees who had not filed such reports, in violation of K.S.A. 65-4928.

117.    Dr. Byrnes suffered damages as a result of Defendants' unlawful retaliation.

118.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of civil penalties and/or punitive damages.

119.    In the alternative, if K.S.A. 65-4928 does not apply, Dr. Byrnes asserts a public policy/common law claim based on these acts of retaliation.

## Count 3: Americans with Disabilities Act

120.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

121.    Defendants are employers, and Dr. Byrnes is an employee, within the meaning of the ADA.

122.    In response to Dr. Byrnes's complaint about sexual harassment and substandard patient care, Defendants stated that they had conducted an investigation (which was not true) and determined that the statements in his complaint were false (which was not true), and, as a result, he should undergo a psychological assessment.

123.    Defendants thus wrongly perceived Dr. Byrnes to have a physical or mental disability.

124.    Though Dr. Byrnes does not have a disability, he is protected by the ADA against discrimination on the basis of a wrongfully perceived disability.

125.    Defendants subjected Dr. Byrnes to adverse employment actions because of his perceived disability and treated him differently than similarly situated employees who were not perceived to have a disability, in violation of the ADA.

126.    Dr. Byrnes engaged in activity protected by the ADA by filing EEOC Charges against the Defendants.

127.    Defendants retaliated against Dr. Byrnes because he engaged activity protected by the ADA, in violation of the ADA.

128.    Dr. Byrnes suffered damages as a result of Defendants' unlawful retaliation.

129.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

## Count 4: Fraud

130.     Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

131.     Defendants now claim they conducted an investigation with respect to Dr. Byrnes. But, shortly after they terminated his employment, they said there was no investigation. Thus, they are either lying now or they were lying then. If they are not lying now, then Defendants made false or untrue representations to Dr. Byrnes that were made as statements of existing and material fact to induce him to resign his privileges at the Hospital, including but not limited to the assurance that there were no investigations against him.

132.     These representations were known to be false or untrue by Defendants or were recklessly made without knowledge concerning them.

133.     The representations were intentionally made for the purpose of inducing Dr. Byrnes to act upon them.

134.     Dr. Byrnes reasonably relied and acted upon the representations made. But for Defendants' representations, Dr. Byrnes would not have resigned his privileges at the Hospital.

135.     Dr. Byrnes sustained damage by relying upon these representations, including but not limited to the loss of his privileges at the Hospital, the loss of his ability to defend himself in any peer review investigation concerning him, and the cost of defending himself against baseless reports submitted to the Kansas Board of Healing Arts.

136.     Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

## Count 5: Fraud by Silence

137.     Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

138.    Defendants had knowledge of material facts regarding a pending or imminent investigation against Dr. Byrnes which Dr. Byrnes did not have and which he could not have discovered by exercising reasonable diligence.

139.    Defendants were under an obligation to communicate the material facts to Dr. Byrnes.

140.    Defendants intentionally failed to communicate the material facts to Dr. Byrnes to induce him to resign his privileges at the Hospital and forfeit his ability to defend himself in the peer review process.

141.    Dr. Byrnes reasonably relied upon Defendants to communicate the material facts to him.

142.    Dr. Byrnes sustained damages as result of Defendants' failure to communicate this to him, including but not limited to the loss of his privileges at the Hospital, the loss of his ability to defend himself in any peer review investigation concerning him, and the cost of defending himself against baseless reports submitted to the Kansas Board of Healing Arts.

143.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

### Count 6: Negligent Misrepresentation

144.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

145.    Defendants, in the course of their professional relationship with Dr. Byrnes, provided false information to him for his benefit and to guide his professional transactions, including but not limited to the assurance that there were no investigations against him.

146.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the false information.

147.    Dr. Byrnes reasonably relied upon the false information.

148.    As a result, Dr. Byrnes suffered damages, including but not limited to the loss of his privileges at the Hospital, the loss of his ability to defend himself in any peer review investigation concerning him, and the cost of defending himself against baseless reports submitted to the Kansas Board of Healing Arts.

