## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MATTHEW BYRNES,

                        **Plaintiff**,

v.

ST. CATHERINE HOSPITAL, et al.,

                        **Defendants**.

Case No. 21-2086-DDC

## <u>MEMORANDUM AND ORDER</u>

People get fired from their jobs for many reasons, or, sometimes, for no reason at all. And if the person's an at-will employee, that's just fine, the law says. Just fine, that is, as long as his employer didn't fire him for discriminatory or retaliatory reasons. Plaintiff Dr. Matthew Byrnes got fired in February 2020. He had worked as a surgeon and intensivist for St. Catherine Hospital (SCH) in Garden City, Kansas, since 2012. And he was their Chief Medical Officer (CMO) from 2013 to 2019. Then, SCH and Centura—who managed SCH—fired him without cause. Plaintiff was an at-will employee under his employment agreement. So, SCH and Centura didn't need a reason to fire him. And the court isn't here to decide if firing him was a good call—justified or unjustified, fair or not. They didn't need a reason at all, much less a good or fair one. Instead, the outcome of defendants' summary judgment motion (Doc. 172) turns solely on whether Centura fired plaintiff for discriminatory or retaliatory reasons.

Plaintiff claims they did. He contends that defendants St. Catherine Hospital and Centura Health Corporation wanted him out because of his complaints about a fellow doctor. Plaintiff had accused Dr. Kurt Kessler of sexual harassment and other standard-of-care shortcomings. He

also claims that—because of these complaints against Dr. Kessler—defendants viewed him as mentally unstable.  So, he asserts, this perceived impairment drove their desire to let him go. What's more, even after they got rid of him, plaintiff claims that defendants continued to retaliate against him by unfairly reporting four of his medical cases to the Kansas Board of Healing Arts (KBHA).

Defendants, for their part, say they didn't fire plaintiff for retaliatory or discriminatory reasons.  Instead, they rely on patient care concerns and issues with peer review in his role as CMO.  And they say they never perceived plaintiff as impaired, nor was their KBHA reporting process retaliatory.

And so, defendants have filed a Motion for Summary Judgment (Doc. 172).  The court grants the motion, concluding that plaintiff has failed to present a triable issue on his federal claims of Title VII retaliation, ADA retaliation, or ADA discrimination.  In a nutshell, plaintiff has failed to adduce evidence that defendants' reasons for terminating his employment were pretext for retaliation.  Nor has he shown facts sufficient to support an inference that defendants perceived him as impaired.  And he fails to demonstrate—such that a reasonable juror could infer—a causal connection between defendants' KBHA reporting processes and his protected activity.  With the federal claims resolved, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims and thus dismisses those state law claims without prejudice.  The court explains its decisions, below.

## I.     Background

The following facts are stipulated, uncontroverted or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

2

### *Plaintiff's Job*

Plaintiff worked at Saint Catherine Hospital in Garden City, Kansas, as a general surgeon and intensivist from 2012 until February 12, 2020. Doc. 165 at 2–3 (Pretrial Order ¶ 2.a.ii., vi., xii.). Plaintiff also served as SCH's Chief Medical Officer from roughly 2013 to June 2019. *Id.* at 3 (Pretrial Order ¶ 2.a.xi.). The agreements that governed plaintiff's employment during his tenure at SCH specified that SCH was "operated and managed by Centura . . . , which may assign management duties to its Centura Health Physician Group division." *Id.* (Pretrial Order ¶ 2.a.ix.); Doc. 174-7 at 1 (Def. Ex. 24). And so, SCH and Centura "concede that they jointly employed" plaintiff. Doc. 165 at 3 (Pretrial Order ¶ 2.a.x.).

### *April 2019 Meeting*

The issues with plaintiff's employment started—at least for purposes of this case—in April 2019. It was then that five SCH doctors, who worked with plaintiff, requested that SCH's Chief Executive Officer (CEO) Scott Taylor fire plaintiff. Doc. 173-2 at 5 (Taylor Dep. 133:23–135:21); Doc. 173-13 at 4 (Arroyo Dep. 31:24–32:5). The doctors attending that meeting included Dr. William Freund, Dr. Kessler, Dr. Julie Freeman (King),[1] Dr. Gretchen Dunford, and Dr. Zeferino Arroyo. Doc. 173-2 at 5 (Taylor Dep. 134:8–12). At the meeting, the doctors expressed various concerns about plaintiff, including one about patient care, and requested that he no longer work at SCH. *Id.* (Taylor Dep. 133:23–135:21). CEO Taylor decided to remove plaintiff as CMO, but leave his employment intact. *Id.* (Taylor Dep. 135:2–21). And so, plaintiff ceased performing the duties of CMO, but he continued working at SCH. Doc. 165 at 3 (Pretrial Order ¶ 2.a.xiii., vi.).

---

[1]     Referred to as Dr. King during discovery, Dr. King returned to use of her maiden name—Freeman—after the parties took depositions. Doc. 189 at 3 n.5.

### *Plaintiff's Sexual Harassment Complaints*

A few months later, on August 31, 2019, plaintiff submitted a written complaint to Dr. Freund and Nancy Killion, Centura's Director of Quality, about Dr. Kessler.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xv.).  Plaintiff submitted the complaint by email at 1:54 AM on a Saturday morning.  Doc. 174-16 at 1 (Def. Ex. 33).  In the complaint, plaintiff alleged, among other things, that:  Dr. Kessler's conversion rate from a laparoscopic approach to an open procedure for gallbladder removal was "massively higher" than the appropriate conversion rate; the nursing staff "is nearly uniformly concerned with his ability to care for patients in the ICU[;]" Dr. Kessler "rarely wears gloves when doing sensitive exams[;]" and Dr. Kessler "made sexually explicit comments to numerous nurses[,]" "inappropriately touched nurses[,]" and "voiced out loud in the operating room area that he rarely spends time at home because he is either at the hospital or the strip club."  *Id.* at 2–3 (Def. Ex. 33).

Dr. Freund, in his capacity as Medical Staff President, investigated the allegations in the complaint, Doc. 174-1 at 4 (Freund Dep. 35:1–7).  But plaintiff contends that his investigation was neither fair nor reasonable, in part, because Dr. Freund let Dr. Kessler read the complaint, told him that plaintiff had filed it, and said he needed Dr. Kessler's response.  Doc. 183 at 4; Doc. 183-15 at 6–7 (Kessler Dep. 27:21–28:11).  And Dr. Freund shared plaintiff's complaint about Dr. Kessler and that he had evaluated those concerns with SCH's Medical Executive Committee (MEC) on September 17, 2019.[2]  Doc. 174-1 at 8–9 (Freund Dep. 58:24–61:10). Based on the MEC meeting discussion, one of the doctors in attendance—Dr. Dunford, Chief of Surgery—contacted Ms. Killion with concerns about plaintiff.  Doc. 173-11 at 3–4 (Dunford

---

[2]     The parties dispute the extent Dr. Freund shared accurately or specifically about his investigation into this complaint.  Doc. 183 at 5.  The parties also dispute Dr. Freund concluding that the allegations in the complaint were false and his representing that conclusion to the MEC.  *Id.*

Dep. 31:20–35:1).  Dr. Dunford expressed that she thought plaintiff "seemed to be very disturbed, writing a letter like that about a colleague."  *Id.* at 4 (Dunford Dep. 34:24–35:1).  Dr. Dunford then emailed Dr. Toni Green-Cheatwood—Centura's Group VP and Physician Executive for Centura's Greater Colorado Kansas (GCK) Group—with the same concerns.  *Id.* at 4 (Dunford Dep. 35:21–36:2).

In response to these emails, Dr. Freund, Dr. Green-Cheatwood, and Dr. Bryan Stucky— Vice-President of Medical Staff—met with plaintiff on October 16, 2019.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvi.).  At the meeting, plaintiff challenged the adequacy of any investigation of his allegations against Dr. Kessler and reiterated his complaints.  Doc. 183-6 at 49–50, 52 (Byrnes Dep. 180:5–181:9, 183:5-24).

### *MEC Request for Psychological Evaluation*

The MEC continued to express concerns about plaintiff's allegations against Dr. Kessler, according to a letter Dr. Freund delivered to plaintiff on December 29, 2019.  Doc. 174-1 at 16 (Freund Dep. 112:1–13).  The letter referenced the MEC's concerns—apparently expressed at a November 2019 meeting—about plaintiff's allegations and about his "insistence that [he] believe these allegations to be true."  Doc. 174-23 (Def. Ex. 40).  In light of these discussions and concerns, the letter requested that plaintiff undergo a psychological evaluation, stating that the MEC "unanimously agreed that it was in the best interest of the hospital and the medical staff to ask [plaintiff] to seek an evaluation including a psychologic assessment."[3]  *Id.*  Dr. Freund alone signed the letter.  *Id.*

---

[3]    Plaintiff disputes the letter's statement that the MEC unanimously agreed to this evaluation request.  While the letter makes this assertion, plaintiff cites deposition testimony from Dr. Stucky stating that the letter itself was drafted after the November meeting and thus the MEC couldn't have voted on the letter itself.  Doc. 183-19 at 35 (Stucky Dep. 83:1–19).  And Dr. Stucky couldn't remember if there was a vote about this request, or whether the vote was unanimous.  *Id.*

On January 19, 2020, plaintiff responded to this request with a letter of his own, emailed to Dr. Stucky, who had replaced Dr. Freund as President of the Medical Staff.[4]  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvii.).  Plaintiff's response letter asserted that "Dr. Freund's letter is tantamount to retaliation against a whistleblower[,]" reiterated his initial complaints about Dr. Kessler, and demanded the MEC retract Dr. Freund's letter.  Doc. 174-24 at 2–6 (Def. Ex. 41). On January 21, 2020, Dr. Stucky emailed plaintiff a letter notifying him that the MEC would retract the letter requesting his psychological evaluation.  Doc. 174-25 at 1–2 (Def. Ex. 42).

### *Kansas Board Healing Arts Complaint and Subpoena*

Less than a week later, SCH received a subpoena from the Kansas Board of Healing Arts (KBHA).  Doc. 165 at 4 (Pretrial Order ¶ 2.a.xviii.).  The subpoena demanded SCH produce records, reports, proceedings, findings, and documents about plaintiff pursuant to an anonymous complaint filed against him.  Doc. 174-27 (Def. Ex. 44).  Plaintiff later provided Centura's in-house General Counsel, Peter Sabey, with a copy of the anonymous complaint.  Doc. 165 at 4 (Pretrial Order ¶ 2.a.xix.).  The KBHA complaint against plaintiff summarized ten different allegations.  Doc. 174-31 at 6 (Def. Ex. 48).  These included:

- "multiple alarming adverse outcomes, including multiple patient deaths[;]"

- "pressuring hospital CEO Scott Taylor to disband the hospital peer review committee[;]"

- "an unusually high number of nicked bowels during surgeries[;]"

- "abandon[ing] 8 I.C.U. cases[;]"

---

[4]      The Pretrial Order provides that plaintiff sent this letter to Dr. Stucky on January 19, 2019.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvii.).  Given the chronology of events, the court assumes the year identified in this stipulation is erroneous and assumes the proper date is January 19, 2020.  The date on the letter itself—and the email that transported it—confirms this assumption.  *See* Doc. 174-24 at 1–2 (Def. Ex. 41).

- "transferring out patients that he has dangerously mismanaged[;]" and
- "well known incidents of sexual relations in hospital treatment rooms with nurses."

*Id.*  The KBHA complaint also described a vote of no confidence from plaintiff's fellow physicians:  "[T]he medical staff has advised the CEO that he is unsafe and needs an assessment due to his erratic behaviors and dangerous violations of the standard of care."  *Id.*

On January 30, 2020, plaintiff phoned Dr. Green-Cheatwood to discuss the anonymous KBHA complaint.  Doc. 183-24 at 3 (Byrnes Decl. ¶ 11).  He told Dr. Green-Cheatwood "that the report was made in retaliation for the complaint [plaintiff] had filed against Dr. Kessler in August."  *Id.*  And, he asserted, the report's allegations were false.  *Id.*  He then cited specific data showing his mortality rate, recited his work experience as a surgeon, and reviewed his litigation record (just two unsuccessful lawsuits against him in 12.5 years in practice).  *Id.*; Doc. 174-29 at 1 (Def. Ex. 46).  He also informed Dr. Green-Cheatwood about "many witnesses who had the best knowledge to speak to and refute the allegations in the KBHA complaint[.]"  Doc. 183-24 at 3 (Byrnes Decl. ¶ 12).

