**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**MATTHEW BYRNES,**

**Plaintiff,**

**v.**

**ST. CATHERINE HOSPITAL, et al.,**

**Defendants.**

**Case No. 21-2086-DDC**

# MEMORANDUM AND ORDER

Defendants fired plaintiff Dr. Matthew Byrnes after (among other things) he fought defendants' attempt to claw back his compensation and reported a coworker for substandard medical practices. Plaintiff alleges his firing amounted to illegal retaliation. After his firing, plaintiff agreed to surrender certain privileges on the condition that defendants had no "Medical Staff" investigations pending. Defendants agreed to this condition. And yet defendants, when they agreed, already had begun planning a review of plaintiff's cases. Plaintiff alleges that defendants falsely represented that no investigation was pending to induce him to surrender his privileges. Plaintiff thus asserts claims for fraud, fraud by silence, and promissory estoppel.

Defendants have moved for summary judgment on these state-law claims. As explained below, the court denies the motion in part and grants it in part. It begins with the threshold issue of jurisdiction.

## I. Jurisdiction

When as here a plaintiff brings a mix of federal and state law claims, 28 U.S.C. § 1367 allows federal courts to exercise supplemental jurisdiction over the state-law claims. The court

previously granted summary judgment in defendants' favor on plaintiff's federal-law claims. Doc. 200. Without federal claims, the court followed our Circuit's preference that state courts decide state-law claims and declined to exercise supplemental jurisdiction over plaintiff's state-law claims. *Id.* at 51. The Tenth Circuit then reversed the court's decision granting summary judgment against plaintiff's federal-law claims. Doc. 208. As part of that holding, the Circuit ordered our court to reconsider whether it should exercise supplemental jurisdiction over plaintiff's state-law claims. *Id.* at 43.

Back in our court on remand, defendants ask the court to decline to exercise supplemental jurisdiction over plaintiff's state-law claims. Doc. 216. Defendants invoke § 1367's catch-all provision, which allows federal courts to decline supplemental jurisdiction over state-law claims "in exceptional circumstances" that present "compelling reasons for declining jurisdiction." § 1367(c)(4). Defendants argue that exceptional circumstances present themselves here because proceeding in federal court will deprive them of state-law evidentiary privileges. The court needn't reach the merits of this argument because, as plaintiff correctly points out, defendants have waived it. Doc. 221 at 3–4.

The decision whether to exercise supplemental jurisdiction under § 1367(c) isn't like subject-matter jurisdiction—parties can waive arguments based on § 1367(c). *See Rubinstein v. Yehuda*, 38 F.4th 982, 995 (11th Cir. 2022) (concluding appellants waived supplemental-jurisdiction argument by failing to raise in district court). Defendants didn't include this argument in the Pretrial Order; to the contrary, the Pretrial Order says jurisdiction under § 1367 "is not disputed." *See* Doc. 165 at 1. As our Circuit has explained, "claims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). Nor did defendants include this argument in their first round of

summary-judgment briefing. *See generally* Doc. 173; Doc. 189. By failing to make this argument until now—five years after this case started—defendants have waived it.

Scrambling to resurrect their argument, defendants quibble with the facts of *Rubinstein* and argue it only applies to waiver on appeal. Doc. 222 at 2. Defendants misunderstand *Rubinstein*'s point. The point is that parties can waive supplemental-jurisdiction arguments made under § 1367(c). Defendants have done so here by failing to include their argument in the Pretrial Order. The court declines to devote time to a waived argument.

In a cursory footnote, defendants claim that the court doesn't have jurisdiction over plaintiff's state-law claims and plaintiff needs to file a new complaint. Doc. 216 at 1. Defendants never explain their position, nor do they cite any authority supporting it. Despite the perfunctory nature of the argument, because defendants mention jurisdiction, the court must address their concern.

The court can't quite follow why defendants think our court lacks jurisdiction over these state-law claims. The court recognizes that plaintiff, following this court's summary-judgment order, filed his state-law claims in state court to preserve them. *See* Doc. 216 at 2. But parallel state-court proceedings don't deprive federal courts of jurisdiction. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Nor can the court understand why defendants think plaintiff should file a new complaint. In the court's view, with the prior summary-judgment order reversed, the operative document in the case is the Pretrial Order. *See* Fed. R. Civ. P. 16(d). The Pretrial Order contains plaintiff's state-law claims (and omits any jurisdictional objections by defendants). *See generally* Doc. 165. The court thinks the current state of play is just fine, and requiring plaintiff to file a new complaint would offend Fed. R. Civ.

P. 1's mandate that courts construe procedural rules "to secure the just, speedy, and inexpensive determination of" cases.

In sum, the court has subject-matter jurisdiction over the contested state-law claims under 28 U.S.C. §§ 1331 and 1367 and it owes a "virtually unflagging obligation" to exercise that jurisdiction. *Colo. River*, 424 U.S. at 817–18. The court thus proceeds on to the merits of the summary-judgment issues, beginning with the summary-judgment facts.