149.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

### Count 7: Promissory Estoppel/Detrimental Reliance

150.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

151.    Defendants made a representation and promise to Dr. Byrnes that they should have reasonably expected to induce, and did induce, action and forbearance of a definite and substantial character on Dr. Byrnes's part.

152.    Injustice can be avoided only by enforcing that promise.

153.    As a result, Dr. Byrnes suffered damages.

154.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

### Count 8: Defamation

155.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

156.    Defendants communicated false information about Dr. Byrnes to the Kansas Board of Healing Arts in about October 2020 and again in about March 2021.

157.    This information harmed Dr. Byrnes's reputation.

158.    Defendants' communications were not made in good faith; rather, they were made with knowledge that the defamatory statements were false or with reckless disregard of whether they were false and were made with evil-mindedness or specific intent to injure.

159.    These communications resulted in injury and harm to Dr. Byrnes's reputation.

160.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

### Count 9: Abuse of Process

161.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

162.    Defendants knowingly, illegally, and improperly used the Kansas Board of Healing Arts statutory reporting process for the purpose of harassing and causing hardship to Dr. Byrnes.

163.    As a result of Defendants' knowing, illegal, and improper misuse of the Kansas Board of Healing Arts statutory reporting process, Dr. Byrnes sustained damages, including but not limited to the cost of defending himself against baseless reports submitted to the Kansas Board of Healing Arts and damage to his reputation.

164.    Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

### Count 10: Common Law Retaliation

165.    Dr. Byrnes incorporates all other paragraphs set forth in this Complaint.

166.    This count is being asserted in the alternative.

167.    In 2019, Defendants wrongly attempted to withhold or divert a portion of Dr. Byrnes' earned wages.

168.    Dr. Byrnes asserted his right to retain his earned wages, which were subject to protection under the Kansas Wage Payment Act, K.S.A. § 44-312 *et seq*. (KWPA).

169.     Dr. Byrnes' assertion of his right to his earned wages was protected activity under Kansas law.

170.     Defendants retaliated against Dr. Byrnes, including but not limited to terminating his employment, for engaging in this protected activity and exercising his right to his earned wages.

171.     Dr. Byres suffered damages as a result of this retaliation.

172.     Defendants acted willfully, wantonly, fraudulently, maliciously, and/or with reckless indifference to Dr. Byrnes's protected rights, supporting an award of punitive damages.

### DAMAGES AND RELIEF

173.     Dr. Byrnes has suffered and continues to suffer damages as a result of Defendants' retaliation and other unlawful conduct, as alleged above.

174.     Dr. Byrnes is entitled to the following damages and relief, which are asserted both cumulatively and in the alternative:

- back pay, lost benefits, and other economic loss relating to his employment termination;

- reinstatement or, in the alternative, front pay;

- compensatory damages;

- actual damages in the form of lost employment opportunities, time away from work, attorneys' fees and other out-of-pocket expenses and/or costs, all other direct and indirect economic loss resulting from Defendants' unlawful actions;

- damages to reputation;

- punitive damages;

- civil penalties;

- interest;

- costs, expenses, and attorneys' fees; and

- any and all other damages and relief allowed by law or deemed to be just and proper.

175.    Dr. Byrnes reserves the right to amend his complaint, including the addition of new claims and theories as more facts become known through investigation and discovery.

### JURY TRIAL DEMAND

176.    Dr. Byrnes requests a jury trial on all claims.

### DESIGNATION OF PLACE OF TRIAL

177.    Dr. Byrnes designates Kansas City, Kansas, as the place of trial.

Respectfully submitted,

By:  */s/ Boyd A. Byers*
       Boyd A. Byers, #16253
       Foulston Siefkin LLP
       1551 N. Waterfront Pkwy. Ste. 100
       Wichita, Kansas 67206-4466
       316.267.9716
       bbyers@foulston.com

       Sarah E. Stula, #27156
       Foulston Siefkin LLP
       32 Corporate Woods, Suite 600
       9225 Indian Creek Parkway
       Overland Park, KS 66210-2000
       913-253-2149
       sstula@foulston.com

       *Attorneys for Plaintiff*