### *Investigating KBHA Complaint*

That same day, Dr. Green-Cheatwood informed in-house counsel Mr. Sabey about her phone call with plaintiff.  Doc. 174-29 at 1 (Def. Ex. 46).  In response, Mr. Sabey initiated an internal investigation, with plans to interview SCH "employees and medical staff members" and gather "documents and information related to [KBHA's] inquiry."  Doc. 174-30 at 1 (Def. Ex. 47).

Mr. Sabey, Dr. Green-Cheatwood, and Morgan Thomas (GCK Group Quality Director) traveled on February 6, 2020, to Garden City to conduct investigative interviews and gather

documents. *Id.*; Doc. 165 at 4 (Pretrial Order ¶ 2.a.xx.). While there, Mr. Sabey and Dr. Green-Cheatwood talked to CEO Taylor, Ms. Killion, Dr. Michael Babigumira, Dr. Arroyo, Dr. Freeman (King), Dr. Dunford, Dr. Stucky, Dr. Freund, Dr. Kessler, and Dr. James Zauche. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xx.). Mr. Sabey and Dr. Green-Cheatwood also inquired about any further developments and gathered documents about plaintiff's allegations against Dr. Kessler. Doc. 183-11 at 48–49 (Freund Dep. 168:24–169:16); Doc. 183-13 at 29–30 (Green-Cheatwood Dep. 92:21–93:21). Mr. Sabey and Dr. Green-Cheatwood didn't interview plaintiff as part of their investigation. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xx.). Nor did they interview any nurses. *Id.*

### *Firing Plaintiff*

Having completed their investigation, Mr. Sabey and Dr. Green-Cheatwood reported their interpretation of its results to Tom Gessel, GCK Group President, and Scott Lichtenberger, President of Centura Health Physician Group by phone on February 10, 2020. Doc. 173-9 at 22 (Green-Cheatwood Dep. 157:24–160:23); Doc. 173-5 at 21 (Sabey Dep. 145:13–146:1; 146:20–148:17). During that phone call, Dr. Green-Cheatwood recommended that they fire plaintiff. Doc. 173-9 at 22 (Green-Cheatwood Dep. 158:13–24). After the call, Mr. Gessel and Dr. Lichtenberger jointly decided to terminate plaintiff's employment. Doc. 173-3 at 3 (Lichtenberger Dep. 24:8–24). According to Dr. Lichtenberger, he decided based on the information provided to him by Dr. Green-Cheatwood and Mr. Sabey. *Id.* at 4 (Lichtenberger Dep. 25:8–27:16; 28:14–18). And so, on February 12, 2020, Dr. Green-Cheatwood and Dr. Zauche met with plaintiff, told him that he was fired, and provided him a termination letter signed by Dr. Lichtenberger. Doc. 165 at 4 (Pretrial Order ¶ 2.a.xxi.). The termination letter specified that plaintiff's employment was terminated "without cause." Doc. 174-45 at 1 (Def. Ex. 51). Plaintiff's then-in-force employment agreement permitted either party to "terminate

[the] Agreement for any reason or no reason" on 90 days written notice.  Doc. 174-7 at 5 (Def. Ex. 24).

### *Peer Review & Report of Cases to KBHA*

Several months after plaintiff's termination, SCH submitted a Report of Adverse Findings on one of the plaintiff's cases to KBHA.  Doc. 173-18 at 3 (Evans Dep. 19:11–20:4).  This report process began, on February 18, 2020, when Dr. Green-Cheatwood sent Mr. Gessel and Dr. Lichtenberger, among others, a proposed plan for establishing quality and peer review at SCH.  Doc. 174-54 at 1–2 (Def. Ex. 60); Doc. 173-15 at 9–10 (Thomas Dep. 111:21–114:1).  The proposed plan involved immediately sending out SCH cases to other facilities boasting high functioning peer review committees so that those committees could review and identify any immediate care concerns.  Doc. 173-15 at 9–10 (Thomas Dep. 112:19–113:3).  So, in May 2020, Dr. Stucky—on behalf of SCH MEC— began identifying which cases to submit for this outside review.  Doc. 173-7 at 5 (Stucky Dep. 27:10–28:24).  Dr. Stucky also relied—specifically in surgical cases—on recommendations from Dr. Green-Cheatwood.  *Id.*  With the cases identified, peer review committees at other Centura facilities—including one from St. Anthony's Hospital directed by Dr. Rebecca Vogel—reviewed them.  Doc. 173-15 at 32 (Thomas Dep. 241:20–242:16); Doc. 173-17 at 2 (Vogel Dep. 46:3–24).  When a case received a score from the peer review committee that met a mandatory reporting threshold, SCH submitted a Report of Adverse Findings to KBHA.  Doc. 173-15 at 32 (Thomas Dep. 241:20–242:16).  As mentioned above, SCH submitted one of plaintiff's cases around September 28, 2020.  Doc. 173-18 at 3 (Evans Dep. 19:11–20:4); Doc. 184-11 (Pl. Ex. E34).  Later, on January 12, 2021, it submitted three more reports about plaintiff's cases.  *Id.* at 3–4 (Evans Dep. 20:18–21:3).

### *KBHA Conclusions*

In the end, KBHA dismissed all four Adverse Findings Reports (and the anonymous complaint against plaintiff) in this fashion:  First, KBHA gave plaintiff an opportunity to respond to the allegations asserted in the anonymous complaint against him.  Doc. 183-24 at 2 (Byrnes Decl. ¶ 10).  And on September 22, 2021, KBHA sent plaintiff a letter stating they had determined not to take any action at this time and closed the case.  *Id.*  After receiving the first SCH Adverse Findings Report, KBHA notified plaintiff and again gave him an opportunity to respond.  *Id.* at 4 (Byrnes Decl. ¶ 17).  KBHA also decided not to take action on that report and closed the case.  *Id.*  Finally, KBHA notified plaintiff and gave him an opportunity to respond to the final three cases SCH had submitted.  *Id.* (Byrnes Decl. ¶ 20).  And plaintiff received a final letter from KBHA on August 3, 2022.  It asserted that "the reviewing Committee determined that the treatment [he] provided adhered to the applicable standard of care" and KBHA closed the matter.  *Id.*

That's all for now.  This Order will provide a few additional facts that correspond to the specific arguments raised in the parties' written submissions.

## II.    Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is

essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart

Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

     The moving party bears "'both the initial burden of production on a motion for summary

judgment and the burden of establishing that summary judgment is appropriate as a matter of

law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v.

Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the

moving party "'need not negate the non-movant's claim, but need only point to an absence of

evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO,

Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  Even if the non-moving party fails to respond

adequately, "the district court may not grant the motion without first examining the moving

party's submission to determine if it has met its initial burden of demonstrating that no material

issues of fact remain for trial and the moving party is entitled to judgment as a matter of law."

*Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

     If the moving party satisfies its initial burden, the non-moving party "'may not rest on its

pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those

dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169

(quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  The specific "facts must be identified

by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."

*Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth

facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, since 1986, federal courts haven't viewed summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    *McDonnell Douglas* **Burden-Shifting Framework**

According to the Pretrial Order, plaintiff asserts seven claims:  Title VII Retaliation (Count 1); Kan. Stat. Ann. § 65-4928 (Count 2); ADA (Count 3); Fraud (Count 4); Fraud by Silence (Count 5); Promissory Estoppel/Detrimental Reliance (Count 7); and Common Law Retaliation under the Kansas Wage Payment Act (Count 10).  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.i.–vii.).  Three of these claims arise under federal law, and this Order will focus on those first:  (1) Title VII retaliation, (2) ADA discrimination, and (3) ADA retaliation.  The familiar *McDonnell Douglas* burden-shifting framework for Title VII claims applies to all three federal law claims.  *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003) (explaining framework applies to Title VII and applying framework to ADA retaliation claim); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (applying framework to ADA disability discrimination claim).  And so, the court identifies that framework before beginning its analysis of plaintiff's federal claims.

Under the familiar burden-shifting framework, plaintiff first must present a prima facie case of discrimination or retaliation.  *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).  But the "burden on the employee to establish a prima facie case is light[.]"  *Guy v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021).  Then, the burden of production shifts to the employer "to offer a legitimate nondiscriminatory [and nonretaliatory]

reason for its employment decision." *Morgan*, 108 F.3d at 1323.  As with the employee's burden in the first step, the employer's burden at this second stage is "exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).  If the employer offers a legitimate reason, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact . . . whether the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief."  *Morgan*, 108 F.3d at 1323 (quotation cleaned up).

The court applies this *McDonnell Douglas* burden-shifting framework to plaintiff's federal law claims, starting with his two Title VII retaliation claims.

## IV.   Title VII Claims (Count I)

Plaintiff asserts two retaliation claims based on Title VII.  First, plaintiff asserts that defendants fired him as retaliation for his complaints about Dr. Kessler's alleged sexual harassment,[5] thus violating Title VII.  Doc. 165 at 17 (Pretrial Order ¶ 4.a.i.).  Second, plaintiff contends, defendants engaged in a biased and unfair review process of his cases, leading to reporting four of his cases to KBHA, in retaliation for those same complaints about sexual harassment and for his filing of EEOC charges.  Doc. 165 at 10 (Pretrial Order ¶ 3.a.).  Together, these claims comprise Count I.  The court starts with plaintiff's termination-based retaliation claim.

### A.   Title VII Termination-Based Retaliation Claim

---

[5]    Plaintiff also asserts that defendants fired him in retaliation for filing EEOC charges.  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.iii.).  The court addresses the timing of the EEOC charge filing later in this Order.  *See* § V.B.  There, the court determines that plaintiff's firing occurred *before* plaintiff filed any EEOC charges.  *Id.*  And so, the court doesn't address the filing of EEOC charges as part of plaintiff's protected activity under its Title VII retaliation claim premised on his firing.  An employer can't fire an employee in retaliation for behavior after he was fired.  *See Durkin v. City of Chicago*, 341 F.3d 606, 614–15 (7th Cir. 2003) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity.").

### 1.    Prima Facie Case

Title VII makes certain forms of retaliation unlawful by providing that an employer may not "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  A plaintiff asserting a Title VII retaliation claim without direct evidence of retaliation must establish a prima facie case under *McDonnell Douglas*.  *Bekkem*, 915 F.3d at 1267.  For Title VII retaliation, this prima facie case has three elements.  A plaintiff must show "(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Id.* (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).  The burden rests on plaintiff to establish a triable issue for all three prima facie elements.  *Id.*

Here, neither party disputes that plaintiff engaged in protected opposition to discrimination.[6]  And the parties also stipulate that plaintiff submitted a written complaint about Dr. Kessler's alleged sexual harassment on August 31, 2019.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xv.).  "Complaints of retaliation for having complained of sexual harassment are, like the complaints of sexual harassment themselves, protected activity under Title VII."  *Townsend v. BG-Meridian, Inc.*, No. CIV-04-1162-F, 2005 WL 2978899, at *5 (W.D. Okla. Nov. 7, 2005).  That takes care of the first prong.

---

[6]     Indeed, defendants "assume for purposes of summary judgment only, and without admitting the same, that Plaintiff participated in protected activity pursuant to Title VII when he complained in August 2019 that nurses were sexually harassed by Dr. Kessler and when he filed charges of discrimination with EEOC."  Doc. 173 at 26 n.7.

The second prima facie prong is equally straightforward.  Plaintiff asserts his firing provides the requisite materially adverse action.  Doc. 183 at 36.  And defendants don't challenge that assertion.[7]  *See generally* Doc. 173.  Nor could they.  The parties stipulate that Dr. Green-Cheatwood informed plaintiff of his job's termination and provided him with a termination letter on February 12, 2020.  Doc. 165 at 3 (Pretrial Order ¶ 2.a.xxi.).  And firing qualifies as a materially adverse action.  *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) ("[H]e was fired, which obviously qualifies as 'materially adverse[.]'").  So, plaintiff's prima facie case of termination-based retaliation under Title VII comes down to the third prong:  causation.