## II. Background

Defendants jointly employed plaintiff. Doc. 208 at 3. Plaintiff began working at St. Catherine's Hospital starting in 2012. *Id.* at 2. He served as the Hospital's Chief Medical Officer from 2013 to June 2019. Doc. 165 at 3.

### *Pay Problems*

As the parties negotiated plaintiff's 2019 employment agreement, Centura became concerned that plaintiff's past compensation exceeded legal limits. *Id.* Centura told plaintiff it might claw back his compensation. *Id.* The Hospital's CEO defended plaintiff's pay vociferously, and called the thought of clawing back plaintiff's pay "preposterous, unethical and disastrous for physician relations in KS." Doc. 184-15 at 3. The CEO also called it "unconscionable to conceive of a fair model whereby [plaintiff] repays a dollar of his hard earned compensation." *Id.* Under plaintiff's new 2019 employment contract, he no longer served as Chief Medical Officer because Centura was so worried about compensation compliance. Doc. 183-20 at 16–17. Centura continued to try to claw back some of plaintiff's pay under the old contract.[1] *Id.* at 18. In December 2019, plaintiff's counsel sent Centura's in-

[1] Defendants dispute that Centura continued to try to claw back plaintiff's compensation. Doc. 224 at 1. Their effort falls short. The Hospital CEO testified that—to his recollection—after the new contract, Centura's legal department still tried to get plaintiff to pay back his earned compensation. Doc. 183-20 at 18.

house counsel a letter summarizing plaintiff's position about his past pay. Doc. 174-14. Ultimately, Centura didn't claw back any of plaintiff's pay. Doc. 173-9 at 3.

***Plaintiff Reports Kessler***

On August 30, 2019, plaintiff lodged a verbal complaint against his coworker, Dr. Kurt Kessler. Doc. 173-8 at 4. Plaintiff's verbal complaint alleged inappropriate behavior and sexual harassment. Doc. 174-15. The next day, August 31, plaintiff submitted a written complaint about Kessler to the Medical Staff President and Director of Quality. Doc. 165 at 3. As relevant here, plaintiff's written complaint made four complaints about Kessler.

**Gallbladder removals.** According to plaintiff, the laparoscopic approach is the gold standard for gallbladder surgery, and most competent surgeons convert the procedure to an open procedure less than 5% of the time. Doc. 174-16 at 2. But Kessler's conversion rate was "massively higher" than 5%. *Id.* Plaintiff acknowledged he didn't have specific numbers, nor did he know what Kessler was telling his patients. *Id.* Plaintiff got his information from traveling anesthetists and surgical department staff. *Id.* Plaintiff wrote, "My information comes from de-identified he[ar]say information from surgical department staff that approached me with concerns about Dr. Kessler during my time as CMO." *Id.* At his deposition, plaintiff testified that he learned of this issue from nurse anesthetists who would rotate in from other states and express their surprise at the high number of open procedures. Doc. 173-8 at 6. Plaintiff also learned about this issue through the operating-room schedule because Kessler would convert a laparoscopic procedure to an open procedure and the operating-room schedule would reflect that change. *Id.* at 7.

**ICU Patient Care.** According to plaintiff's written complaint, the nursing staff was "nearly uniformly concerned" about Kessler's ability to care for ICU patients. Doc. 174-16 at 3. The nurses had created a binder of Kessler events to document his poor care. *Id.* And the nurses

told plaintiff they were afraid to complain about Kessler through formal channels out of fear of retribution. *Id.* At his deposition, plaintiff explained that he told the nurses, after they had come to him repeatedly with complaints, to document their complaints, and the nurses put them into a binder. Doc. 173-8 at 9. Plaintiff testified that he saw the binder but never opened it. *Id.*

**Gloves.** Plaintiff alleged that Kessler had the nickname "dirty Kurtie" because of sexually explicit comments made to nurses and because Kessler didn't use gloves when performing sensitive exams. Doc. 174-16 at 3. Specifically, Kessler frequently performed "buttock and perianal exams with his bare hands." *Id.* Plaintiff saw a clinic patient who "switched surgeons because she was uncomfortable with [Kessler's] buttock examination with no gloves." *Id.* At his deposition, plaintiff confirmed that a patient told him that Kessler had "examined her butt without gloves." Doc. 183-6 at 30. Plaintiff called it "a very poorly kept secret that he didn't use gloves." *Id.* at 46–47.

**Complaints from others.** Emergency-rooms physicians had complained repeatedly—including via formal complaints—about Kessler's behavior and clinical care. Doc. 174-16 at 4. The medical director "backed up" the complaints made by the emergency-room physicians. *Id.*

***Kessler Investigation & Aftermath***

Dr. William Freund, president of the Hospital's Medical Executive Committee (the Committee), investigated plaintiff's complaint and found plaintiff's allegations about Kessler lacked merit. Doc. 208 at 3. But Freund's investigation left much to be desired.