Recall that a plaintiff establishing a prima facie retaliation case must show "'a causal connection existed between the protected activity and the materially adverse action.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193).  And as "a prerequisite to this showing, [plaintiff] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity."  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  "An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."  *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (emphasis in original).  "Plaintiff must therefore point to evidence that those who acted against him knew of his formal complaints."  *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019).  And "bare speculation" supporting an employer's knowledge

---

[7]    Defendants' brief doesn't contest that terminating plaintiff qualifies as an adverse action.  It does contest plaintiff's ability to establish a materially adverse action, however, on another basis:  MEC's request for plaintiff to submit to a psychological evaluation.  Doc. 173 at 27.  But defendants misapprehend the basis of plaintiff's Title VII claim.  Plaintiff clarifies in his Response that he doesn't argue that the psychological evaluation request was a materially adverse action.  *See* Doc. 183 at 36 n.11.

of plaintiff's protected opposition won't suffice. *Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1328 (10th Cir. 2023).

Here, defendants argue that plaintiff fails to provide evidence of the requisite knowledge to establish a causal connection. Doc. 173 at 29–30. That is, plaintiff hasn't adduced evidence that the decision makers who fired him knew of his protected activity, defendants contend. *Id.* Without adducing evidence of such knowledge, defendants argue, plaintiff's claim fails. *Id.* Not so fast, plaintiff responds. While plaintiff concedes that the decision makers who terminated him didn't possess knowledge of his protected activity, he claims that doesn't end the analysis.[8] Doc. 183 at 40–41. Instead, plaintiff argues, the "cat's paw" doctrine[9] applies here. *Id.*

"On a cat's paw theory of liability the influence of [a] biased subordinate provides the causal connection the plaintiff's prima facie case requires[.]" *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 795 (10th Cir. 2014). That's so because "even though the ultimate

---

[8]      Plaintiff also argues that the close temporal proximity between plaintiff's January 2020 written and oral complaints and his termination in February 2020 "by itself, shows causation." Doc. 183 at 36. To be sure, "a plaintiff may show a causal connection by presenting evidence that the 'temporal proximity' between the protected conduct and the materially adverse action justifies an inference of retaliatory motive." *Singh*, 936 F.3d at 1043 (quotation cleaned up). Nonetheless, "a plaintiff who seeks to show causation [by temporal proximity] still must present evidence that the decisionmakers *knew* of the protected conduct." *Id.* (emphasis in original). So, plaintiff's temporal proximity causation argument doesn't take care of the knowledge question. That is, the alleged temporal proximity doesn't, "by itself," demonstrate causation and plaintiff still must rely on the cat's paw doctrine.

[9]      The Tenth Circuit previously explained the etymology of the cat's paw doctrine. This etymology contributes to a fuller understanding of the doctrine, so the court recites it here:

> The cat's paw doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. . . . In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006) (quotation cleaned up).

decisionmakers weren't biased it was still because of bias that the employee suffered the adverse action." *Id.* "[T]o survive summary judgment when asserting the cat's-paw theory of liability, a plaintiff must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action." *Singh*, 936 F.3d at 1038.

Here, it's undisputed that Dr. Lichtenberger and Mr. Gessel jointly decided to terminate plaintiff's employment. Doc. 173-3 at 3 (Lichtenberger Dep. 24:8–24); Doc. 183 at 14 (disputing the veracity of the information on which Dr. Lichtenberger and Mr. Gessel relied, but not disputing whether they made the firing decision). It's also undisputed that they didn't know of plaintiff's complaints about Dr. Kessler. Doc. 173-3 at 13 (Lichtenberger Dep. 62:18–24); Doc. 183 at 15. At first blush, that seems to end the issue. When a plaintiff doesn't "come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity[,]" his claim fails. *Hinds*, 523 F.3d at 1203. But, plaintiff retorts, Dr. Lichtenberger and Mr. Gessel decided to terminate him based on information provided by Dr. Green-Cheatwood and Mr. Sabey. Doc. 183 at 15; Doc. 173-3 at 4 (Lichtenberger Dep. 25:6–27:21). And so, plaintiff argues, Dr. Lichtenberger and Mr. Gessel were innocent cats with burned paws. That is, Dr. Lichtenberger and Mr. Gessel simply did the bidding of Dr. Green-Cheatwood and Mr. Sabey, who, plaintiff asserts, were motivated by retaliatory animus.

For plaintiff here to invoke the cat's paw doctrine successfully, he first must establish a genuine issue of material fact from which a jury could infer that retaliatory animus motivated a subordinate's action. Plaintiff contends that Dr. Green-Cheatwood and Mr. Sabey imputed

retaliatory bias to the decision makers, Dr. Lichtenberger and Mr. Gessel.  And plaintiff asserts that a reasonable juror could infer Dr. Green-Cheatwood and Mr. Sabey's retaliatory bias based on the evidence of pretext plaintiff provides.  Doc. 183 at 41.

A plaintiff appropriately may rely on pretext evidence at the causation stage, Tenth Circuit precedent holds.  *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (identifying that the Tenth Circuit has taken into account pretext evidence in a retaliation claim's prima facie stage) (citing *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (analyzing causation element of prima facie case for Title VII retaliation claim by addressing pretext evidence)).  But here plaintiff takes a spaghetti-on-the-wall approach to pretext, rattling off no fewer than 13 theories to see which one will stick.  Doc. 183 at 38–39.  And plaintiff's burden at the prima facie causal connection stage differs from plaintiff's burden at the pretext stage.  *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) ("The burden of establishing a prima facie case in the *McDonnell Douglas* framework is not onerous. . . . [But in the] pretext analysis . . . the burden is more demanding and requires a plaintiff to assume the normal burden of any plaintiff to prove his or her case at trial." (quotation cleaned up)).  So, if the court engages in a full analysis of plaintiff's pretext arguments here— under the prima facie burden—it would have to revisit that entire analysis under plaintiff's higher burden of pretext below.  The court declines.  And so, the court assumes—without deciding—that a reasonable juror could infer Dr. Green-Cheatwood and Mr. Sabey's retaliatory animus under one of the many pretext arguments plaintiff proffers.  And the court thus moves on to the second step of the cat's paw doctrine.  And no one need worry that the court has abandoned the pretext analysis.  The court will return to these pretext arguments under *McDonnell Douglas*'s third step later in this Order.  *See* § IV.A.3.

The second cat's paw theory prong requires a plaintiff to show a genuine issue of material fact that "the subordinate intended the action to cause an adverse employment action[.]" *Singh*, 936 F.3d at 1038. The most obvious actions relevant here are Dr. Green-Cheatwood and Mr. Sabey's acts of conducting investigative interviews and then reporting their findings to the decision makers. And plaintiff has adduced evidence sufficient for a reasonable juror to infer that Dr. Green-Cheatwood and Mr. Sabey intended those interviews and that reporting to cause plaintiff's firing. Dr. Green-Cheatwood, for her part, expressly relied on the information procured in the interviews to recommend that Dr. Lichtenberger and Mr. Gessel fire plaintiff. Doc. 173-9 at 22 (Green-Cheatwood Dep. 157:5–158:24). And Mr. Sabey testified that the whole point of investigating was to provide information about the interviews so the decision makers could rely on it. Doc. 173-5 at 23 (Sabey Dep. 158:8–159:8). Both subordinates thus drew a straight-line between the action of engaging in the interview process and firing plaintiff, satisfying prong two.

The third prong of the cat's paw theory requires plaintiff to show a genuine issue of material fact that "the subordinate's actions proximately caused the intended adverse employment action." *Singh*, 936 F.3d at 1038. Our Circuit requires the subordinate's involvement to surpass "mere influence or input in the decisionmaking process." *BCI Coca-Cola*, 450 F.3d at 487 (quotation cleaned up). Instead, "the biased subordinate's discriminatory reports, recommendation, or other actions [must have] caused the adverse employment action." *Id.* Here, the court concludes, a reasonable juror could infer from the February 10, 2020, phone conversation that Dr. Green-Cheatwood and Mr. Sabey's interview reports caused Dr. Lichtenberger and Mr. Gessel to fire plaintiff. Dr. Lichtenberger testified that he had relied on Mr. Sabey's verbal report about the interviews in making his firing decision. Doc. 173-3 at 5–6

(Lichtenberger Dep. 32:8–33:9).  And he testified that he relied on Dr. Green-Cheatwood's representations about the investigations, as well.  *Id.* at 4 (Lichtenberger Dep. 25:6–27:16).  And he had to rely in this fashion.  Dr. Lichtenberger was new to his position—he had worked for defendants for just one month when he fired plaintiff—and he didn't know plaintiff at all.  *Id.* at 3 (Lichtenberger Dep. 23:3–24:7).  He identified Mr. Sabey as his source to confirm that the interviews substantiated the allegations against plaintiff.  *See id.* at 5 (Lichtenberger Dep. 32:11–16).  Mr. Gessel, for his part, doesn't recall who made plaintiff's termination decision, whether he was involved in that decision, or why plaintiff was fired.  Doc. 183-12 at 3–4 (Gessel Dep. 41:12–42:16).  He could surmise, however, that Dr. Green-Cheatwood and Mr. Sabey supported firing plaintiff because, since they were the ones involved in the discussion, he "probably would have remembered [any] objection."  *Id.* at 5 (Gessel Dep. 43:21–25).  While Mr. Gessel's testimony proves less definitive, Dr. Lichtenberger's suffices to show a genuine issue of material fact from which a reasonable juror could infer that Dr. Green-Cheatwood and Mr. Sabey's report caused plaintiff's firing, satisfying the third prong of the cat's paw doctrine.

And so, assuming cat's paw liability, the court concludes that plaintiff otherwise has established a prima facie case for a Title VII retaliation claim premised on his termination.

## 2.    Legitimate, Nondiscriminatory Reason

If plaintiff "establishes a prima facie case of retaliation, the burden shifts to [the employer] to assert a legitimate, nondiscriminatory reason for the adverse action."  *Proctor*, 502 F.3d at 1208.  If the employer "provides a legitimate, nondiscriminatory reason for its decision, the burden shifts back to [plaintiff] to show that [the employer's] proffered reason is a pretext masking discriminatory animus."  *Id.* (quotation cleaned up).

Our Circuit has explained that the defendant employer, at this second step, doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).  That is, defendants' "burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  "'[T]his stage of the analysis only requires the defendant to articulate a reason for the [employment decision] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'" *Frappied*, 966 F.3d at 1058 (first alteration in original) (quoting *Flasher*, 986 F.2d at 1316 & n.4).  So, according to our Circuit's authority, a party's burden to demonstrate a legitimate, nondiscriminatory reason is "exceedingly light." *Bekkem*, 915 F.3d at 1268 (quotation cleaned up).

Here, defendants offer four legitimate, nondiscriminatory reasons for firing plaintiff. They harbored concerns about plaintiff:  (i) abandoning patients in the ICU; (ii) poorly documenting patients' status; (iii) potentially exercising poor clinical judgment; and (iv) stopping some of the peer review components in his role as CMO.  Doc. 173-3 at 4 (Lichtenberger Dep. 25:6–26:19).  Defendants' reasons for firing plaintiff aren't prohibited facially—so, defendants have satisfied their burden at this step.  The court needn't litigate the merits of firing plaintiff for these reasons, nor need it determine whether any of these four reasons were bona fide.  Instead, because defendants' burden at this stage is exceedingly light, defendants' showing qualifies as a legitimate, nondiscriminatory reason satisfactory to discharge defendants' burden at step two.  *Frappied*, 966 F.3d at 1058.  This claim's disposition thus turns

21

on whether plaintiff has adduced sufficient evidence to identify a triable issue of pretext under *McDonnell Douglas* step three.

### 3.        Pretext

At the third step of the *McDonnell Douglas* framework, the burden shifts back to plaintiff.  Now, plaintiff must present a genuine issue of material fact that defendants' asserted reasons for terminating his employment were pretextual.  To meet this burden, plaintiff must provide evidence that "the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination" or retaliation.  *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).  To analyze whether a reasonable juror could find pretext under this standard, the court doesn't ask "whether the employer's reasons were wise, fair or correct[.]" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007).  Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1119.