Start with Freund's methods. Freund and Kessler were work friends. Doc. 183-20 at 32. Freund told Kessler about plaintiff's complaint and allowed Kessler to read the complaint. Doc. 183-15 at 6–7. Dr. Toni Green-Cheatwood, a Centura Vice President and Physician Executive, testified that disclosing the identity of a complainant to the subject of the complaint wasn't appropriate. Doc. 183-13 at 18. Freund also asked Kessler for a response, so Kessler pulled

medical records to review gallbladder-removal cases, and Kessler determined that his conversion rate from laparoscopic to open was about 5.6%. Doc. 183-15 at 8–11. Green-Cheatwood testified that to rely on a physician's review of his own cases wasn't an appropriate method of investigation. Doc. 183-13 at 6. And Freund testified that his usual practice is to "take notes all day," and he is "very detailed"—but he didn't take notes when investigating plaintiff's complaint. Doc. 183-11 at 19–21, 23.

Next, consider the substance of Freund's findings about Kessler. Freund testified that Kessler, during the investigation, admitted "that he sometimes was not as good about using gloves as he should be[.]" Doc. 183-11 at 6–7. Freund also located a folder with complaints from nurses, and that folder contained complaints about Kessler not wearing gloves. Doc. 174-1 at 5. Freund reviewed the nurses' complaints during his investigation and took control of the folder, but, ultimately, the folder was lost or destroyed.[2] Doc. 183-35 at 2. Another doctor confirmed "long-standing concerns" from nurses about Kessler's "hand hygiene" when assessing wounds and infected areas. Doc. 183-10 at 23–24. So, plaintiff's complaint—that nurses had complained about Kessler not wearing gloves—was accurate. *Id.* at 24. And a later investigation found that Kessler's rate of converting laparoscopic procedures to open procedures was "over 2.5 times the national benchmark." Doc. 174-57 at 25.

Nevertheless, at a September 2019 Committee meeting, Freund told the Committee that he'd investigated plaintiff's complaint about Kessler and found the allegations false. Doc. 184-23 at 3; Doc. 183-11 at 31; Doc. 174-20; Doc. 183-20 at 34–35. A follow-up email from one of

[2] Defendants claim Director of Quality Nancy Killion took control of the file, Doc. 183-35 at 2, but Killion testified to the contrary, asserting that no one ever gave her the file, Doc. 183-16 at 27–28. Freund, for his part, claimed that he took the manila folder and gave it to the president of the medical staff "just for him to have the documentation." Doc. 183-11 at 45. But the president of the medical staff testified he didn't know who had custody of the file. Doc. 183-19 at 31.

the doctors on the Committee expressed concern about "the irrational thought process that is displayed by [plaintiff] within the letter." Doc. 184-23 at 3.

In October 2019, plaintiff met with Hospital leadership, who informed him that his grievance was dismissed in its entirety. Doc. 183-6 at 49–50. Plaintiff testified that "it felt like a letdown . . . that such obvious quality issues were going to be swept under the rug." *Id.* at 52. Plaintiff also questioned the thoroughness of the investigation. *Id.* After the leadership meeting, plaintiff told Green-Cheatwood, "I presented very cogent and clear concerns. And the response was to ask if I am having stress issues. This dissuades any 'whistleblowing' activities significantly." Doc. 184-22 at 2.

In early January 2020, plaintiff received a letter from Freund. Doc. 174-24 at 2. Freund's letter demanded that plaintiff seek a psychological evaluation. *Id.* The letter justified this demand by citing plaintiff's insistence on the truth of his allegations against Kessler. *Id.* Plaintiff submitted a formal response to Freund's letter, calling it "tantamount to retaliation against a whistleblower." *Id.* at 3. Plaintiff re-iterated that he "absolutely" stood by his initial complaint. *Id.* at 4. And plaintiff specified that, for his "clinical allegations" about Kessler the complaint "was very clear that it is hearsay." *Id.*

### ***KBHA Complaint***

In late January 2020, the Kanas Board of Healing Arts notified plaintiff that someone had filed an anonymous complaint against him. Doc. 183-24 at 2. The anonymous KBHA complaint alleged that plaintiff had (i) pressured the Hospital CEO to disband the peer-review committee; (ii) given substandard patient care; and (iii) made false accusations against a fellow physician. *Id.* Plaintiff denied all of these charges. Doc. 174-29 at 1. According to the Hospital CEO, the "general perception" at the Hospital was that Kessler had made the anonymous complaint against

plaintiff. Doc. 183-20 at 38–39. And Kessler did so to retaliate against plaintiff for complaining about him. *Id.*

Green-Cheatwood and the Hospital's general counsel investigated the KBHA complaint. Their investigation also left much to be desired. No one interviewed plaintiff himself, even though doing so would've complied with human-resources best practices and the Hospital's standard procedures. Doc. 208 at 21. Interviewing plaintiff also would've provided answers to some unanswered questions. Green-Cheatwood claimed that she couldn't interview plaintiff because of scheduling difficulties and because plaintiff had hired counsel, but these difficulties didn't prevent her from coordinating schedules with other doctors or interviewing Kessler with his lawyer present. *Id.* One doctor testified that his interview was brief because he told investigators plaintiff was a good guy and a good doctor, but those weren't the answers the investigators were looking to find. *Id.* at 22. Investigators also blamed plaintiff for dropping the Hospital's peer-review program but, as discussed below, plaintiff neither interfered with nor dropped the peer-review program. *Id.* at 23 n.9. Ultimately, investigators never gave plaintiff the benefit of the doubt, relied only on evidence to plaintiff's detriment, and failed to interview key witnesses. *Id.* at 23. And so, a reasonable factfinder could find Green-Cheatwood and the general counsel's investigation biased and unfair. *Id.* at 24.