The court thus evaluates "the facts as they appeared to the person making the decision," and doesn't "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment."  *Id.*  "The reason for this rule is plain:  [the court's] role is to prevent intentional discriminatory [employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young*, 468 F.3d at 1250; *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("'An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.'" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))).

22

Plaintiff's pretext arguments fall into four categories[10]: defendants' inconsistent and uncorroborated reasons for plaintiff's termination; the temporal proximity between protected activity and termination; defendants' failure to conduct reasonable and sufficient investigations; and defendants' failure to follow normal policies and procedures. Doc. 183 at 38–39. The court concludes that plaintiff hasn't adduced sufficient evidence to create a genuine issue that defendants' rationale for his termination is pretext for retaliation. The court explains this conclusion by addressing each pretext argument, below.

### i.   Inconsistent and Uncorroborated Reasons

*First*, plaintiff argues that defendants offer inconsistent and uncorroborated reasons for firing plaintiff. The Tenth Circuit has "held that a jury can reasonably infer pretext when an

---

[10]    Plaintiff's Response brief lists 13 different pretext arguments. Doc. 183 at 38–39. The court identified significant overlap in several of these enumerated arguments. So, the court streamlined the arguments into four overarching categories. This footnote explains the four pretext arguments that capture all of plaintiff's pretext theories.

   *First*, the court grouped together arguments about defendants' inconsistent and uncorroborated reasons for plaintiff's termination including: "(a) Defendants provided changing, inconsistent, and post-hoc reasons for termination[;]" "(b) Many irregularities, inconsistencies, and fact disputes regarding the alleged reasons for termination[;]" and "(c) Witnesses did not actually corroborate the stated reasons for termination[;]" "(e) Reasons were inconsistent with performance assessments, objective data, and recent contract renewal and recredentialing[;] and "(f) CEO Taylor . . . said [plaintiff's] performance was good, he met all quality care metrics, and termination was 'unwarranted' and 'wrong.'" *Id.*

   *Second*, the court grouped together arguments about temporal proximity including: "(m) Temporal proximity between protected activity and termination" and "(i) [o]ngoing concern over [plaintiff's] complaints about Kessler that continued up to termination." *Id.*

   *Third*, the court grouped together arguments about failure to conduct reasonable and sufficient investigations including: "(d) Failure to conduct a reasonable investigation[;]" "(l) Investigation of [plaintiff] was conducted 'solely because of' the KBHA complaint . . . which . . . was retaliatory[;]" and "(h) Disparate treatment of other doctors . . . (failure to interview)[;]" and "(j) Failure to conduct a reasonable investigation into Byrnes' complaints about Kessler." *Id.*

   *Last*, the court grouped together arguments about defendants' failure to follow normal policies and procedures: "(g) Not following policies and normal procedures in numerous respects[;]" and "(k) failure to follow policy and normal procedure in that investigation." *Id.*

employer is inconsistent in the reasons it provides for the termination." *Fassbender v. Correct Care Sols.*, *LLC*, 890 F.3d 875, 887 (10th Cir. May 2018) (quotation cleaned up). "Such inconsistencies include abandoning explanations that the employer previously asserted[,]" *id.*, or affirmatively disclaiming a proffered rationale. *Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005). But "merely providing additional non-discriminatory reasons for the termination is not enough to establish pretext, especially where the additional reasons are not contradictory." *Rolland v. Carnation Bldg. Servs., Inc.*, 739 F. App'x 920, 924 (10th Cir. 2018) (collecting cases). "Rather, inconsistency evidence is only helpful to a plaintiff if the employer has changed its explanation under circumstances that suggest dishonesty or bad faith." *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1291 (10th Cir. 2022) (quotation cleaned up); *see also Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 WL 4807176, at *8 (10th Cir. Oct. 15, 2021) (assuming employer provided an "inconsistent explanation" for firing plaintiff but concluding that the circumstances still did "not suggest [the employer] changed its explanation under circumstances that suggest dishonesty or bad faith").

Here, plaintiff explains, various spokespersons for defendants emphasized different termination reasons, which, plaintiff argues, amounts to an inconsistency sufficient for a reasonable juror to infer pretext. Doc. 183 at 38. As explained above under *McDonnell Douglas*'s stage two, defendants identified four reasons—across their spokespersons and decision makers—to fire plaintiff: abandoning patients in the ICU; poorly documenting patients' status; potentially exercising poor clinical judgment; and stopping some of the peer review components in his role as CMO. Doc. 173-3 at 4 (Lichtenberger Dep. 25:6–26:19). And the summary judgment evidence supports plaintiff's contention that the various spokespersons emphasized one reason over another. But those varying emphases don't equal inconsistent

reasons.  Indeed, the different spokespersons—even when emphasizing one primary firing reason—also cited other reasons, as well.

Decision maker Dr. Lichtenberger identified patient abandonment in the ICU as his primary concern but noted all four reasons in his deposition testimony.  *Id.*  For example, even as Dr. Lichtenberger prioritized the alleged abandoning of patients, he, too, referenced plaintiff's neglect in "doing some of the peer review components."  *Id.* (Lichtenberger Dep. 25:6–26:16).  Similarly, defendants' corporate witness echoed Dr. Lichtenberger's concern about patient abandonment but also cited "clinical competency" concerns.  Doc. 183-8 at 22–23 (Eklund Dep. 62:23–63:1).  And outside counsel framed the primary issue leading to plaintiff's firing as shutting down the peer review system, but he also discussed the "inappropriateness of [plaintiff's] patient care."  Doc. 183-34 at 1 (Pl. Ex. D2).  To be sure, defendants identified multiple reasons, and different spokespersons did so with differing emphases.  But defendants never abandoned or affirmatively disclaimed any of their reasons.  *See Whittington*, 429 F.3d at 994.

What's more, the four reasons cited by defendants are "not contradictory" to one another.  *See Rolland*, 739 F. App'x at 924.  Plaintiff could have abandoned patients in the ICU and interfered with the peer review system when serving as CMO; these actions aren't mutually exclusive.  Nor has plaintiff adduced evidence of "circumstances that suggest dishonesty or bad faith."  *Litzsinger*, 25 F.4th at 1291.  A given spokesperson prioritizing one reason—while still citing other reasons consistent with other spokespersons—doesn't suggest dishonesty or bad faith.  *Id.*  In sum, despite the multitude of reasons and the varying speakers' different emphases, the summary judgment evidence reveals sufficient overlap in the reasons given to preclude an inference of pretext premised on inconsistent reasons.

Next, plaintiff contends defendants' termination reasons were uncorroborated.  Doc. 183 at 38.  He argues that witnesses and previous assessments of plaintiff's work don't align with defendants' termination reasons.  *Id.*  And he argues that CEO Taylor's perspective that plaintiff's firing was unwarranted and wrong likewise demonstrates uncorroborated reasons.  Finally, he argues that he had no role in stopping the peer review system, so this reason, too, was uncorroborated.  But a reasonable juror couldn't infer from the summary judgment evidence here that defendants' termination reasons were uncorroborated.  Here's why:  Five different doctors had brought similar concerns about plaintiff's patient care to CEO Taylor in April 2019, *before* plaintiff engaged in the protected activity at issue here.  Doc. 173-2 at 5 (Taylor Dep. 133:23–135:21); Doc. 173-13 at 4 (Arroyo Dep. 31:24–32:5) (explaining that in April 2019 five doctors communicated to CEO Taylor the same concerns about plaintiff that Dr. Arroyo reiterated to Mr. Sabey in the investigative interview).  And at that time, the five doctors requested that SCH fire plaintiff.  Doc. 173-2 at 5 (Taylor Dep. 133:23–135:21).  But instead of firing plaintiff in April 2019, CEO Taylor removed him as CMO.  *Id.* (Taylor Dep. 135:2–8); Doc. 165 at 3 (Pretrial Order ¶ 2.a.xiii.).  More importantly, whether those five doctors were correct in their assessments about plaintiff's patient care issues isn't something for the court to decide here.  The court doesn't need to hash out whether defendants' deciding to fire plaintiff was "wise, fair or correct[.]"  *Riggs*, 497 F.3d at 1118.  Instead, the court evaluates merely "whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1119.  And the April 2019 meeting suggests, at the very least, that patient care concerns weren't uncorroborated.  Even if those concerns never made it into a formal assessment or CEO Taylor didn't agree that they warranted termination, there were doctors who corroborated the patient care concerns *before* any protected activity.

Nor is it of any moment that plaintiff contends the peer review termination reason is false.  Again, the court evaluates "the facts *as they appeared* to the person making the decision," and evaluates "whether the employer honestly believed its reasons and acted in good faith upon them."  *Riggs*, 497 F.3d at 1119 (emphasis added).  The summary judgment evidence suggests that the decision makers—Dr. Lichtenberger and Mr. Gessel—and those influencing the decision makers—Dr. Green-Cheatwood and Mr. Sabey—understood that plaintiff bore responsibility for the hospital's inadequate peer review system.  *See* Doc. 173-5 at 16 (Sabey Dep. 115:21–116:8); Doc. 173-9 at 9–10 (Green-Cheatwood Dep. 83:19—85:3).  Mr. Sabey came to that understanding from the interviews.  Doc. 173-5 at 16 (Sabey Dep. 115:21–116:8).  Dr. Green-Cheatwood arrived at that conclusion from her own CMO experience.  Doc. 173-9 at 9–10 (Green-Cheatwood Dep. 83:19—85:3).  And Dr. Lichtenberger relied on the information he received from Dr. Green-Cheatwood and Mr. Sabey.  Doc. 173-3 at 4, 5–6 (Lichtenberger Dep. 25:6–27:16, 32:8–33:9).  The court needn't decide whether plaintiff was at fault for the peer review system stalling out; just whether the decision makers, when firing plaintiff, *thought* he was at fault.  And plaintiff hasn't presented a triable issue about the decision makers' understanding.  Instead, plaintiff disputes his role in the peer review interference with deposition testimony from CEO Taylor and Ms. Killion.  Doc. 183 at 31.  But CEO Taylor wasn't part of the decision making process.  Doc. 173-2 at 5 (Taylor Dep. 133:8–12).  So, his understanding about how the peer review system became defunct sheds no light on how the facts appeared to the people making the decision to terminate.  And plaintiff cites the deposition testimony of Ms. Killion.  Doc. 183 at 31.  But she testified that she doesn't recall discussing the peer review process in the interview with Dr. Green-Cheatwood and Mr. Sabey.  Doc. 183-16 at 40 (Killion Dep. 120:10–121:3).  Her understanding, therefore, also didn't reach the ears of the decision

makers.  In sum, none of the evidence plaintiff cites creates a triable issue about the *decision makers'* understanding of the peer review debacle.

So, the court concludes, plaintiff hasn't created a triable issue that the absence of corroborating evidence—in the form of witnesses, performance assessments, CEO Taylor's judgment, or a false peer review reason—demonstrates pretext.  *See Sarrai v. Azar*, Civ. No. 16-1299 KK/SCY, 2018 WL 6833408, at *13 (D.N.M. Dec. 28, 2018) ("[T]hat [defendants] failed to confirm the complaints' accuracy does not give rise to a reasonable inference that their stated reliance on these complaints is pretextual.").  The court moves on to plaintiff's next pretext argument:  temporal proximity.

## ii.        Temporal Proximity

*Second*, plaintiff argues, the temporal proximity of his re-upped sexual harassment complaints (in January 2020) to his firing (in February 2020) creates a triable issue of pretext.  Doc. 183 at 39.  This temporal proximity pretext argument is particularly compelling, plaintiff asserts, because the concerns about plaintiff's protected activity were ongoing, continuing up to just weeks before termination.  *Id.*  But here's the problem:  the concerns that surfaced in the interviews—and that decision makers relied on to fire plaintiff—emerged *before* plaintiff's protected activity in August 2019.  That five-doctor meeting with CEO Taylor in April 2019 manifested many of the same concerns, thus mitigating against a plausible finding of pretext on temporal proximity grounds.  What's more, "close temporal proximity can support a finding of pretext only in combination with other evidence of pretext."  *Lobato v. N. M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013).  And, as discussed more fully below, no other evidence of pretext here contributes to the requisite combination.