***Termination***

On February 12, 2020, after the questionable investigation, the Hospital terminated plaintiff's employment. Doc. 173-14 at 3. Nevertheless, plaintiff retained his medical-staff privilege to practice medicine at the Hospital. Doc. 173-5 at 24–25. Also on February 12, the Committee decided to convene a "special meeting" on February 14 to discuss whether to investigate plaintiff and what to do with plaintiff's medical-staff privileges during an investigation. Doc. 174-48 at 1.

On February 13, plaintiff's attorney wrote to the Hospital's general counsel that plaintiff no longer intended to continue practicing at the Hospital. Doc. 174-47 at 1. Plaintiff's attorney also offered that plaintiff would relinquish his medical-staff privileges subject to, as relevant here, two conditions:

(1) the Hospital agreed that defendants had terminated his employment without cause, and

(2) the Hospital and Committee "acknowledge and agree that this is a voluntary resignation of privileges and that [plaintiff] is a member in good standing of the Medical Staff, with no restrictions on his privileges at the time of his resignation and no pending Medical Staff investigations."

*Id.* at 1–2. Defendants and the Committee accepted plaintiff's conditions for resigning his medical-staff privileges. Doc. 174-49 at 1. Because plaintiff resigned his medical-staff privileges voluntarily, the Committee never launched the investigation contemplated during the February 12 special meeting. Doc. 173-7 at 13–14.

After plaintiff's termination, in September 2021, KBHA ultimately decided not to take any action on the Kessler-initiated complaint. Doc. 183-24 at 2. And it closed the case. *Id.*

***Was There a Pending Investigation?***

Plaintiff asserts that defendants falsely represented that there was no pending medical-staff investigation when they accepted his medical-staff-privileges resignation on February 13. Doc. 223 at 8. Understanding this assertion requires a brief detour through the Hospital's history of peer review.

In early January 2020, Centura staff set out to learn the status of peer review at the Hospital. Doc. 174-50 at 1–4. Centura's medical-staff-services manager responded that no peer-review committee existed at the Hospital. *Id.* at 1. This was a dubious statement. Director of Quality Nancy Killion—not plaintiff, despite what the anonymous complaint said—had recommended that the Committee dissolve the peer-review committee. Doc. 183-16 at 11–12.

After dissolution of the peer-review committee, the Committee itself performed peer-review functions. Doc. 183-20 at 19–20; *see also* Doc. 183-16 at 11. Indeed, the Hospital's risk-management plans, submitted to a state agency to comply with reporting requirements, documented that the Committee served as the peer-review committee. Doc. 183-16 at 15–18. Nevertheless, upon hearing no peer review occurred at the Hospital, a Quality Director with Centura, Morgan Thomas, worked with Green-Cheatwood "to do something quickly to get a process in place for peer review quickly[.]"[3] Doc. 173-15 at 10.

Thomas and Green-Cheatwood came up with a process "to do a retrospective 2-year review on all of the key quality indicators that lead to cases going to peer review[.]" *Id.* On January 29, 2020, Thomas emailed Green-Cheatwood a plan for peer review at the Hospital. Doc. 174-53. The plan would become effective upon "SCH/BW Board approval." *Id.* at 1. The plan called for review by two outside hospitals to ensure peer review for the Hospital "free of administrative interference." *Id.* And the peer-review plan would review cases for the past two years. *Id.*

---

[3] Plaintiff maintains that Thomas had "no reasonable basis for" concluding that peer review didn't occur at the Hospital. Doc. 223 at 10. Currently, plaintiff has the better of this dispute. Thomas testified that she was unaware that three administrators—Killion, the Hospital's CEO, and the Chief of the Medical Staff—had testified that plaintiff never interfered with the peer-review process. Doc. 183-21 at 25–26. Thomas's testimony about what Director of Quality Killion told her about peer review is difficult to follow; it makes little sense. *Id.* at 26–27. What's more, Thomas never talked to the Hospital's CEO about peer review, and she couldn't remember ever talking to the Chief of the Medical Staff about peer review. *Id.* at 27. Nor did she talk to plaintiff. *Id.*