28

### iii.      Unreasonable Investigation

*Third*, plaintiff contends that defendants' failure to conduct reasonable investigations demonstrates pretext.  Doc. 183 at 38.  In assessing an investigation in the context of a pretext analysis, the Tenth Circuit doesn't focus on whether that investigation is "optimal (i.e., text-book best practices)" but instead on whether it "was fair."  *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017).  That is, a "failure to conduct . . . a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext."  *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (quotation cleaned up).  *Smothers* is instructive here.  In *Smothers*, the employer fired an employee by relying on information from just one side of an employment dispute.  *Id.*  And the employer actively refused to let plaintiff talk about the quarrel.  *Id.*  The Tenth Circuit held that this coupling of one-sided reliance and active refusal sufficed for a reasonable jury to infer pretext.  *Id.* at 543.  The Tenth Circuit later framed *Smothers*' employer as having "deliberately prevented the plaintiff from responding to the allegations against him."  *Gupta v. Okla. City Pub. Schs.*, No. 21-6138, 2022 WL 1742048, at *6 (10th Cir. May 31, 2022).  On the other hand, where an employer acknowledged that plaintiff disputed the accusations against him—but declined to rely on plaintiff's representation about the conflict—the Tenth Circuit found no such inference of pretext.  *Id.*  That is, "an employer may . . . 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'"  *Dewitt*, 845 F.3d at 1314 (quoting *BCI Coca-Cola*, 450 F.3d at 488).

Here, plaintiff argues, defendants conducted an unreasonable investigation after receiving the KBHA subpoena primarily by criticizing who defendants chose to interview—and who they chose not to interview.  Plaintiff contends that defendants didn't interview "other obvious

witnesses" like nurses or a co-surgeon, didn't interview plaintiff himself,[11] didn't consider "readily available provider data," and accepted "biased witnesses' allegations without verifying them." Doc. 183 at 38. But an "optimal," "best practices" investigation isn't required. *Dewitt*, 845 F.3d at 1315. And defendants' decision to interview doctors, instead of nurses, makes sense given that the doctors—in light of their expertise and experience—likely were better placed to identify issues with plaintiff's performance as a doctor. To be sure, considering provider data undoubtedly falls into the best practices category. But such data rarely tells the whole story. And—once again—best practices aren't required.

So, at bottom, a single phone call is the most important event for the court to evaluate pretext here. It is undisputed that Dr. Green-Cheatwood conversed with plaintiff about the KBHA complaint—the subject of the allegedly unreasonable investigation—on January 30, 2020. Doc. 183-24 at 3 (Byrnes Decl. ¶ 11). And it is undisputed that plaintiff, during this

---

[11]    Plaintiff also cites this "failure to interview" in a separate pretext argument about disparate treatment of other doctors. Doc. 183 at 38. But the evidence plaintiff adduces as disparate treatment for the termination decision all centers on the unreasonableness of the investigation. This evidence includes: a failure to interview other informed witnesses; a failure to interview a co-surgeon in one of plaintiff's cases reviewed by Dr. Green-Cheatwood; a failure to interview plaintiff; and a failure to provide plaintiff with an opportunity to respond. Because these instances of alleged disparate treatment thus center on the reasonableness of defendants' investigation, the court doesn't address a disparate treatment pretext argument separately here. It is subsumed in plaintiff's pretext argument based on unreasonable investigation.

   And even if it did address disparate treatment separately, the court could dispense with the argument quickly. "A plaintiff may show pretext by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Smothers*, 740 F.3d at 540 (quotation cleaned up). Plaintiff adduces no evidence suggesting anyone had complained to the KBHA about the allegedly similarly-situated doctors, or that KBHA had issued a subpoena against these other allegedly similarly-situated doctors. And that report and subpoena drove the investigation here. So, plaintiff fails to adduce disparate treatment evidence to establish pretext.

   The only other disparate treatment evidence plaintiff adduces involves a Report of Adverse Findings submitted to KBHA months after plaintiff was fired. But here the court addresses just evidence about defendants' termination decision. So, the court doesn't take up that disparate treatment argument here.

conversation, told Dr. Green-Cheatwood that the allegations were false.  *Id.*  And that's not all.

Plaintiff also pleaded his case.  He cited specific data showing his mortality rate, recited his work

experience as a surgeon, and even reviewed his litigation record (just two unsuccessful lawsuits

against him in 12.5 years in practice).  *Id.*; Doc. 174-29 at 1 (Def. Ex. 46).  Finally, he identified

medical staff members who would support him.  Doc. 183-24 at 3 (Byrnes Decl. ¶ 12); Doc. 174-

29 at 1 (Def. Ex. 46).

This conversation ends the analysis about the KBHA complaint investigation.  During the

phone call, plaintiff provided "'his version of events.'"  *Dewitt*, 845 F.3d at 1314 (quoting *BCI*

*Coca-Cola*, 450 F.3d at 488).  And that's a far cry from "deliberately prevent[ing] the plaintiff

from responding to the allegations against him."  *Gupta*, 2022 WL 1742048, at *6.  To be sure,

defendants didn't interview plaintiff formally during their investigation.  And perhaps such a

formal interview would constitute a best practice.  But, one more time, an "optimal"

investigation isn't the standard.  *Dewitt*, 845 F.3d at 1315.  And neglecting to provide plaintiff a

second, more formal opportunity to defend himself isn't required.[12]  *See Daimaru v. Wayfair,*

*LLC*, 631 F. Supp. 3d 1069, 1085 (D. Utah 2022) ("[Defendant's] failure to ask for more

information is not the same as a deliberate attempt to prevent her from arguing her case.").

Finally, just because defendants chose not to rely on plaintiff's representations, but instead relied

on those of other witnesses, it doesn't follow that a reasonable juror properly could infer pretext.

---

[12]    The court recognizes that plaintiff had this conversation with Dr. Green-Cheatwood alone.  But it
is undisputed that Dr. Green-Cheatwood sent an email to Mr. Sabey summarizing the phone call.  Doc.
174-29 (Def. Ex. 46).  And plaintiff argues that Dr. Green-Cheatwood and Mr. Sabey influenced the
decision makers to the point of imputing their own biases, *see* § IV.A.1. above.  That argument cuts both
ways.  If Dr. Green-Cheatwood and Mr. Sabey's perspectives so influenced the termination decision, then
this phone call suffices as an opportunity for plaintiff to tell defendants his version of the events.

*See Gupta*, 2022 WL 1742048, at *6.  And so, the January 30, 2020, conversation negates any inference of pretext stemming from an allegedly unfair investigation into the KBHA complaint.

A similar analysis overwhelms any inference of pretext premised on the investigation into plaintiff's complaints about Dr. Kessler.  Again, plaintiff takes issue with the choice of witnesses, noting that defendants only interviewed one nurse and didn't interview the ICU nurses' boss until just before plaintiff's firing.  Doc. 183 at 4.  But the nurse who defendants interviewed was *the one nurse* plaintiff alleged Dr. Kessler had harassed—a logical choice.  Doc. 183-14 at 19 (Hauer Dep. 40:7–17); Doc. 174-17 at 2 (Def. Ex. 34) (explaining that plaintiff's complaint included "a single incident" involving the nurse interviewed).  And SCH's Human Resources Director interviewed that nurse within one week of plaintiff's written complaint.  Doc. 174-18 at 1 (Def. Ex. 35).  The nurse explained in the interview that the allegedly inappropriate touching was simply when "the doctor had brushed up against [her]" and that she "was not uncomfortable."  *Id.*  She also commented that she "was surprised" the person reporting the incident said anything and surmised that the person reporting it "must have taken it wrong" because the brushing up "did not bother [her]."  *Id.*  To be sure, the nurse told plaintiff the touching was "weird and inappropriate."  Doc. 183-32 at 1 (St. Clair Decl. ¶ 7).  But she never claims to have made any such representation to the Human Resources Director—instead the nurse says she doesn't recall their conversation.[13]  *Id.* at 1–2 (St. Clair Decl. ¶ 9).  In light of such

---

[13]      The summary judgment record appears to contain evidence manifesting a dispute over what precisely this same nurse told Dr. Freund when he interviewed her on behalf of the MEC.  Dr. Freund claims she never said the touching was "weird and inappropriate," but she says she did.  *See* Doc. 183-11 at 17–18 (Freund Dep. 65:23–66:12); Doc. 183-32 at 2 (St. Clair Decl. ¶ 10).  But the court has determined that the MEC wasn't plaintiff's employer.  *See* § V.A.; Doc. 165 at 3 (Pretrial Order ¶ 2.x.).  So, the court focuses here on what defendants—plaintiff's employer—did in their investigation of the Kessler complaint.

statements to HR, defendants' decision not to pursue other interviews seems—perhaps not "optimal"—but at least explicable.  *Dewitt*, 845 F.3d at 1315.

What's more, plaintiff again had occasion to provide "'his version of events'" during his October 16, 2019, meeting with Dr. Freund, Dr. Green-Cheatwood, and Dr. Stucky.  *Id.* at 1314 (quoting *BCI Coca-Cola*, 450 F.3d at 488); Doc. 165 at 3 (Pretrial Order ¶ 2.a.xvi.).  At the meeting, plaintiff not only reiterated his concerns about Dr. Kessler but also expressed his views about the thoroughness of the investigation.  Doc. 174-61 at 2 (Def. Ex. 67); Doc. 183-6 at 50–52 (Byrnes Dep. 181:21–183:10).  Once again, defendants' request that plaintiff attend this meeting and explain his version of events surrounding the Kessler complaint "'defeat[s] the inference' of pretext stemming from an allegedly unfair investigation[.]"  *Dewitt*, 845 F.3d at 1314 (quoting *BCI Coca-Cola*, 450 F.3d at 488).  And so, plaintiff is left with one final pretext argument: deviation from normal policies and procedures.

### iv.        Deviation from Normal Policies and Procedures

*Fourth*, plaintiff asserts that defendants' failure to follow their normal policies and procedures allows an inference of pretext.  Doc. 183 at 38.  As evidence, plaintiff invokes CEO Taylor's not participating in the firing decision and defendants' practice of resolving patient care issues with a doctor by discussing it with him, not firing him.[14]

---

[14]      Plaintiff adduces other evidence as well, but the court needn't address it here.  *First*, plaintiff invokes Dr. Green-Cheatwood's review of plaintiff's cases.  Doc. 183 at 12–13, 39.  But plaintiff himself identifies that Dr. Green-Cheatwood didn't review the relevant case until *after* plaintiff's firing and concedes that Dr. Green-Cheatwood's "opinions regarding that procedure could not have formed a basis for [plaintiff's] termination."  *Id.* at 12–13.  If any alleged issues with Dr. Green-Cheatwood's review didn't influence plaintiff's firing, the court needn't address that pretext argument here.  *Second,* plaintiff cites shortcomings of the KBHA complaint's investigation—neglecting to interview plaintiff, neglecting to interview other witnesses, such as nurses, and neglecting to review quality data—as evidence of procedural deviation.  *Id.* at 38.  And he also cites the Kessler complaint investigation's shortcomings— neglecting to interview more than one nurse.  But the court has addressed these arguments already in § IV.A.3.iii., above, and so it needn't take them up again here.