Thomas also has a disconcerting habit (for litigation purposes anyway) of destroying her notes. *Id.* at 4–5. For example, Thomas took notes from a meeting with the Executive Director of Quality about peer review, but those "notes are long gone." *Id.* at 16–18. Thomas also wrote a report claiming that providers had difficulty getting cases reviewed, but her report doesn't reflect where she got this information. *Id.* at 20–22. True to form, she testified that she had destroyed her notes containing the particulars. *Id.* And Thomas claimed that "medical staff leadership" told her that plaintiff interfered with the peer-review committee. *Id.* at 23–24. But she couldn't remember who told her this, didn't remember what they said, and yet again had destroyed her notes. *Id.*

On February 10, 2020, Green-Cheatwood emailed a group of Centura administrators with "the action plan for peer review and items we need to prepare as we make decisions on action with [plaintiff]." Doc. 184-4 at 1. Green-Cheatwood noted that the Committee had "approved unanimously the plan for peer review." *Id.* The peer-review plan targeted plaintiff's cases specifically:

Action steps

1. Peer Review – Review process
   a. Dr. Byrnes cases
      i. Toni, Morgan and O'Re to conduct a review of cholecystectomies, thyroidectomies, and bowel resections as specifically mentioned as procedures of concern.
      ii. Cases that meet triggers will be submitted for peer review at PSF or SAH
      iii. All mortalities will be reviewed
      iv. Scoring at SAH and PSF to be done in accordance with the Centura system scoring and presented to SCH MEC and upheld
   b. Dr. Kessler cases
      i. Review cholecystectomies as conversion rate was cited as procedure of concern
      ii. Result of rate of conversion to be presented to SAH or PSF peer review for comment
   c. 2018-present
      i. All cases meeting triggers to be reviewed by O'Re. She will forward to SAH and PSF peer review those requiring case review by Dr. Stuckey with support from Toni and Morgan.
      ii. Scoring at SAH and PSF to be done in accordance with the Centura system scoring and presented to SCH MEC and upheld
   d. Given the increased burden on the SAH and PSF, extend PSF compensation model for the SAH peer review of SCH. Separate contract with SCH cost center (will be less costly than external peer review)

*Id.* at 2.

More than a week later, on February 18—days after plaintiff had relinquished his medical-staff privileges voluntarily—Green-Cheatwood circulated a revised version of the proposed peer-review plan. Doc. 174-54 at 1. Though the plan called for all cases from the last two years, it had special criteria as applied to plaintiff. *Id.* at 3. It called for all of plaintiff's cases from the past five years. *Id.* Here's the relevant part of Thomas and Green-Cheatwood's peer-review plan from February 18:

**Cases for external to SCH, but internal to Centura Peer Review to clean up the past...**

- All cases 2018 to present that meet any of the following:
  - Mortalities
  - Return to surgery
  - Readmissions
  - Serious safety events/Sentinel Events
  - PSI
- Dr. Kessler → laparoscopic to open conversation rate (2017-2019)
- Dr. Byrnes → 2015 forward from list above AND (all below are from the compliant)
  - Complications from abdominal surgeries
  - Mortalities
  - Cases listed by Board of Healing Arts
  - Unexpected Return to surgery
  - Patients d/c'ed NOT to home
  - Any cases called out during the investigation
  - 100% of patients in SCH's peer review policy

**Using SAH and PSF's MEC**

**For SAH**- for Byrnes, any Kessler cases, and other as needed by volume
**For PSF**- any cases from 2018 forward that meet criteria sans Byrnes' with volume equally distributed with SAH

*Id.* Though Green-Cheatwood's February 10 email mentioned that the Committee had approved the plan, as of February 18, approval work remained. In this February 18 email, Green-Cheatwood wrote, "[i]f we can get all approvals and contracts done as expeditiously as possible, we are planning for starting the actually case work ideally by March 9th." *Id.* at 2.

Ultimately, the Hospital, after completing the peer-review process, submitted four of plaintiff's cases to the KBHA. Doc. 208 at 31. The four cases weren't mandatory-reporting cases and defendants didn't give plaintiff an opportunity to respond before reporting. *Id.* at 31–32. The KBHA later closed the investigation into these four cases, concluding three of them met the standard of care. *Id.* at 34. And it declined to take any action on the fourth case. *Id.*

## III. Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*,

625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified

by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## IV. Analysis

Defendants move for summary judgment against all plaintiff's state-law claims. The court's analysis of the motion unfolds in this order. The court begins with plaintiff's state-law retaliation claim based on defendants terminating him after he had raised concerns about Kessler's medical care. He bases that retaliation claim on a Kansas statute, Kan. Stat. Ann. § 65-4928, and, alternatively, on Kansas common law. Next, the court considers plaintiff's retaliation claim alleging defendants terminated him after he had engaged in conduct protected by the Kansas Wage Payment Act. And last, the court concludes with plaintiff's three fraud-based legal theories of recovery. Plaintiff bases these fraud claims on defendants representing that no investigation was pending to induce plaintiff to resign his medical-staff privileges.