A showing of pretext premised on a deviation from procedure requires evidence that the defendant acted (i) "contrary to a written company policy[;]" (ii) contrary to "an unwritten policy[;]" or (iii) "contrary to company practice when making the adverse employment decision." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quotation cleaned up). "However, 'deviations from normal company procedures' provide support for an assertion of pretext only when they can be considered 'disturbing procedural irregularities.'" *May v. Cockman*, No. CV 13-1021 GBW/KK, 2016 WL 10591979, at *8 (D.N.M. Jan. 28, 2016) (quoting *Doebele*, 342 F.3d at 1138 n.11). "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1230. In this similarly-situated analysis, a court should "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Here, plaintiff never adduces evidence of any written policies that defendants violated when reaching a decision to terminate him.[15] So, he must rely either on unwritten policies or company practice to establish pretext by deviation. To establish pretext based on CEO Taylor not participating in the termination decision, plaintiff adduces just one scrap of evidence: CEO Taylor's subjective belief. CEO Taylor testified that he "believe[d]" it would be atypical to

---

[15]    Plaintiff adduces evidence of written SCH and Centura policies about the peer review process and a physician's opportunity to respond to cases under review. Doc. 184-3 (Pl. Ex. D6); Doc. 184-24 (Pl. Ex. E167). But plaintiff clarifies in his briefing that the quality review to which these policies apply "did not occur until after [plaintiff's] termination[.]" Doc. 183 at 21. So, the court doesn't take into account these written policies in assessing whether defendants' termination reasons were pretextual.

exclude the CEO and that it "seemed unusual" that the CEO wouldn't know the reason for a termination decision. Doc. 183-20 at 42, 45 (Taylor Dep. 117:17–20; 120:7–24). But CEO Taylor's belief, without more, doesn't reach the level of a "disturbing procedural irregularit[y]." *May*, 2016 WL 10591979, at \*8. And, although plaintiff's argument may have some logical appeal at first blush, it fades when one considers the CEO's position in the relevant hierarchy here. Centura employed both decision makers[16] whereas SCH employed Taylor. Doc. 183-20 at 2 (Taylor Dep. 12:11–25). And CEO Taylor explains that he "reported directly to the Centura leadership team" and functioned as Centura's "agent" whose "authority came directly from their delegated authority[.]" *Id.* So, while one logically might assume a CEO would make hiring and firing decisions, the analysis changes when the CEO is the agent of an overarching corporation like Centura. As such, CEO Taylor not participating in the firing decision doesn't help plaintiff here. In sum, plaintiff hasn't adduced evidence sufficient for a reasonable juror to infer that defendants' termination reasons were pretextual based on CEO Taylor's un-involvement in the firing decision.

Nor does defendants' decision to fire plaintiff for his alleged patient care issues—instead of discussing those issues with him and coaching him through them—allow an inference of pretext. To argue pretext here, plaintiff cites CEO Taylor's testimony about one or two older radiologists who the hospital thought it might need to remove from reading mammograms because they misread them. Doc. 183-20 at 49–51 (Taylor Dep. 128:17–130:2). To CEO Taylor's knowledge—he left SCH during this time—those radiologists continued to work at the hospital but with more extensive oversight and increased peer review requirements. *Id.*

---

[16]    Mr. Gessel held the position of Group President of Centura's Greater Colorado Kansas (GCK) and Dr. Lichtenberger held the position of Centura Health Physician Group President of Physician Alignment. Doc. 173 at 10, 15.

Essentially, this evidence invokes the similarly-situated employee argument:  Because those radiologists weren't fired but instead received increased monitoring, defendants should have taken a similar approach to plaintiff's patient care issues.  And so, he argues, a reasonable juror can infer defendants' proffered termination reasons were pretextual because defendants treated plaintiff differently than a similarly-situated employee.  But plaintiff's pretext argument fails because those radiologists weren't similarly situated employees, at least not under the controlling legal definition of the term.

A similarly-situated employee is one who "violated work rules of comparable seriousness." *Aramburu*, 112 F.3d at 1404.  But here, defendants' concerns about the allegedly similarly-situated radiologists were limited to one discrete issue:  the accurate reading of mammograms.  And, while such an issue is less-than-ideal, defendants could address it easily by putting checks in place to confirm correct diagnoses.  The work rules plaintiff allegedly violated were myriad, not singular, and not so easily addressed with simple double-checks and oversight. The KBHA complaint against plaintiff summarized ten different allegations.  These included: "multiple alarming adverse outcomes, including multiple patient deaths[;]" "pressuring hospital CEO Scott Taylor to disband the hospital peer review committee[;]" "an unusually high number of nicked bowels during surgeries[;]" "abandon[ing] 8 I.C.U. cases[;]" "transferring out patients that he has dangerously mismanaged[;]" and "well known incidents of sexual relations in hospital treatment rooms with nurses."  Doc. 174-31 at 6 (Def. Ex. 48).  The KBHA complaint also described his fellow physicians' concerns:  "[T]he medical staff has advised the CEO that he is unsafe and needs an assessment due to his erratic behaviors and dangerous violations of the standard of care."  *Id.*  Such numerous and serious allegations preclude the argument that

plaintiff and the radiologists were similarly-situated employees who "violated work rules of comparable seriousness." *Aramburu*, 112 F.3d at 1404.

Nor does plaintiff adduce evidence about the "relevant employment circumstances" of those radiologists, allowing the court to categorize them as similarly-situated employees. *Id.* In his pretext section, plaintiff doesn't adduce any evidence of the radiologists' work history or of company policies, which is necessary to compare plaintiff and the radiologists as similarly-situated. *Id.*; *see* Doc. 183 at 38. Instead, plaintiff merely cites CEO Taylor's account of the radiologists' treatment. *See* Doc. 183 at 38 (citing to PSAF 142 at Doc. 183 at 34). And CEO Taylor couldn't remember whether defendants removed either radiologist from patient care, though he thought they continued practice. Doc. 183-20 at 50 (Taylor Dep. 129:5–11). Nor was CEO Taylor in defendants' employ long enough to know with any certainty the ultimate outcome of the radiologists' saga. *Id.* (Taylor Dep. 129:9–18). Absent more substantial evidence, no reasonable juror could infer pretext based on defendants' deviation from company policy as demonstrated by their differential treatment of plaintiff and the radiologists.

### v.        Pretext Conclusion

In sum, plaintiff has failed to demonstrate a genuine issue about whether the proffered reasons for his termination were pretextual. The arguments based on inconsistent and uncorroborated reasons; temporal proximity; unreasonable investigation; and failure to follow normal policies and procedures are insufficient, taken separately and together, for a reasonable jury to conclude that defendants' termination reasons were pretext for a retaliatory discharge. Defendants thus are entitled to summary judgment on the claim of Title VII termination-based retaliation. The court addresses plaintiff's other Title VII claim, next.

**B.      Title VII Review Process Retaliation Claim**

Plaintiff also contends under Title VII that defendants targeted him and treated him

differently in the 2020 quality review process.  Doc. 183 at 36.  Recall that plaintiff, to state a

prima facie case for retaliation, must show that (1) he engaged in protected opposition, (2) to a

reasonable worker,  the challenged employment action is materially adverse, and (3) the

protected activity and the materially adverse action were connected causally.  *Bekkem*, 915 F.3d

at 1267.  If plaintiff presents a prima facie case of retaliation, then defendant must respond with a

legitimate, nonretaliatory reason for the challenged action.  *Parker Excavating, Inc. v. Lafarge

W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017).  If defendant satisfies this burden, plaintiff must

show that defendant's reason was merely a pretext for retaliation.  *Id.*

Once again, plaintiff's first protected action—filing complaints against Dr. Kessler for

alleged sexual harassment—is stipulated and undisputed.  Doc. 165 at 3 (Pretrial Order

¶ 2.a.xv.).  And plaintiff's second action—filing an EEOC charge—likewise qualifies as

protected activity.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)

("By filing an EEOC claim, Plaintiff engaged in protected activity.")  So, plaintiff easily meets

the first prong of a prima facie case.  And as with plaintiff's other Title VII claim, the second

prong of the prima facie analysis here is also straightforward.  Defendants don't dispute that

reporting to a state regulatory board constitutes a materially adverse action.  *See* Doc. 173 at 26–

31.  Their position makes sense.  As another court has explained:

> It is difficult to see how threatening to report Plaintiff to the state licensing board,
> who presumably has the ability to revoke Plaintiff's license and thus impede his
> ability to work in his profession, could not be an adverse employment action.  A
> reasonable employee could be dissuaded from engaging in protected speech if they
> knew their employer would take steps to limit their ability to work in their
> profession[.]

*Bogden-Cozmuta v. Granby Urgent Care, LLC*, No. 20-CV-00879-VLB, 2022 WL 4585442, at

*7 (D. Conn. Sept. 29, 2022).  The proverbial rubber once again meets the road, therefore, on the

causation prong.

　　To establish the requisite causal connection between his protected conduct and the

materially adverse action, plaintiff must adduce evidence capable of supporting a reasonable

finding that a desire to retaliate against him for his complaints about Dr. Kessler or EEOC charge

filing motivated defendants to adopt retaliatory processes when they decided to report his cases

to KBHA.  Plaintiff's two causation theories sound like this:  (1) Dr. Stucky and Dr. Green-

Cheatwood identified, with a retaliatory motive, specific cases of plaintiff's for peer review; and

(2) Drs. Stucky and Green-Cheatwood manipulated the peer review committee to deny plaintiff

the opportunity—which it had provided to other doctors—to respond to the reviewed cases

before reporting those cases to KBHA.  Doc. 183 at 41.  Here's the problem with these

theories.[17]

　　Plaintiff has come forward with no evidence to demonstrate that the reviewing committee

knew of his protected activities.  And neither of his theories establishes the requisite knowledge.

Recall that a plaintiff asserting a claim of retaliation "must first come forward with evidence

from which a reasonable factfinder could conclude that those who decided to take adverse action

against him had knowledge of his protected activity."  *Singh*, 936 F.3d at 1043 (quotation

cleaned up).  So, unless plaintiff adduces evidence to demonstrate that the decision makers

themselves had knowledge of plaintiff's protected activities, this theory of causation fails.  *See*

---

[17]　　Notice that neither causation theory involves the EEOC charge filing as protected activity.
Plaintiff fails to offer *any* theory where the peer review committee—who, the court determines, are the
decision makers here—have knowledge of his EEOC filing.  *See generally* Doc. 183.  And so, plaintiff's
claim—as premised on the EEOC filing as protected activity—fails.  And the court doesn't address it in
the analysis here.  The court explains this conclusion more fully when, below, it addresses plaintiff's
ADA retaliation claim premised on the EEOC charge filing.  *See* § V.B.

*Henderson v. Stormont-Vail Healthcare, Inc.*, 607 F. Supp. 3d 1173, 1189 (D. Kan. 2022) ("Without evidence that these committee members had knowledge of plaintiff's complaint, plaintiff necessarily cannot establish the requisite causation between her complaint and the [standard of care violation] finding.").

To address his knowledge problem, plaintiff first urges the court to view Dr. Stucky and Dr. Green-Cheatwood—not the committee—as the decision makers because they chose the cases and passed the information on to the committee. Doc. 183 at 41. The court isn't persuaded. It declines to equate choosing which cases to place before a committee at an outside facility with deciding how appropriate or egregious those cases were. In his alternative theory, plaintiff accepts the committee as the decision maker but contends that the doctors manipulated the committee such that the committee didn't allow plaintiff to offer input. *Id.* This theory fails as well. As discussed before, to rely on a cat's paw theory of liability—such as this alleged manipulation requires—the subordinate's involvement must surpass "mere influence or input in the decisionmaking process." *BCI Coca-Cola*, 450 F.3d at 487 (quotation cleaned up). Instead, "the biased subordinate's discriminatory reports, recommendation, or other actions [must have] caused the adverse employment action." *Id.* Plaintiff hasn't adduced any evidence to show the doctors exercised anything beyond influence or input in the decisionmaking process here. To be sure, deciding which cases a committee reviews constitutes influence. But it doesn't *cause* the committee to find those cases were handled so poorly or inappropriately that they must report them to KBHA. What's more, the members of the peer review committee were from another hospital. Doc. 183-22 at 8 (Vogel Dep. 46:3–24). They worked and conducted peer review at a sister facility—not SCH—and this arrangement arose from an intentional attempt to ensure an "unbiased, robust peer review[.]" *Id.* Such geographical removal casts doubt on the Dr. Green-

Cheatwood and Dr. Sabey's ability to manipulate the committee. And so, plaintiff's failure to adduce evidence of the committee's protected activity knowledge persists.