### A. Kan. Stat. Ann. § 65-4928 Retaliation

Plaintiff alleges that defendants retaliated against him for reporting Kessler's departures from the standard of care and in so doing violated the retaliation protections provided by Kan. Stat. Ann. § 65-4928. To understand this claim, start with some statutes.

Kansas law has a mandatory-reporting statute imposing a duty to disclose on healthcare providers, agents, and employees in certain circumstances. Kan. Stat. Ann. § 65-4923. Specifically, when a healthcare provider, agent, or employee "has knowledge that a health care provider has committed a reportable incident," that employee "shall report such knowledge." *Id.* § 65-4923(a). To have "knowledge" within the meaning of the mandatory-reporting statute, the person must have "familiarity because of direct involvement or observation of the incident." *Id.* § 65-4923(a)(4). And if the person makes such a report, Kansas law protects the person from employer retribution with an anti-retaliation provision: "No employer shall discharge or otherwise discriminate against any employee for making any report pursuant to" the mandatory-reporting statute. *Id.* § 65-4928(a). These Kansas statutes are "structured like many whistleblower statutes to prevent an employer from retaliating against an employee for reporting incidents the Kansas legislature wanted reported in the public interest." *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 540 (10th Cir. 1995).

Here, defendants argue that these laws don't protect plaintiff's complaint about Kessler. Doc. 215 at 18. The mandatory-reporting statute requires disclosure of a reportable incident when it's based on a person's knowledge. And knowledge, under the Kansas statute, means a person has "familiarity because of direct involvement or observation of the incident." § 65-4923(a)(4). Yet, according to defendants, plaintiff didn't base his complaints about Kessler on "direct involvement [with] or observation of the incident[s]." *Id.* Instead, he based his complaints "on hearsay, speculation, and conjecture." Doc. 215 at 19. In defendants' view, this means plaintiff didn't make a complaint under the mandatory-reporting statute, so the anti-retaliation provision doesn't apply. Defendants' argument focuses on the knowledge

requirement of the mandatory-reporting statute, but there's a factual dispute that undermines that approach.

There's a genuine dispute of material fact whether plaintiff had the requisite knowledge. The mandatory-reporting statute defines knowledge as "familiarity because of direct involvement or observation of the incident." § 65-4923(a)(4). Plaintiff treated one of Kessler's patients who—in the view of the summary-judgment facts—had switched doctors because she'd received substandard care from Kessler. Plaintiff also saw the operating-room schedule, which showed Kessler converting laparoscopic gallbladder removals to open procedures. Defendants struggle to reshape this fact into a strawman, claiming it can't show *observation*. Doc. 224 at 5. But a reasonable factfinder could conclude that this fact shows *direct involvement*. Nowhere do defendants tackle the definition of "direct involvement."

The court thus denies defendants' request for summary judgment against plaintiff's claim for retaliation under § 65-4928.[4]

**B. KWPA Retaliation**

Plaintiff also asserts that defendants retaliated against him for engaging in protected conduct under the Kansas Wage Payment Act. Doc. 165 at 18. In plaintiff's telling, defendants wrongfully attempted to claw back plaintiff's wages. Plaintiff then asserted his right to those wages, and defendants retaliated against him by firing him and taking "other adverse action against him." *Id.*

---

[4] Because the court concludes that § 65-4928 covers plaintiff's conduct, it needn't reach the parties' arguments about his alternative basis—a public-policy retaliation claim. *See* Doc. 223 at 28 (clarifying that plaintiff pleads his public-policy retaliation claim as an alternative to his § 65-4928 claim). *See also Sporleder v. U.S. Bancorp*, 2019 WL 3716453, at *2 (D. Kan. Aug. 7, 2019) ("[U]nder the adequate alternative remedy doctrine, if an adequate federal or state remedy is available, the public policy claim under Kansas common law is precluded.").

The Kansas Supreme Court has recognized a common-law tort available to plaintiffs who were fired for exercising their rights under the KWPA. *Campbell v. Husky Hogs, LLC*, 255 P.3d 1, 7 (Kan. 2011). "But a person can't be fired in retaliation for exercising rights under the Kansas Wage Payment Act unless the employee has given some indication that he or she is acting under its provisions." *Deeds v. Waddell & Reed Inv. Mgmt. Co.*, 280 P.3d 786, 789 (Kan. Ct. App. 2012). An employee doesn't need to file a wage claim under the KWPA to provide his employer with an "indication" that he's acting under the KWPA. *Id.* at 791–92. Rather, in the words of Kansas's Court of Appeals, a complaint must be "clear enough that the employer would understand that the employee is asserting rights protected by the" KWPA. *Id.* at 792.

Here, plaintiff claims defendants were on notice that he was asserting his KWPA-protected rights because of the December 2019 letter from his lawyer objecting to the prospect of clawing back plaintiff's compensation. Doc. 223 at 31. It's undisputed that the letter never mentions the KWPA. So, plaintiff's KWPA claim faces an uphill battle. Plaintiff cites the following sentence from his letter as evidence that defendants understood he was asserting the KWPA: "[Plaintiff] firmly believes that the compensation St. Catherine paid him during the Review Period was consistent with the value of the services he performed and that neither St. Catherine nor [plaintiff] violated any applicable law or otherwise engaged in any misconduct in connection with the Employment Agreement." Doc. 174-14 at 15. Was this "clear enough" that defendants would understand plaintiff was invoking the KWPA? It wasn't.