In his last-ditch effort, plaintiff attempts to cure this knowledge problem one final way: by adducing evidence that Dr. Green-Cheatwood singled out one of plaintiff's cases to Rebecca Vogel. Doc. 183 at 20. Dr Vogel served as chair of the peer review committee and the email she received from Dr. Green-Cheatwood revealed plaintiff's identity, which should have remained undisclosed. Doc. 184-33 at 2–3 (Pl. Ex. E234). But that Dr. Vogel knew plaintiff's identity isn't evidence that Dr. Vogel knew about plaintiff's protected activities. This is especially so here because Dr. Vogel led peer review conducted by at an outside, sister facility—not SCH— and so plaintiff's identity alone was less likely to divulge his protected activities. Doc. 183-22 at 8 (Vogel Dep. 46:3–24).

But let's just say it did disclose those protected activities. Still, one person's sole knowledge—when a group is deciding something—isn't sufficient to establish the requisite causation. *See Flores v. DeJoy*, No. 19-CV-00784-LF-JHR, 2021 WL 2186240, at *10 (D.N.M. May 28, 2021) ("The biggest problem for [plaintiff] in showing a causal connection . . . is that only one person involved in the process . . . was aware that [plaintiff] had filed an EEO complaint."). Instead, a plaintiff must demonstrate not just a single person's knowledge, but also that the group mentioned or considered the protected activity when reaching its decision. *See id.* ("Given that [plaintiff] has no evidence that his EEO activity was even mentioned, much less considered, when the committee made its decision, and that only one member of the committee even knew about his EEO activity, no reasonable jury could find a causal connection[.]"); *see also Henderson*, 607 F. Supp. 3d at 1191 ("While Dr. Sachs was one of th[e] members [of the

decision making committee], there is no evidence that he influenced the decision in any way or that he shared his knowledge of plaintiff's complaint.").

Plaintiff thus fails to come forward with evidence sufficient for a reasonable juror to infer a causal connection between his protected activities and the processes that led to SCH reporting his cases to KBHA.  And without the requisite causal connection, plaintiff's Title VII retaliation claim based on the peer review process can't stand.  The court grants defendants summary judgment on Count 1.  And the court moves on to address plaintiff's other set of federal claims, below.

## V.    ADA Claims (Count 3)

Plaintiff brings two claims under Count 3, both premised on the Americans with Disabilities Act.  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.iii.).  One claim asserts that defendants wrongly perceived or regarded plaintiff as disabled because he filed a protected complaint.  *Id.* The second claim asserts that defendants violated the ADA by retaliating against plaintiff after he filed EEOC charges of discrimination.  *Id.*  The court addresses each claim, in turn.

Recall that the *McDonnell Douglas* burden-shifting framework applies with equal force to plaintiff's ADA claims.  *See Morgan*, 108 F.3d at 1323 (applying framework to ADA disability discrimination claim); *Doebele*, 342 F.3d at 1135 (applying framework to ADA retaliation claim).  And so, the court begins with this now familiar question:  Has plaintiff established a prima facie case for each ADA claim?

### A.    "Regarded As" ADA Disability Claim[18]

Plaintiff claims that defendants violated the ADA by wrongly perceiving plaintiff to have a mental disability because he filed a protected complaint.  Doc. 165 at 17–18 (Pretrial Order

---

[18]    The Pretrial Order asserts two claims under the ADA.  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.iii.).  The ADA Amendments Act of 2008 ("ADAAA") amended the ADA and "went into effect on

¶ 4.a.iii.).  And plaintiff contends, as a result of that wrong perception, defendants fired him.

Doc. 183 at 46.  The ADA prohibits covered employers from discriminating against a "qualified

individual on the basis of disability" in hiring, advancement, training, termination, and "other

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "To establish a prima

facie case of employment discrimination under the ADA, [plaintiff] must present evidence that

(1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential

functions of his job with or without accommodations; and (3) he was terminated under

circumstances which give rise to an inference that the termination was based on his disability."

*Smothers*, 740 F.3d at 544 (quotation cleaned up).  Under the first prong of the prima facie case,

"being regarded as" having a disability qualifies as being disabled.  42 USC § 12102(1)(C).

"Under the ADAAA, for a plaintiff alleging disability discrimination to show that the

employer regarded him as having an impairment, the plaintiff must show that (1) he has an actual

or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the

employer was aware of and therefore perceived the impairment at the time of the alleged

discriminatory action."  *Adair*, 823 F.3d at 1306.  That is, to establish the first prong a prima

facie case of ADA discrimination based on plaintiff's perceived mental disability, plaintiff must

adduce evidence that—applying the three elements outlined above—defendants regarded

---

January 1, 2009." *Dewitt*, 845 F.3d at 1303 n.1.  Here, the "events that form the basis for [plaintiff's] disability-related claims occurred after this date; therefore, the ADAAA is technically applicable here." *Id.*  So, the court "refer[s] to [plaintiff's] disability-related claims . . . as claims alleging violations of the ADAAA." *Id.*  Also, as our Circuit has noted, the 2008 amendments "primarily" revised "the ADA's definition of 'disability.'" *Id.*  And the ADAAA modified the scope of a "regarded as" claim by defining "being regarded as having such an impairment" as not requiring that "'the impairment limits or is perceived to limit a major life activity.'" *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016) (quoting 42 USC § 12102(3)(A)).  Because this modified scope affects plaintiff's claims here, the court's analysis relies principally on cases decided after the ADAAA's effective date.

plaintiff as having an impairment.  Having satisfied that first prong,[19] plaintiff then must adduce

evidence that the circumstances of his termination give rise to the inference that it was based on

his perceived disability.  *Smothers*, 740 F.3d at 544.  The court thus addresses, first, whether

plaintiff has adduced evidence to show that defendants regarded him as having an impairment.

Then, the court takes up whether the circumstances of his termination allow a reasonable juror to

infer that defendants premised that termination on his perceived disability.

Here, plaintiff doesn't come forward with evidence that he had an actual or perceived

impairment, thus failing to establish the first prong of a prima facie case for "regarded as" ADA

discrimination.  In his attempt to meet his burden that he had a perceived impairment, plaintiff

adduces evidence that the Medical Executive Committee (MEC) requested he undergo a

psychological evaluation.  Doc. 174-23 (Def. Ex. 40) (letter from MEC to plaintiff

recommending psychological evaluation).  And while this evidence, on its face, might seem

sufficient to permit a finding that plaintiff had a perceived impairment, a sister circuit has

determined—even after the 2008 ADA Amendments Act broadening the "regarded as" claim—

that a request for psychological evaluation isn't enough to suggest that the employer regarded

plaintiff as disabled.  *Krueger v. Home Depot USA, Inc.*, 674 F. App'x 490, 494 (6th Cir. 2017)

("Asking [the employee] to undergo a psychological evaluation is not enough to suggest that

Home Depot regarded [the employee] as mentally disabled.").  And other circuits held the same

before the ADAAA took effect.  *See Stewart v. County of Brown*, 86 F.3d 107, 111 (7th Cir.

1996) (affirming that an employer's ordering "a number of psychological evaluations for

---

[19]     The parties don't dispute the second prong of a prima facie ADA disability discrimination case:
that plaintiff "is qualified to perform the essential functions of his job with or without
accommodations[.]"  *Smothers*, 740 F.3d at 544.  *See* 183 at 46 n.15 ("Defendants did not contest that
[second] element, which is not surprising given that [plaintiff] did not actually have any impairment.  In
any event, there is an abundance of evidence that [plaintiff] was qualified.").  And so, the court's analysis
doesn't address this second prong.

[plaintiff], and . . . stat[ing] to third persons that he considered [plaintiff] to be emotionally or psychologically imbalanced" didn't show a perception of mental impairment); *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998) (holding that employer's request for a mental evaluation after plaintiff had demonstrated "unusual workplace behavior" didn't demonstrate that employer perceived plaintiff as impaired).

But even if plaintiff had adduced evidence capable of establishing that the MEC regarded plaintiff as impaired, his prima facie case would fail on the third element of the "regarded as" test. That is, plaintiff hasn't adduced evidence of circumstances which permit a reasonable juror to infer that defendants fired plaintiff based on his perceived disability. To be sure, defendants were aware of a perceived impairment at the time of termination, having first heard concerns about plaintiff's mental state in September 2019 from members of the Medical Executive Committee. *See* Doc. 174-21 (Def. Ex. 38) (explaining the MEC's concerns about plaintiff's mental state in a September 2019 email to Dr. Green-Cheatwood, Physician Executive for Centura's GKC group); Doc. 173-11 at 3–4 (Dunford Dep 32:21–35:1) (testifying that Dr. Dunford reached out to Nancy Killion, Centura's Director of Quality, in September 2019— shortly after learning about plaintiff's letter of complaint—because of concerns about his impairment). And plaintiff argues that these "internal communications show [defendants] believed [plaintiff] had such an impairment because of his protected complaints about Kessler[.]" Doc. 183 at 46. But that perception isn't all an ADA claim requires.

Circumstances must allow a reasonable juror to infer that plaintiff's *employer* fired plaintiff based on the perceived disability. But all the evidence plaintiff adduces to demonstrate his perceived mental state centers on the Medical Executive Committee (MEC), who *wasn't* plaintiff's employer. Doc. 173-4 at 6 (Gessel Dep. 48:7–16) ("Whether it's employment or new

contracts or termination of existing contracts, those weren't the purview of the hospital board."); *see also* Doc. 165 at 3 (Pretrial Order ¶ 2.a.x.) ("For purposes of [plaintiff's] Title VII and ADA claims, the Hospital and Centura concede that they jointly employed [plaintiff].").  It is undisputed that the MEC had no power to make employment decisions about employed physicians.  Doc. 173 at 2–3; Doc. 183 at 3.  And so, plaintiff needed to adduce evidence of circumstances surrounding his firing that allow an inference that *SCH* or *Centura*—not the MEC—perceived he had an impairment.  But he didn't adduce any.  Indeed, defendants—his employers—didn't take any action or indicate in any way that they might terminate plaintiff when the MEC concerns surfaced in September 2019.  Instead, defendants acted four months later—and only after the KBHA complaint and subpoena—arrived early in 2020.  And plaintiff hasn't adduced any evidence to suggest that those affiliated with defendants who knew about the MEC concerns—Dr. Green-Cheatwood, Nancy Killion, and Mr. Sabey—ever expressed those concerns to Dr. Lichtenberger and Mr. Gessel, the persons who decided to terminate plaintiff.

And so, even when the court assumes defendants perceived plaintiff as having an impairment—a generous assumption given the case law about psychological evaluations— plaintiff still hasn't adduced sufficient evidence that the circumstances of his termination give rise to an inference that defendants based it on his perceived disability.  Plaintiff's ADA "regarded as" disability discrimination claim thus fails at the prima facie stage and the court grants summary judgment to defendants on this claim.  Now, to plaintiff's second ADA claim.

### B.    ADA Retaliation Claim

In the Pretrial Order, plaintiff premises his second ADA claim on defendants' "retaliating against [plaintiff] when they took adverse action against him after he filed EEOC charges of discrimination alleging Defendants violated the ADA."  Doc. 165 at 17–18 (Pretrial Order

¶ 4.a.iii.).  But then, in his Response to Defendants' Motion for Summary Judgment, plaintiff changes his tack.  He reframes his ADA retaliation claim and premises it on his "January 2020 opposition to being wrongly regarded as disabled and asked to undergo medical examination."  Doc. 183 at 46.  And, as a result, plaintiff argues in his Response that defendants' "actions to fire him and subject him to their pretextual quality investigation . . . create an inference that ADA retaliation caused those actions."  *Id.*  That is, instead of premising his ADA retaliation claim on his filing an EEOC charge—which first happened in May 2020—plaintiff scoots his premise for retaliatory conduct back in time.  In his Response, plaintiff attempts to alter the premise of his ADA claim to his January 2020 letter opposing the psychological evaluation request.  And that changed premise would allow plaintiff's ADA retaliation claim to encompass *both* his firing *and* the case peer review that followed.  But that's a problem.  Here's why.

Fed. R. Civ. P. 16(d) provides that the pretrial order "controls the course of the action" unless modified by the court.  What's more, "'[c]laims, issues, defenses, or theories of damages not included in the pretrial order are waived.'"  *Zenith Petrol. Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal–Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).  Courts must construe pretrial orders liberally "'to cover any of the legal or factual theories that might be embraced by their language.'"  *Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)).  Nonetheless, pretrial orders require the parties to disclose the "real issues" preserved for trial to "avoid surprise."  *Id.* (quotation cleaned up).