Consider the context of the letter. To comply with federal laws seeking to stamp out fraud and abuse in healthcare, defendants must watch for indicators that plaintiff was paid in excess of fair market value. Doc. 173-5 at 4. A third-party evaluator had flagged plaintiff's compensation as potentially excessive. *Id.* That's why defendants started this kerfuffle about

plaintiff's compensation. Plaintiff's letter disputed that his compensation was excessive, so it repeatedly emphasized that defendants hadn't violated any laws. Doc. 174-14 at 15.

No reasonable factfinder could conclude that a letter—which emphasizes defendants didn't violate any laws—placed defendants on notice that they had violated the KWPA. To be sure, plaintiff invoked his right to his compensation. But not every use of the word compensation invokes the KWPA. *See, e.g.*, *Deeds*, 280 P.3d at 792 (concluding plaintiff had failed to create triable issue that he'd raised KWPA where he complained about methodology for calculating compensation). A review of the letter demonstrates that plaintiff invoked his right to compensation under the employment agreement—not the KWPA. *See, e.g.*, Doc. 174-14 at 2 ("[Plaintiff] has engaged a valuation expert to review the compensation paid pursuant to the Employment Agreement[.]"); *id.* at 3–4 (describing circumstances of plaintiff signing the employment agreement at issue); *id.* at 11 ("[Plaintiff] maintains that the terms of the Employment Agreement were commercially reasonable and that the compensation St. Catherine paid [plaintiff] during the [relevant time period] was consistent with fair market value, and he does not believe that St. Catherine did anything illegal or improper in connection with the Employment Agreement."). A 15-page, lawyer-drafted letter that insists defendants haven't violated any laws and focuses solely on plaintiff's compensation under an employment agreement doesn't suffice. No reasonable jury could find that plaintiff put defendants on notice that plaintiff was claiming he's entitled to wages under the KWPA.

In sum, no reasonable factfinder could conclude that plaintiff's letter would put defendants on notice that plaintiff asserted his KWPA rights. Defendants thus deserve summary judgment against plaintiff's KWPA retaliation claim.

### C. Fraud, Fraud by Silence, & Promissory Estoppel

Recall that the parties, as a condition of plaintiff's resignation of his medical-staff privileges, agreed to the following: "St. Catherine and the Medical Staff's leaders acknowledge and agree that this is a voluntary resignation of privileges and that [plaintiff] is a member in good standing of the Medical Staff, with no restrictions on his privileges at the time of his resignation and no pending Medical Staff investigations." Doc. 174-47 at 1. Plaintiff alleges this statement was a lie since defendants knew that Green-Cheatwood and Thomas planned to investigate him when they made this representation. Based on these events, plaintiff brings three overlapping claims: (1) fraud, (2) fraud by silence, and (3) promissory estoppel. Doc. 165 at 18.

Plaintiff bases all three claims on the same set of facts. He alleges that defendants knew they were investigating plaintiff but claimed falsely that no investigation was pending. Based on the assurance that no investigation was pending, plaintiff asserts he resigned his medical-staff privileges. After he did so, defendants reviewed his cases—without giving him a chance to respond to their findings because he no longer was employed by defendants. And they submitted four of plaintiff's cases to the KBHA improperly.

Defendants argue that all three of these claims fail for the same reasons: (i) the investigators weren't investigating plaintiff, (ii) the investigation didn't become finalized or implemented until after plaintiff resigned, and (iii) the investigation wasn't a "Medical Staff" investigation. Doc. 215 at 27–31. Take these attacks one at a time.

Defendants first argue that uncontroverted summary-judgments facts show that Thomas and Green-Cheatwood weren't investigating plaintiff. It's true that Thomas and Green-Cheatwood had developed a comprehensive plan for reviewing *all* cases. But there is admissible evidence that their plan singled out plaintiff's cases and treated those cases differently from cases involving other physicians. And, for purposes of plaintiff's fraud claim, it doesn't matter why

Thomas and Green-Cheatwood singled out plaintiff's cases. All that matters is that they did so. A reasonable jury thus could conclude that Thomas and Green-Cheatwood's proposed review amount to an investigation of plaintiff, specifically.