Here, the court entered the Pretrial Order on January 23, 2024, before defendants filed their summary judgment motion.  Doc. 165.  The court has reviewed the Pretrial Order and concludes that it placed defendants on notice of just one basis for plaintiff's ADA retaliation claim:  his filing of EEOC charges.  *Id.* at 17–18 (Pretrial Order ¶ 4.a.iii.).  And that claim wasn't

broadly worded to permit the court to construe it liberally to include plaintiff's January 2020 opposition letter. What's more, plaintiff's Third Amended Complaint unequivocally indicates that the EEOC filing forms the grounds for his ADA retaliation claim. Doc. 87 at 16 (3d Am. Compl. ¶¶ 126–27) ("Dr. Byrnes engaged in activity protected by the ADA by filing EEOC Charges against the Defendants. . . . Defendants retaliated against Dr. Byrnes because he engaged activity protected by the ADA, in violation of the ADA."). The court can't read the Pretrial Order or Third Amended Complaint to place defendants on notice of any other theory of recovery for ADA retaliation. And so, the court evaluates plaintiff's ADA retaliation claim as based solely on his filing of EEOC charges—and not his January 2020 opposition. As a result, this ADA claim doesn't encompass plaintiff's firing, as explained, below.

The ADA prohibits employers from retaliating against employees who engage in an activity protected by that act. *See* 42 U.S.C. § 12203(a)–(b). To make a prima facie case of ADA retaliation, plaintiff must show that "(1) he engaged in a protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1187 (10th Cir. 2016). (quotation cleaned up).

Here, the court already has identified plaintiff's sole protected activity—his EEOC charge filing. *See Anderson*, 181 F.3d at 1178 ("By filing an EEOC claim, Plaintiff engaged in protected activity."). And that protected activity determines the timeframe of relevant adverse employment actions. That is, plaintiff solely may allege adverse employment actions "subsequent to or contemporaneous with the protected activity[.]" *Foster*, 830 F.3d at 1187. Here, plaintiff filed his first EEOC claim on May 1, 2020. Doc. 87 at 9 (3d Am. Compl. ¶ 67).

48

So, the court only needs to evaluate those adverse employment actions occurring on or after May 1, 2020.

Defendants fired plaintiff on February 12, 2020.  Doc. 165 at 4 (Pretrial Order ¶ 2.a.xxi.).  So that adverse action is out.  Defendants also engaged in a review process of cases that plaintiff contends demonstrates a retaliatory motive because of his disparate treatment in the process compared to other doctors.  And that process led to defendants reporting some of plaintiff's cases to KBHA.  That one happened in the proper timeframe.  The court already has determined that such reporting qualifies as an adverse employment action.  *See* § IV.B.  So, on this review process basis, plaintiff has satisfied the first two prongs of a prima facie ADA retaliation claim.  All that remains is prong three:  the causal connection between his EEOC filing and defendants' reporting to KBHA.

But, as with the Title VII claim premised on the review process discussed above, *see* § IV.B., here, too, plaintiff has a causation problem.  Recall that a plaintiff asserting a claim of retaliation "must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to take adverse action against him had knowledge of his protected activity."  *Singh*, 936 F.3d at 1043 (10th Cir. 2019) (quotation cleaned up).  But here, doctors in a different, sister facility conducted the review process.  Doc. 183-22 at 8 (Vogel Dep. 46:3–24).  And, although Dr. Stucky and Dr. Green-Cheatwood determined which cases to send to that review committee, the court already has concluded that this didn't turn them into decision-makers.  *See* § IV.B., above.  So, the relevant decision makers are, yet again, the peer review committee.  This means that plaintiff—to discharge the requirement of a causal connection—must adduce evidence that those review committee decision makers had knowledge of his EEOC charge filing.  And plaintiff hasn't adduced such evidence—at all—zero.  *See*

§ IV.B.n.18; *see also generally* Doc. 183.  Here too, then, plaintiff fails to establish a prima facie case of ADA retaliation on the final prong—causation.  And without a prima facie case, plaintiff's claim can't stand.  The court thus grants defendants summary judgment against plaintiff's ADA claims (Count 3).  Having thus granted summary judgment on all of plaintiff's federal claims, the court takes up plaintiff's state claims, below.

## VI.     State Law Claims

In addition to his federal claims, plaintiff asserts state and common law claims for Retaliation (Count 2), Fraud (Count 4), Fraud by Silence (Count 5), Promissory Estoppel/Detrimental Reliance (Count 7) and Common Law Retaliation for protected activity— under the Kansas Wage Payment Act (Count 10).  Doc. 165 at 17–18 (Pretrial Order ¶ 4.a.ii., iv.– vii.).

Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction[.]"  Section 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  In "the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7.  Also, "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."  *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

Our Circuit has expressed its preference that, when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims. *See Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). But still, the decision is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

The court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's state law claims. The court finds no compelling reasons to depart from our Circuit's general directives. Fairness and comity lead the court to conclude that a Kansas state court should resolve plaintiff's Kansas state law claims.

## VII.   Other Pending Motions

The court also takes this opportunity to rule other pending motions associated with the summary judgment briefing: three sealing motions and one disregard or surreply motion. The court starts with the sealing motions.

### A.   Sealing Motions (Doc. 176; Doc. 188; Doc. 194)

Defendants have filed two Motions for Leave to File Under Seal (Doc. 176; Doc. 194) and plaintiff has filed one Motion for Leave to File Exhibits Under Seal (Doc. 188). All three sealing motions are unopposed.[20] The parties ask the court to seal in their entirety—or give leave to file redacted versions of—specified exhibits filed with their supporting summary judgment memorandums.

---

[20]   Defendants' first sealing motion (Doc. 176) left ambiguous plaintiff's position about their specific sealing and redacting requests. *See* Doc. 176 at 4. But plaintiff's counsel later communicated informally to chambers, clarifying that plaintiff didn't oppose defendants' motion.

The Supreme Court recognizes a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S 589, 597 (1978) (citations omitted).  Nevertheless, a party may rebut the presumption of access to judicial records by demonstrating that "countervailing interests heavily outweigh the public interests in access." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (quotation cleaned up).  The party seeking to deny access must shoulder the burden to establish a sufficiently significant interest outweighing the presumption of access.  *Id*. (quotation cleaned up); *see also United States v. Bacon*, 950 F.3d 1286, 1293 (10th Cir. 2020) ("The party seeking to keep records sealed bears the burden of justifying that secrecy," and it must "articulate a sufficiently significant interest that will justify continuing to override the presumption of public access." (quotation cleaned up)).

This legal standard requires federal courts to assess competing interests:  the general right of public access weighed against an interest in protecting certain information from disclosure.  When engaging in this endeavor, district courts have substantial discretion.  *See, e.g.*, *Nixon*, 435 U.S. at 599 ("[T]he decision [about] access [to judicial records] is one best left to the sound discretion of the trial court[.]"); *see also Mann*, 477 F.3d at 1149 ("Whether judicial records and other case-related information should be sealed or otherwise withheld from the public is a matter left to the sound discretion of the district court." (citation omitted)).  Applying this standard, the court finds that the parties' need to preserve confidentiality here outweighs the public's right to access because the material at issue falls into two categories meriting protection:  (i) patient identity and medical information; and (ii) confidential and proprietary business information.  And our Circuit has clarified that "[m]edical records and confidential business records are

examples of the types of private information this court has allowed to be sealed." *Luo v. Wang*, 71 F.4th 1289, 1304 (10th Cir. 2023).

Having reviewed the exhibits at issue in these three sealing motions, the court concludes that each falls appropriately within one of these two categories.  And the court notes that the parties diligently have sought limited redactions to preserve public access whenever possible.  So, the court grants defendants' Motions for Leave to File Under Seal (Doc. 176; Doc. 194) and plaintiff's Motion for Leave to File Exhibits Under Seal (Doc. 188).

**B.      Motion to Disregard or for Leave to File Surreply (Doc. 195)**

The final pending motion that spins out of the summary judgment briefing is plaintiff's Motion to Disregard Defendants' New Evidence or, in the Alternative, for Leave to File a Surreply (Doc. 195).  Plaintiff asks the court to disregard new materials attached to defendants' Reply brief (Doc. 189).

Our Circuit answered "whether the district court may consider evidence and issues raised by the party moving for summary judgment in a reply brief without allowing the opposing party to respond" in *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998).  It determined that a district court has "two permissible courses of action" in this situation:  the court may "permit[] a surreply or, in granting summary judgment for the movant, it [may] refrain[] from relying on any new material contained in the reply brief."  *Id.*; *see also Doebele*, 342 F.3d at 1139 n.13 (10th Cir. 2003) (concluding "the court abused its discretion to the extent it relied on new evidentiary materials presented for the first time in [defendant's summary judgment] reply brief" because the district court denied plaintiff's motion to file a surreply); *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005) (explaining that a district court choosing not to rely on new evidence raised in a summary judgment reply brief "does not abuse its discretion by precluding a surreply" (quotation cleaned up)).  Here, the court grants movants

summary judgment. And it does so without relying on any of the new evidence filed with defendants' Reply brief. So, the court follows the second permissible course of action identified by our Circuit. It grants the portion of plaintiff's motion requesting that it disregard defendants' new materials filed on reply and denies the portion of plaintiff's motion requesting leave to file a surreply.

## VIII.   Conclusion

For the reasons stated in this Memorandum and Order, the court grants defendants' Motion for Summary Judgment (Doc. 172) against plaintiff's retaliation claims under Title VII and plaintiff's "regarded as" discrimination and retaliation claims under the ADA. The court dismisses plaintiff's state law claims without prejudice. The court also grants the parties' Motions for Leave to File Under Seal (Doc. 176; Doc. 188; Doc. 194). And it grants in part and denies in part plaintiff's Motion to Disregard Defendants' New Evidence or, in the Alternative, for Leave to File a Surreply (Doc. 195). The court directs the Clerk to enter Judgment consistent with this Memorandum and Order and close this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 172) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** the parties' Motions for Leave to File Under Seal (Doc. 176; Doc. 188; Doc. 194) are granted.

The court directs the Clerk to remove the provisional designation and leave permanently under seal the following Doc. 174 exhibits: Doc. 174-27, Doc. 174-30, Doc. 174-33, Doc. 174-36, Doc. 174-43, Doc. 174-44, Doc. 174-57, Doc. 174-58, and Doc. 174-62. And the court directs the Clerk to unseal any provisionally sealed exhibits in Doc. 174 not enumerated here.

The court also directs the Clerk to remove the provisional designation and leave permanently under seal the following Doc. 184 exhibits: Doc. 184-5, Doc. 184-11, Doc. 184-21,

Doc. 184-30, Doc. 184-31, and Doc. 184-33.  And the court directs the Clerk to unseal any provisionally sealed exhibits in Doc. 184 not enumerated here.

The court also directs the Clerk to remove the provisional designation and leave permanently under seal the following Doc. 190 exhibit:  Doc. 190-1.  And the court directs the Clerk to unseal the other provisionally sealed exhibit in Doc. 190 not enumerated here.

The court further directs defendants to file the redacted version—previously submitted to chambers by email—of the following exhibits:  Doc. 174-27, Doc. 174-30, Doc. 174-33, Doc. 174-36, Doc. 174-43, Doc. 174-44, Doc. 174-58, Doc. 174-62, and Doc. 190-1.

Finally, the court directs plaintiff to file the redacted version—previously submitted to chambers by email—of the following exhibits:  Doc. 184-5, Doc. 184-11, Doc. 184-21, Doc. 184-30, and Doc. 184-33.

**IF IS FURTHER ORDERED BY THE COURT THAT** plaintiff's Motion for Leave to Disregard Defendants' New Evidence or, in the Alternative, for Leave to File a Surreply (Doc. 195) is granted in part and denied in part.  The court grants plaintiff's request to disregard defendants' new evidence and denies plaintiff's request for leave to file a surreply.

**IT IS SO ORDERED.**

**Dated this 5th day of September, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

55