Next, defendants raise a timing issue, claiming they couldn't have lied to plaintiff because their review didn't start until May 2020. It's undisputed that on February 13, 2020, when plaintiff resigned his medical-staff privileges, defendants hadn't implemented the review. But the wheels of their review already had started moving before that date. The email claiming the Hospital had no peer review, which triggered Thomas and Green-Cheatwood to develop this plan, was sent on January 2, 2020. Doc. 174-50 at 1. After that trigger, Thomas emailed Green-Cheatwood a proposed review plan on January 29. Doc. 174-53 at 1–2. As of January 29, that plan didn't single out plaintiff's cases. *Id.* And the January 29 plan explicitly noted that they needed various approvals to implement the plan. *Id.* at 1. On February 10—before plaintiff resigned—Green-Cheatwood emailed a plan targeting plaintiff's cases specifically. Doc. 184-4 at 1–2. And Green-Cheatwood's February 10 email explicitly stated that the Committee "has approved unanimously the plan for peer review." *Id.* at 1. So, before plaintiff resigned, the Committee had approved a review plan and it targeted plaintiff's cases.

Defendants emphasize a February 18 email—after plaintiff's resignation—from Green-Cheatwood that circulates a slightly different proposed plan. Doc. 174-54. Because the plan still was a proposed plan, defendants obviously hadn't implemented it yet. And Green-Cheatwood mentions that though the Committee has approved the peer-review plan, some approvals remained. *Id.* at 1–2. In defendants' view, this February 18 email demonstrates that no finalized, approved, or implemented plan existed until after plaintiff resigned.[5] But the condition

---

[5] Defendants assert that the "plan was not proposed, finalized, approved, or implemented until **after** [plaintiff] resigned his Medical Staff privileges." Doc. 215 at 28 (emphasis in original). As

of plaintiff's resignation wasn't a finalized, approved, or implemented investigation. Plaintiff resigned on the condition that there was no *pending* investigation. Viewed in the light most favorable to plaintiff, a reasonable jury could find that the summary-judgment facts—specifically, the February 10 email describing a Committee-approved investigation into plaintiff—showed a pending investigation into plaintiff. In contrast, a reasonable jury alternatively could find that there was no pending investigation on the operative date. But these alternative outcomes, both reasonable, demonstrate why the court can't grant summary judgment on this basis. The court thus rejects defendants' attempt to use bureaucratic approvals to avoid this outcome.

Finally, consider defendants' argument that Thomas and Green-Cheatwood weren't doing a "Medical Staff" investigation. According to defendants, Thomas and Green-Cheatwood developed a "Quality Review." Doc. 215 at 27. And the Quality Department is separate from the Medical Staff. To unpack this argument, the court undertakes the tedious task of examining the Hospital's bureaucracy.

Thomas and Green-Cheatwood developed a plan to implement a temporary peer-review system based on their dubious assumption that no peer review occurred at the Hospital. *See above* § II at 11–12. Thomas testified that at "Centura, peer review fell under the independent medical staff world and was run . . . by Medical Staff Services Department[.]" Doc. 173-15 at 3. The Medical Staff Services Department is "a department of the hospital that supports the independent medical staff." *Id.* And independent medical staff is governed by the Committee. *Id.* at 20. Thomas explained that peer review "did not run under Quality"—instead "Quality would support" peer review. *Id.* at 3.

---

demonstrated above, defendants' assertion that the plan wasn't proposed is obviously contradicted by the summary-judgment record.

It isn't indisputably clear that Thomas and Green-Cheatwood developed a "Quality Review" that remained strictly within the confines of the quality department. While defendants repeatedly refer to this endeavor as a "Quality Review" in their briefs, it's undisputed that Green-Cheatwood called the review "Peer Review" when she circulated the proposed process. Her February 10 email said, "Here is the action plan *for peer review* and the items we need to prepare as we make decisions on actions with [plaintiff]." Doc. 184-4 at 1. And, according to Thomas's testimony, peer review fell within the province of the medical staff. Doc. 173-15 at 3. So, a reasonable jury could conclude that the review was a peer review and, therefore, a medical-staff review.

There's another problem with defendants' claim that strict boundaries divided quality and medical staff. The review process—whether a quality review or peer review—involved a Committee member: Dr. Bryan Stucky, Vice President and later President of the Committee. Doc. 208 at 3. Stucky was involved heavily in the peer-review process and deciding which cases to take to the KBHA. *Id.* at 39. Indeed, Green-Cheatwood's February 10 email imagines a peer-review role for Stucky. Doc. 184-4 at 2. Because Stucky was a Committee member, and the Committee governs the medical staff, a reasonable factfinder thus could conclude that the investigation was a medical-staff investigation.

The court thus rejects defendants' arguments that the court properly can grant summary judgment against plaintiff's claims for fraud, fraud by silence, and promissory estoppel. Perhaps their arguments will persuade a jury. But that's not a reason to grant summary judgment against these claims. These claims survive.

## V. Conclusion

Defendants' Motion for Summary Judgment is granted in part and denied in part. The court orders the parties to submit three mutually agreeable trial dates that will conclude the trial

before March 31, 2027 to the court's chambers email account within 14 days of this Order. That joint email should also include an estimated length of trial. The court invokes Fed. R. Civ. P. 1 and directs the parties to confer about stipulations that will shorten the trial. The court anticipates that this trial will consume no more than five trial days. This estimate includes jury selection.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 213) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

**Dated this 30th day of September, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**